# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 3:06CR719 |
| Plaintiff, | Judge James G. Carr |
| Vs. | **SENTENCING MEMORANDUM** |
| **MARWAN OTHMAN EL-HINDI,** *et al.,* | Stephen D. Hartman (0074794) |
| | Kerger & Hartman LLC |
| | 33 South Michigan Street |
| Defendants. | Toledo, OH 43602 |
| | PH:  (419) 255-5990 |
| | Fax: (419) 255-5997 |
| | shartman@kergerlaw.com |
| | |
| | Charles M. Boss (0011436) |
| | Boss & Vitou Co., L.P.A. |
| | 111 W. Dudley Street |
| | Maumee, OH 43537 |
| | PH:  (419) 893-5555 |
| | Fax: (419) 893-2797 |
| | cboss@bossvitou.com |
| | |
| | A. Alek El-Kamhawy (0071845) |
| | Raslan, El Kamhawy & PLA, LLC |
| | Reserve Square Building |
| | 1700 East 13th Street, Ste. 3FE |
| | Cleveland, OH 44114 |
| | PH:  (216) 928-1500 |
| | Fax: (216) 928-1501 |
| | alek.kamhawy@gmail.com |
| | |
| | **ATTORNEYS FOR DEFENDANT MARWAN OTHMAN EL-HINDI** |

\* \* \* \* \*

Now comes Defendant Marwan El-Hindi, by and through counsel, and respectfully submits this memorandum in anticipation of sentencing.

## I.   INTRODUCTION

Now that the Federal Sentencing Guidelines are advisory, this Court enjoys both greater freedom and greater responsibility. No longer is the Court bound to make decisions based on a rigid analysis of guideline factors. Instead, this Court is required to consider all factors set forth in 18 U.S.C. 3553(a). This means that this Court is permitted and encouraged to consider evidence about Marwan El-Hindi's personal and family history, individual characteristics, and a far broader range of mitigating factors than was previously permitted under the guidelines.

Every sentence imposed in Federal Court must be "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). This is obviously the starting point for every sentencing decision. This memorandum will attempt to set forth Marwan El-Hindi's personal history and characteristics; a discussion regarding the seriousness of the offense, and its nature and circumstances; the need (or lack of need) to protect the public; Marwan El-Hindi's individual need for education, vocational training, or medical care; and the need to avoid any unwarranted disparity.

The Court has yet to determine the applicable guideline range for Marwan El-Hindi, but once it does, it must "give respectful consideration to the guidelines" in determining a sufficient sentence, *Kimbrough v. United States*, 128 S.Ct. 558, at 570, 169 L.Ed.2d 481 (2007). The Court may not presume that the guideline sentence is the correct one. *Rita v. United States*, 127 S.Ct. 2456, (2007). Nor is the Court bound by the "policy determinations" embedded in the guidelines. *Kimbrough v. United States*, 128 S.Ct. 558 (2007). After accurately calculating the advisory guideline range so that it "can derive whatever insight the guidelines have to offer," the district court "must sentence based on 18

U.S.C. § 3553(a) without any thumb on the scale favoring a guideline sentence." *United States v. Sachsenmaier*, 491 F.3d. 680, at 685 (7th Cir. 2007).

Since the Court has yet to determine the applicable guideline range for El-Hindi, it is not known whether that determination will contain a "departure". A guideline departure refers to the imposition of a sentence outside the advisory guideline range, or the assignment of a criminal history category, different than the one contemplated by the guidelines, to result in a sentence outside the advisory guideline range. U.S.S.G. § 1B1.1(E). Importantly, a departure results from a district court's application of a particular guidelines provision. *United States v. Smith*, 474 F.3d 888, 896(n)(3) (6th Cir. 2007).

Depending on the Court's determination on the Sentencing Guidelines, it is likely that El-Hindi will seek a "variance" from the advisory guideline range. A variance refers to the imposition of a sentence outside of the advisory guidelines range based on this Court's weighing of one or more of the sentencing factors of 18 U.S.C. § 3553(a). *United States v. Smith*, 474 F.3d 888 (6th Cir. 2007). And while it is certainly true that the same facts and analysis can, at times, be used jointly to justify a guidelines departure and a variance, the concepts are distinct.

## II.     18 U.S.C. § 3553 FACTORS

In sentencing a defendant, a district court must consider all of the factors set forth in 18 U.S.C. §3553(a). Those factors include:

>   (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
>   (2)  the need for the sentence imposed-
>      A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>      B. to afford adequate deterrence to criminal conduct;
>      C. to protect the public from further crimes of the defendant; and
>      D. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>   (3)  the kinds of sentences available;
>   (4)  the kinds of sentence and the sentencing range for-

      A. the applicable category of offense committed by the applicable category of defendant as set for in the guidelines…

…

(5)     any pertinent policy statement-

…

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

18 U.S.C. §3552(a)

Some of those factors need not be discussed at length here and/or will be addressed at the sentencing hearing. A number of the factors, however, are of particular import to the sentencing of Marwan El-Hindi.

**1.**    **Nature and Circumstances of the Offense and History and Characteristics of Marwan El-Hindi**

    **a.**    **Nature and Circumstances of the Offense**

Defendant El-Hindi is facing sentencing on two separate cases, having been convicted in a jury trial in case 3:06CR00719-002 and then later convicted of separate offenses in a trial to the Court in docket number 3:07CR00074-001. The Court is well aware of the offenses of conviction such that a recitation of the statutes is not necessary here.

Case no. 06-00719 was the "terrorism case," but in fashioning an appropriate sentence the Court should be mindful of the unique circumstances of that case, particularly with respect to El-Hindi. El-Hindi does not intend to re-litigate the case, but there are certain aspects of the case, and of El-Hindi's connection to the evidence and the other defendants, which should be considered in arriving at a just and fair sentence.

First of all, the Court should be mindful of the role that the Government's informant, Darren Griffin, played in connecting El-Hindi to the events that led to

conviction. There can be no debate about the fact that without Darren Griffin there would be no conspiracy. That is not to say that El-Hindi simply would not have been caught, but the fact is that without Griffin, none of the events that led to El-Hindi's conviction would have even happened.

Griffin spent nearly four years bringing up the concepts of violence and personal involvement in the Middle East conflict. The early recordings clearly indicate that El-Hindi did not show an interest in becoming involved, that his own purpose, in fact his "jihad," was to raise his children in the Muslim way. It is a fact, based on the evidence admitted at trial, that Griffin was the first to raise the idea of personal involvement to El-Hindi, and he did so all the way back in March, 2003. He spent the next three years trying to put together a group of people intent on getting involved in armed conflict. Griffin admitted on the stand that it was his decision (not the FBI's) to **create** a terrorism cell. He was not trying to find or join a cell, he was actually trying to put one together. It was in furtherance of that goal that he spent so much time and effort discussing his efforts with El-Hindi. Had Griffin not found the co-defendants and introduced them to El-Hindi, there never would have been any grounds on which to charge El-Hindi in a conspiracy.

El-Hindi did not ask for an entrapment instruction at trial. Of course, following his conviction he and his counsel regret that decision. Perhaps he would have been convicted even if the Court had given an entrapment instruction. Even if Griffin's conduct did not rise to entrapment as that is defined by the law, there is no doubt that with him this particular case would not have happened. We will never know what path El-Hindi would have taken had he not spent so much time with Darren Griffin, but the

Court should be mindful of Griffin's efforts and involvement and that should be an important factor in El-Hindi's sentencing.

Another important factor of the offense for El-Hindi concerns what he did not do during the course of events in this case. The Court is well aware, having sat through the trial and considered the many other pleadings in this case, of the ways in which El-Hindi did not get involved in Griffin's cell and did not take part in any planning or training. He did not ever express a desire to get personally involved in any conflict.

Finally, one of the most important circumstances of this offense, that should be a major factor in sentencing in this case, is that nothing was going to happen when law enforcement arrested El-Hindi and the other defendants. At the time the Indictment was unsealed, El-Hindi had virtually no contact with the co-defendants, and barely ever spoke to Griffin any longer. There was no plan at that time, no training, no goals and no cell. Whatever may have been the intention or interest of the various defendants in February, 2005, the ensuing year shows that nothing was going to materialize into any kind of violence. Any plan or conspiracy had all but been abandoned.

Here again, the fact that everyone had essentially given up whatever they had previously intended would not rise to the level of abandonment sufficient to avoid a conviction, but certainly it is an important factor at sentencing that El-Hindi had no criminal intent by time he was arrested. Not only was this not a situation in which a plot was thwarted just before an impending attack, but whatever criminal mindset may have existed at one time was, without the intervention of any law enforcement, given up prior to the time of arrest. The lack of a *mens rea* by the time an arrest took place is an important mitigating factor in measuring El-Hindi's culpability.

These are charges that sound in terrorism, and the evidence included images and concepts that are certainly associated with terrorism. However, the Court told each and every prospective juror, during the jury selection process, that this was not a traditional "terrorism case" as one would normally think of it. El-Hindi should not be sentenced as though it were.

b. **History and Characteristics of Marwan El-Hindi**

Marwan was born in Amman Jordan on February 23, 1963. He is 46 years old today. He was born into a Palestinian family. His family was a part of refugees displaced and transplanted from Palestine-Israel to Jordan after 1948 hostilities.

His father was a civil servant in Jordan for 16 years, working for the Jordanian Government as a Director of Human Services at Jordanian Economic Ministry overseeing financial matters related to security deposits. After being a civil servant for 16 years, his father retired from the Government and opened his own Export and Import Business. He passed in 2004. Marwan's mother is alive and well. She always was and is a homemaker.

Marwan was the oldest of seven siblings. Marwan has three sisters and three brothers. Education was very important for Marwan's parents. His sister Maha has an associate degree in Business Administration from Arab Community College in Amman, Joan. She lives in Amman, Jordan, and is married to an Agricultural Engineer. Together they are raising two boys. His brother Youssef is a neurosurgeon in Hungary, East Europe, who is married and has two daughters. Marwan's sister Manal has a Bachelors degree in Medical Technology from the University of Jordan. She is married to a doctor. They resides in Chicago, Illinois and are raising four kids. Another brother, Mohammed, has a Bachelor degree in Computer Science from University of Amman. He resides and

works in Dubai, United Arab Emirates, is married and is raising two girls. His brother Ahmed has a Bachelor degree in Business Administration from Arab Community College. He is married with three children. He is continuing his father's business. His sister Hind is currently working on her Ph.D. in Banking at the Amman University. She is raising two kids.

After he finished High School in 1982, Marwan attended Arab Community College in Amman, Jordan for a year and a half. He then applied and was admitted to Onondaga Community College in Syracuse, New York. He came to the United States on April 20, 1984 and attended classes in Business Administration and English as Second Language. He studied at Onondaga Community College on-and-off for two years, then transferred to Morrsville Community College, again in the suburbs of Syracuse, New York, where he attended courses related to Agricultural Engineering. He regrets that he never graduated and does not hold any advanced academic degrees.

Marwan met and married his first wife in Syracuse, New York in 1986. At the time, he attended and worked at the Islamic Society of Central New York, where he was a chef. Islamic Society of Central New York is a part of an organization known as Quaran and Sunnah Society ["QSS"]. QSS is an American Muslim organization with national presence and Mosques all over the United States. Marwan's responsibilities included cooking and arranging for dinners. During the Month of Ramadan (Muslim's Holy month, when Muslims are fasting from sun rise to sunset), Marwan was responsible for feeding close to six hundred people every night. In addition, Marwan started to try his hand in small business, with varying degrees of success in different ventures.

During that period, Marwan began growing his beard and dressing in traditional Islamic attire. Growing a beard and dressing that way is part of the Sunnah. The Sunnah is what prophet Mohammed and his followers adhered to.

Marwan became a naturalized US citizen in 1990. In 1991, he moved to Detroit, Michigan where he was promised a job managing a Restaurant.

In 1992, after separating and divorcing his first wife, Marwan married his second wife, Nadia Ibrahim. They have six children: daughters Fatima, Salwah, Sarah, and Nura, and sons Othman and Moawia, whose ages range from 6 to 15 years old.

Between 1992 and 2001, the family moved between Detroit, Syracuse, Chicago and Toledo, following Marwan's work and business opportunities. They finally settled in Toledo, Ohio in or around 2001. During this time Marwan worked at several restaurants, a travel agency, and engaged in a variety of small businesses, including import/export and wholesaling items such as candy and grocery bags. He always had aspirations to be successful in business ventures to provide for his family.

In 2003 Marwan and his brother Youssef opened EMSS. (European Medical Studies and Services). EMSS was a business engaged in recruiting American high school graduates to attend Medical Schools in Eastern Europe. EMSS worked with a similar but established company in Chicago, Illinois called Source America. Source America was run by Dr. Mark Kaushal, who worked closely with Marwan to their mutual benefit. From 2003 to 2006, EMSS grew to enroll approximately 30 students annually to attend Medical School at Comenius University, which has campuses in Bratislava and Martin, both in Slovakia. Simultaneously, Marwan steadfastly continued his small business

9

dealings cooperating and working with multitude of members of Toledo Arab/Islamic community and others.

In Toledo, Marwan attended Tawfiq Mosque on Monroe St. This Mosque is affiliated with QSS. He attended Quaran studies lead predominantly by African American Muslims. Marwan's children attended Toledo Islamic Academy, where Marwan's wife was a teacher. Toledo Islamic Academy is part of Sa'ad Foundation Mosque in Toledo.

In middle 2004, Marwan and his second wife separated, eventually going through a somewhat messy divorce. She moved back to her home country of Egypt, and Marwan found himself a single father raising six children. Overwhelmed with this responsibility, realizing that he could not raise his children alone, he followed the advice and invitation from an Egyptian friend he had met at a Mosque while in Egypt. Marwan traveled back to Egypt and married for a third time. His new wife, Marwa came back to the states with Marwan and helped him raise his children as her own. In 2005, she and Marwan welcomed their new daughter, Maria.

For the balance of 2005 and until this indictment in February of 2006, Marwan's life was centered on raising his children, providing for them, and helping his new wife to integrate into American society. He continued to pray at the Mosque at Monroe Street here in Toledo.

Marwan El-Hindi was arrested on February 19, 2006, and has been held continuously since that date in federal custody. He has been an exemplary federal inmate while in pretrial detention and subsequent to his conviction while awaiting sentencing. This is despite the fact that the Bureau of Prisons saw fit to treat El-Hindi, and his co-

defendants, with a heightened set of security protocols which, in the beginning of his detention, added to the difficulties inherent in any incarceration. Once the BOP realized that Marwan was not a special security risk or a problem inmate, it moved him into the general population at FDC Milan, where he is still housed.

**(2)** **the need for the sentence imposed-**

    **(A)** **to reflect the seriousness of the offense, to promote respect for the law, and to provide punishment for the offense;**
    **(B)** **to afford adequate deterrence to criminal conduct;**
    **(C)** **to protect the public from further crimes of the defendant; and**
    **(D)** **to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;**

The sentence imposed upon Marwan El-Hindi does not need to be long in order to reflect the seriousness of the offense, promote respect for the law and provide punishment. This is true, in part, because the offense did not include any attempt or action on Marwan's part, or anyone else's for that matter, to make any plan come to fruition. In fact, the offense here never got even as far as the planning stage, let alone to execution.

The seriousness of these types of offenses and the deterrence to others gets established, as it did in this case, by the publicity attendant the indictment and arrest. El-Hindi was not even arraigned when Alberto Gonzalez was on television announcing the arrests in what the government then called the first "home grown" terrorism case. The publicity waned, however, as it became clear that there was not much to report about this case. The reality of this case is that nothing happened, nothing was about to happen, and no one involved in the case was talking about making anything happen or even putting a plan together.

11

The seriousness of the offenses here, and therefore the need to deter others, pales in comparison to other terrorism cases, in which an actual plan is made or action is taken. This was not a traditional terrorism case, in that no one got killed, nothing got attacked, and there was no imminent danger to anyone.

These Defendants, especially El-Hindi, did not get stopped from doing anything. El-Hindi did not even have any contact with the co-Defendants when the arrests were made.

The government is certain to request that the Court impose a life sentence on each of these Defendants. In El-Hindi's case especially, however, such a sentence would be fundamentally unfair. The Court, in order to fairly address the seriousness of this offense, and the need to deter others, should examine the sentences of other "terrorism" cases.

**(6)** **The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[1]-**

People who get life sentences in terrorism cases are those who carry out a plan or are caught in some phase of the planning or execution. The people who carried out the 1993 World Trade Center bombing were sentenced to life sentences, as did Richard Reid, the so-called "shoe bomber." (CR-02-10013, COURT). Zacarias Moussaoui, the 20th 9/11 hijacker, and the people who planned and took steps to attack soldiers at Fort Dix.

Defendants in terrorism cases in which there was concrete planning, or even some execution of a plan, receive less that life sentences. John Walker Lindh, who trained at a camp and carried weapons against U.S. forces in Afghanistan, was sentenced to 20 years. The men who plotted to plant a bomb in a subway during the Republican convention in New York had inspected the station, drawn diagrams and consulted an engineer, and

---

[1] El-Hindi also adopts by reference as if fully stated herein the section of Amawi's Sentencing Memorandum entitled "Need to Avoid Unwarranted Sentencing Disparities," pp. 49-59

were sentenced the 30 years in prison. *U.S. v. Siraj,* 468 F.Supp.2d 408 (S.D.N.Y. 2007). Christopher Paul was a member of Al Qaeda. He fought in Afghanistan and Bosnia, and he conducted training sessions in a state park here in Ohio. He did far more than El-Hindi, and he received a 20 year sentence.

Fawzi Assi, who actually acquired night vision goggles and other things to deliver to Hezbollah, was recently sentenced to 10 years. *U.S. v. Assi,* 512 F.Supp.2d 1047 (E.D. Mich 2007). Nurabim Abdi, who had been to terrorist training camps, and plotted to blow up a shopping mall in Columbus, was sentenced to 10 years. *U.S. v. Abdi,* 463 F.3d 547 (6th Cir. 2006).

There is a distinction evidence in sentences handed down in the so-called "terrorism cases" that have been prosecuted in the last few years. Those who get life sentences are people caught in the act, or actively working to carry out a plan to commit violence.  These are people who made plans, took steps to bring those plans to fruition, and in some cases were caught in the execution of the plans, but they do not get sentenced to life in prison. El-Hindi does not deserve such a life sentence, and a life sentence is not necessary to reflect the seriousness of what he did, to promote respect for the law or to provide adequate deterrence to others.

In considering the issue of disparity of sentences, the Court should consider the plea agreements of Zubair and Khaleel Ahmed. They, too, went much further than El-Hindi ever did in their actions. These are two young men who (a) made contact with individuals on the internet who openly professed support of terrorists, (b) discussed with each other a plan to get involved in armed conflict, (c) acquired a license to own or carry a firearm, (d) put together the funds they needed to begin their travel to an eventual

terrorist training camp, (e) boarded a plane to fly to Egypt and meet a contact who would eventually get them to a training camp, and (f) met with their contact person in Egypt, who was, according to their plan, to help them achieve their goal of getting to a training camp.

For all of that conduct, the government has set the bar somewhere in the 9 to 11 year range with a plea agreement.

What the Ahmed cousins did was far more than El-Hindi did to achieve any goal, set a plan in place or take any action toward committing an act of violence. There is no dispute about why the Ahmeds went to Egypt, and there is no dispute that El-Hindi went there and brought them back. The trial evidence showed that, after the ICNA conference, when he heard what they would do, El-Hindi talked about putting Griffin and the Ahmeds together, but he never did so. Despite what he may have let the Ahmeds believe, or what he may have told them, El-Hindi did not facilitate a meeting after July 4 in Cleveland. Despite the number of times Griffin directly asked El-Hindi to bring the Ahmeds to meet him, or whatever El-Hindi might have said he would do, the fact is that Marwan had the Ahmeds here in Toledo on multiple occasions <u>after</u> the ICNA conference, but he never took them to meet Griffin.

What is a greater indicator of El-Hindi's intent, and on what basis should he be sentenced: his actions or his words? His words were enough to get him convicted, but in order to render a fair and just sentence, his actions, or the lack thereof, should matter more.

To impose on El-Hindi a sentence that is greater than that ultimately imposed on the Ahmed cousins would be fundamentally unfair given their relative conduct. It is true

14

that the government entered into a plea agreement with the Ahmeds, and therefore did not have to conduct another trial, but to give that substantial relative weight is akin to punishing El-Hindi for exercising his Constitutional right to trial.

### III. SENTENCING GUIDELINE ISSUES

Since court has yet to make a determination of the advisory Guideline range, and the applicability of the "terrorism enhancement" of U.S.S.G. §3A1.4, Defendant El-Hindi will reserve argument on the need to apply either a "variance" or "departure " from the Sentencing Guidelines.

In the event that the court does hold that El-Hindi qualifies for the "terrorism enhancement" under U.S.S.G. §3A1.4 he will be urging the court to exercise it's considerable discretion and grant both a downward departure and a variance as was done in *U.S. v. Benkahla*, 530 F.3d 300,( 4th Cir. 2008). The court in *Benkahala* determined that the "terrorism enhancement" was required under a strict reading of the guidelines. "But the court thought the case called for a downward departure under §4A1.3 or (in the alternative) a variance under 18 U.S.C. § 3553(a). "Sabri Benkahla is not a terrorist," the court stated. *Benkahla,* 501 F. Supp.2d at 759." *Benkahala,* id. at 305-306. As in *Benkahla,* El-Hindi is not a terrorist.

El-Hindi's detailed argument about the proper Guideline calculation and the application of the 3A1.4 enhancement was set forth in his objections to the final Presentence Investigation Report, and therefore will not be restated here. Counsel respectfully requests, however, that the Court consider those arguments as though fully set forth in this Sentencing Memorandum for purposes of the sentencing hearing and for the record.

IV. **WITNESS LIST**

    A. The following witnesses may be presented at the time of sentencing:

1) Yousef El-Hindi

2) Manal El-Hindi

3) Fatima El-Hindi

4) Salwah El-Hindi

5) Dr. Mark Kaushal

6) Ashraf Zaim

7) Osama Ala-Waheeby

V. **CONCLUSION**

Wherefore, Defendant Marwan El-Hindi respectfully requests that this court impose a minimally-sufficient sentence to achieve the statutory purposes of punishment- justice, deterrence, incapacitation, and rehabilitation- by imposing a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

                                          Respectfully submitted,

                                          KERGER & HARTMAN, LLC

                                          /s/ Stephen D. Hartman
                                          By: STEPHEN D. HARTMAN
                                               Attorney for Defendant
                                               Marwan Othman El-Hindi

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this Sentencing Memorandum was filed electronically this 5th day of October, 2009. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

        Respectfully submitted,

        KERGER & HARTMAN, LLC

        /s/   Stephen D. Hartman
        By:  STEPHEN D. HARTMAN
             Attorney for Defendant
             Marwan Othman El-Hindi