```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION

 3   UNITED STATES OF AMERICA,    - Docket No. 3:06-CR-719
                                  -
 4       Plaintiff,               - Toledo, Ohio
                                  - October 21, 2009
 5           v.                   - Sentencing
                                  -
 6   MARWAN EL-HINDI, et al.,     -
                                  -
 7       Defendants.              -
     -------------------------------

 8
                        TRANSCRIPT OF SENTENCING
 9            BEFORE THE HONORABLE JAMES G. CARR
              UNITED STATES DISTRICT CHIEF JUDGE
10
     APPEARANCES:
11
     For the Plaintiffs:  United States Attorneys' Office
12                        By:     Thomas E. Getz
                              Justin E. Herdman
13                        801 Superior Avenue, W
                          Cleveland, OH 44113
14                        (216) 622-3840

15                        U.S. Department of Justice
                          By:  Jerome J. Teresinski
16                             David I. Miller
                          10th & Constitution Ave, NW
17                        Washington, DC 20530
                          (202) 353-3464
18
                          Office of the U.S. Attorney- Austin
19                        By:  Gregg N. Sofer
                          816 Congress Avenue
20                        Austin, TX 78701
                          (512) 916-5858
21

22

23

24

25
```

```
 1   For the Defendant Amawi: Office of the Federal Public
                              Defender - Cleveland
 2                            By:  Amy B. Cleary
                                   Jonathan P. Witmer-Rich
 3                                 Edward G. Bryan
                                   Timothy C. Ivey
 4                            750 Skylight Office Tower
                              1660 West Second St.
 5                            Cleveland, OH 44113
                              (216) 522-4856
 6
                              Muawad & Muawad
 7                            By:  Elias Muawad
                              36700 Woodward Avenue, Suite 209
 8                            Bloomfield Hills, MI 48304
                              (248) 594-4700
 9
     For the Defendant        Kerger & Kerger
10   El-Hindi:                By:  Stephen D. Hartman
                              Suite 201
11                            33 South Michigan Street
                              Toledo, OH 43602
12                            (419) 255-5990

13                            Boss & Vitou
                              By:  Charles M. Boss
14                            111 West Dudley Street
                              Maumee, OH 43537-2140
15                            (419) 893-5555

16                            Raslan, El-Kamhawy & Pla
                              By:  Alek H. El-Kamhawy
17                            Suite 3FE, 1700 East 13 Street
                              Cleveland, OH 44114
18                            (216) 928-1500

19   For the Defendant        David L. Doughten
     Mazloum:                 4403 St. Clair Avenue
20                            Cleveland, OH 44103-1125
                              (216) 361-1112
21
                              Helmick & Hoolahan
22                            By:  Jeffrey J. Helmick
                              2nd Floor
23                            1119 Adams Street
                              Toledo, OH 43624-1508
24                            (419) 243-3800

25
```

```
 1                                Mohammed Abdrabboh
                                  1620 Ford Avenue
 2                                Wyandotte, MI 48192
                                  (734) 283-8405
 3
        Court Reporter:           Tracy L. Spore, RMR, CRR
 4                                1716 Spielbusch Avenue
                                  Toledo, Ohio 43624
 5                                (419) 243-3607

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
        Proceedings recorded by mechanical stenography,
24      transcript produced by notereading.

25
```

| | | |
|---|---|---|
| 10:52:16 | 1 | (Commenced at 10:48 a.m.) |
| 10:52:16 | 2 | THE CLERK:  3:06-719, United States v. |
| 10:52:23 | 3 | Marwan El-Hindi.   Matter called for sentencing. |
| 10:52:25 | 4 | THE COURT:  The record should show the |
| 10:52:26 | 5 | defendant is present in court with his attorneys, Mr. |
| 10:52:29 | 6 | Charles Boss and Mr. Steve Hartman.   The government is |
| 10:52:32 | 7 | represented by Mr. Tom Getz and Mr. Justin Herdman |
| 10:52:37 | 8 | and -- |
| 10:52:37 | 9 | MR. BROWN:  Duncan Brown for the United |
| 10:52:41 | 10 | States. |
| 10:52:41 | 11 | THE COURT:  And Mr. Sofer and Mr. |
| 10:52:44 | 12 | Teresinski. |
| 10:52:44 | 13 | MR. SOFER:  Good morning, Your Honor. |
| 10:52:48 | 14 | THE COURT:  Mr. Herdman, I understand you'll |
| 10:52:54 | 15 | be -- you have received and reviewed the presentence |
| 10:52:57 | 16 | report? |
| 10:53:06 | 17 | MR. GETZ:  Your Honor, Tom Getz.   I'll be |
| 10:53:08 | 18 | representing the government in the sentencing for Mr. |
| 10:53:10 | 19 | El-Hindi. |
| 10:53:10 | 20 | THE COURT:  I misunderstood.   Have you |
| 10:53:12 | 21 | received and reviewed the presentence report? |
| 10:53:14 | 22 | MR. GETZ:  We have, Your Honor.   Any |
| 10:53:15 | 23 | objections that we have have been forwarded to the |
| 10:53:18 | 24 | probation department.   I believe they've all been |
| 10:53:20 | 25 | resolved. |

| | | |
|---|---|---|
| 10:53:21 | 1 | THE COURT:  And Mr. Boss and Mr. Hartman, |
| 10:53:23 | 2 | have you received and reviewed the presentence report? |
| 10:53:27 | 3 | MR. HARTMAN:  We have, Your Honor. |
| 10:53:28 | 4 | THE COURT:  Mr. El-Hindi, have you read the |
| 10:53:33 | 5 | presentence report? |
| 10:53:37 | 6 | THE DEFENDANT:  Yes, I have. |
| 10:53:38 | 7 | THE COURT:  Did you understand what it says |
| 10:53:40 | 8 | and what it means? |
| 10:53:41 | 9 | THE DEFENDANT:  Yes, I did. |
| 10:53:42 | 10 | THE COURT:  And are you satisfied that your |
| 10:53:46 | 11 | attorneys have taken enough time to go over the report |
| 10:53:49 | 12 | with you and discuss it with you and to answer any |
| 10:53:53 | 13 | questions about it that you may have had? |
| 10:53:57 | 14 | THE DEFENDANT:  Yes, they did. |
| 10:53:58 | 15 | THE COURT:  And are you prepared to proceed |
| 10:54:00 | 16 | with sentencing this morning? |
| 10:54:02 | 17 | THE DEFENDANT:  Yes, I am. |
| 10:54:04 | 18 | THE COURT:  And are you confident that your |
| 10:54:06 | 19 | attorneys are also prepared to proceed with sentencing |
| 10:54:09 | 20 | as well? |
| 10:54:10 | 21 | THE DEFENDANT:  I hope so. |
| 10:54:12 | 22 | THE COURT:  But more than hope. |
| 10:54:15 | 23 | THE DEFENDANT:  Yes. |
| 10:54:16 | 24 | THE COURT:  They're as ready to go as you |
| 10:54:18 | 25 | think they can be? |

10:54:19    1              THE DEFENDANT:  Yes.

10:54:20    2              THE COURT:  Mr. Getz?

10:54:21    3              MR. GETZ:  Thank you, Your Honor.   Your

10:54:32    4    Honor, the government is aware of some time constraints.

10:54:36    5              THE COURT:  I apologize.   I'm all set.

10:54:56    6              MR. GETZ:  Thank you, Your Honor.   As I

10:54:59    7    say, we are aware, cognizant there are some time

10:55:03    8    constraints here.  We're also aware from the Court's

10:55:05    9    comments that the Court has reviewed the parties'

10:55:09   10    sentencing memoranda.   So --

10:55:11   11              THE COURT:  Just for the record, there are

10:55:13   12    no outstanding objections by either party.

10:55:16   13              MR. GETZ:  None from the government, Your

10:55:17   14    Honor.

10:55:17   15              MR. HARTMAN:  We have no additional

10:55:19   16    objections.  We would renew all those that we previously

10:55:22   17    submitted.

10:55:22   18              THE COURT:  Of course.   I'm going to make

10:55:24   19    the same decision on the loose end about criminal

10:55:28   20    history on this defendant as well.   I'll simply accept

10:55:32   21    the criminal history as computed in the guidelines.

10:55:40   22              MR. GETZ:  For this sentencing hearing,

10:55:42   23    because I know that the Court is aware of the positions

10:55:45   24    the government has taken in its memorandum, I'm not

10:55:48   25    going to be playing a lot of links or a lot of clips,

10:55:55    1    but maybe one or two if necessary.    However, I would

10:55:57    2    ask the Court that if at any time in any of the items

10:56:01    3    that I make reference to the Court would like to take

10:56:04    4    time to see the link from our memorandum or see that

10:56:08    5    item of evidence, I would ask the Court to please so

10:56:11    6    advise, and we'll make sure that we bring it up.

10:56:14    7                 THE COURT:  Of course.

10:56:15    8                 MR. GETZ:  I believe that the Court will

10:56:16    9    recall most of these that I'm going to be referencing.

10:56:20   10                 I do also have some items that I will be --

10:56:24   11    five or six items I'll be showing the Court during the

10:56:28   12    course of my remarks.    However, I would like to say

10:56:31   13    that because the presentation might be somewhat shorter

10:56:34   14    than the presentation the government made in the Amawi

10:56:36   15    sentencing, I would not want the Court to conclude from

10:56:46   16    that shorter presentation that the government is in any

10:56:49   17    way making any concession that this defendant is any

10:56:52   18    less dangerous or that his crimes are any less serious

10:56:55   19    than Mr. Amawi or Mr. Mazloum.

10:56:57   20                 THE COURT:  I understand that.

10:57:00   21                 MR. GETZ:  This defendant is convicted --

10:57:02   22                 THE COURT:  Certainly.    To the extent that

10:57:04   23    you think in the course of making sort of a prefatory or

10:57:07   24    what I consider to be sort of generally applicable

10:57:11   25    remarks, if there's something that occurs to you that

10:57:16  1   you haven't already mentioned in the course of these

10:57:20  2   proceedings, you say, Judge, wait a minute, with regard

10:57:23  3   to this defendant, that's not quite so; by all means,

10:57:29  4   let's not cast the stone.  You're more than welcome to

10:57:37  5   say, Judge, you said earlier this, but you really should

10:57:41  6   be thinking that.  So certainly whatever objections you

10:57:50  7   make along the way are deemed applicable to this as

10:57:54  8   well.  Go ahead.

10:57:55  9              MR. GETZ:  As the Court is aware, in the --

10:57:59  10  what we'll refer to as the terrorism case, this

10:58:02  11  defendant, of course, was convicted of the same serious

10:58:04  12  offenses as his co-defendant, Mr. Amawi.  He also was

10:58:09  13  found guilty by this Court in a fraud-related offense,

10:58:15  14  fraud-related offenses in a separate trial.  These

10:58:17  15  involve defendant's activity, as the Court will recall,

10:58:20  16  in forming an alleged nonprofit corporation in his

10:58:23  17  mother's name and then using the shell of that

10:58:26  18  corporation after altering the name a little bit to

10:58:29  19  apply for a government grant based on additional false

10:58:33  20  representations.

10:58:34  21             Now, I know it's not necessary for us to

10:58:36  22  revisit all the facts of that case.  It wasn't a

10:58:39  23  lengthy trial.  But there are a few facts that are

10:58:43  24  pertinent to the defendant's character and

10:58:45  25  characteristics of all of his offenses that come out of

10:58:48  1    that.   So I want to start there.   First of all, I

10:58:51  2    think it's important to note that that activity had

10:58:53  3    nothing at all to do with Darren Griffin.   It was prior

10:58:57  4    to his involvement with Darren Griffin.   It also had

10:59:00  5    nothing to do with any federal undercover investigation.

10:59:03  6    The defendant devised and carried out this scheme on his

10:59:07  7    own prior to any involvement with Darren Griffin or the

10:59:09  8    federal government.

10:59:11  9            First, to carry it out and discreet himself,

10:59:16 10    he used his mother's identification.   Also the Court

10:59:18 11    will recall the testimony of the defendant's second

10:59:21 12    wife, Nadia El-Hindi, that after the defendant obtained

10:59:25 13    the government grant funds, he used her name without her

10:59:28 14    knowledge and consent on the check so he could divert

10:59:32 15    funds to his own use.   One of the exhibits, Your Honor,

10:59:35 16    in the trial, as the Court will recall --

10:59:40 17            THE COURT:   I suppose technically that's a

10:59:45 18    forgery if she was the payee and he signed her name.

10:59:52 19            MR. GETZ:  Yes, Your Honor.   And I would

10:59:55 20    remind the Court that I don't know if there was any

10:59:57 21    evidence that he was the person who signed her name to

10:59:59 22    it, but we do know that he was the person who negotiated

11:00:03 23    the check, and we also know he was the person who

11:00:05 24    controlled this particular account.

11:00:08 25            THE COURT:   Also doing so was necessary to

11:00:10  1   accomplish the objectives of the fraud, which was to

11:00:13  2   stick money in his pocket.

11:00:15  3           MR. GETZ:  That's correct, Your Honor.

11:00:17  4   That was in the trial that was case Number 3:07-CR-074.

11:00:24  5   That was Exhibit Number 10C.  And I would suggest to

11:00:40  6   the Court that the manner which he carried out this

11:00:43  7   scheme says much more about him than just that he's a

11:00:46  8   con man and a thief.  It's an indication of the extent

11:00:49  9   to which he is a user and a manipulator.

11:00:52  10          Further illustrations of that was from Count

11:00:55  11  9 of the indictment and what we'll call the terrorism

11:00:59  12  case.  That was a count that was severed from that case

11:01:03  13  in that trial, and later we also had that dismissed

11:01:06  14  after the convictions.  But that was another fraudulent

11:01:10  15  scheme that was devised by this defendant.  However,

11:01:13  16  this one did involve Darren Griffin.  And Darren

11:01:16  17  Griffin was involved in this because the defendant

11:01:20  18  solicited Darren Griffin to participate in this

11:01:23  19  particular fraud.  What he did was he specifically

11:01:26  20  asked Darren Griffin to and used Darren Griffin and his

11:01:32  21  own youngest children to defraud the government, to

11:01:35  22  cheat the government by having Griffin falsely claim to

11:01:38  23  be the child care provider for his two youngest

11:01:41  24  children.  And on February 11, the defendant had Darren

11:01:46  25  Griffin sign a letter to that effect given to the Lucas

11:01:50  1  Metropolitan Housing Authority that falsely claimed that

11:01:54  2  the defendant was paying Darren Griffin $175 per week to

11:01:59  3  watch his two youngest children.  I have that letter

11:02:04  4  signed by Darren Griffin marked as government's

11:02:09  5  sentencing Exhibit Number 1.  I would ask that to be

11:02:14  6  admitted for purposes of this sentencing hearing, Your

11:02:17  7  Honor.

11:02:17  8          THE COURT:  Any objection?

11:02:22  9          MR. HARTMAN:  Yeah, I object; it's not

11:02:24  10  authenticated.

11:02:25  11          THE COURT:  Overruled.  Any reason to

11:02:27  12  believe it's not true and accurate, a true and correct

11:02:30  13  and accurate copy of what it purports to be?

11:02:32  14          MR. HARTMAN:  Well, only that we have no way

11:02:36  15  of knowing if that's Mr. Griffin's signature.  I don't

11:02:40  16  know who signed this.

11:02:43  17          THE COURT:  I don't see any reason to doubt

11:02:45  18  its authenticity.  If some reason develops, call it to

11:02:49  19  my attention, and I'll act accordingly.  In any event,

11:02:53  20  this is a sentencing proceeding.  The rules of evidence

11:02:56  21  don't technically apply according to my understanding.

11:03:00  22  Your objection is noted.

11:03:02  23          MR. GETZ:  Let me mention to the Court,

11:03:03  24  you'll note on the letter it is stamped "received and

11:03:06  25  initialed," stamped received on February 17, 2004.  So

11:03:11  1    about six days after the date on the letter by Lucas

11:03:15  2    Metropolitan Housing Authority.   In addition --

11:03:19  3                  THE COURT:  That's okay.

11:03:21  4                  MR. GETZ:  Well, Your Honor, I have some

11:03:23  5    additional exhibits that are pertinent to this

11:03:25  6    particular letter and the point I want to make.  One of

11:03:28  7    them is what I'll mark as Government Sentencing Exhibit

11:03:33  8    Number 2, and also Sentencing Exhibit Number 3.   These

11:03:35  9    are documents from the Lucas Metropolitan Housing

11:03:40  10   Authority.  I will add, Your Honor, for the record these

11:03:42  11   documents were provided on discovery to defense some

11:03:46  12   time ago.   And these would have been pertinent to Count

11:03:52  13   9 had that count proceeded to trial.  What those

11:04:01  14   documents show is that as a result of the claim of --

11:04:09  15   the false claim of child care being provided, the net

11:04:13  16   result of that was -- not only was the defendant

11:04:15  17   obtaining free rent, but he actually received a monthly

11:04:21  18   stipend of $64 a month, which is represented in the

11:04:28  19   adjusted tenant rent as a negative $64.  You'll note on

11:04:31  20   both of these documents the defendant's signature

11:04:34  21   appears.

11:04:35  22                  And turning the Court's attention

11:04:40  23   specifically to Government 2, you'll note in the box on

11:04:43  24   the top left-hand side it says "allowances."   There's

11:04:47  25   an annual child care expense allowance of $9,100.  And I

11:04:53  1    think the Court will find that multiplying $175, as

11:04:57  2    represented in the letter, by 52 weeks, you will find

11:05:01  3    that is $9,100.  So this letter was, in fact, used in

11:05:06  4    order for the defendant to obtain a benefit and again

11:05:10  5    cheat the government, not only using Darren Griffin as

11:05:13  6    an accomplice, but using his own two youngest children

11:05:16  7    as the basis for that claim.

11:05:22  8            So it's clear from the defendant's fraud

11:05:25  9    schemes that he uses others to further his goals.  But

11:05:28  10   the use and manipulation of other individuals is not

11:05:30  11   just limited to his fraud activities; the defendant has

11:05:34  12   used his position and his recognition as a mentor, a

11:05:38  13   religious elder to the younger Muslims and other

11:05:45  14   associates that he's come into contact with as

11:05:49  15   demonstrated, and as I'll point out to the Court, and

11:05:53  16   particularly to share and spread his expressed hatred

11:05:57  17   for Israel and his anger at the United States for

11:06:00  18   supporting Israel.

11:06:03  19           In September there was evidence from the

11:06:05  20   trial testimony of Darren Griffin that in September of

11:06:09  21   2002, so very early on in their relationship, and prior

11:06:13  22   to the beginning of the Iraq war, the defendant asked

11:06:16  23   Griffin about kidnapping Israeli soldiers and U.S.

11:06:21  24   politicians.  We reference that in our memo on page 37.

11:06:31  25           THE COURT:  That was before Amawi was in the

| | | |
|---|---|---|
| 11:06:33 | 1 | picture; am I correct? |
| 11:06:34 | 2 | MR. GETZ:  I'm sorry, Your Honor? |
| 11:06:35 | 3 | THE COURT:  That was before Amawi was in the |
| 11:06:37 | 4 | picture? |
| 11:06:37 | 5 | MR. GETZ:  That would be correct, Your |
| 11:06:44 | 6 | Honor. |
| 11:06:44 | 7 | THE COURT:  What was the context of that? |
| 11:06:52 | 8 | Do you recall?  What was the setting for that |
| 11:06:54 | 9 | conversation? |
| 11:06:59 | 10 | MR. GETZ:  Let me confer. |
| 11:07:01 | 11 | (Discussion had off the record.) |
| 11:07:01 | 12 | THE COURT:  What was sort of the occasion |
| 11:07:03 | 13 | that brought that about? |
| 11:07:06 | 14 | MR. GETZ:  Well, Your Honor, it was in |
| 11:07:07 | 15 | September of 2002, just prior to the beginning of the |
| 11:07:11 | 16 | war.  We can pull up the exact date. |
| 11:07:19 | 17 | THE COURT:  And they can interrupt and tell |
| 11:07:21 | 18 | me -- |
| 11:07:21 | 19 | MR. GETZ:  Your Honor, again, I would |
| 11:07:22 | 20 | reference that this was from testimony of Darren |
| 11:07:26 | 21 | Griffin.  I'm not certain if this is a recorded |
| 11:07:29 | 22 | conversation. |
| 11:07:30 | 23 | THE COURT:  That's okay. |
| 11:07:33 | 24 | MR. GETZ:  In response to some of the |
| 11:07:35 | 25 | concerns of the Court expressed during the earlier |

11:07:37  1    sentencing hearing, I would just like to remind the

11:07:41  2    Court that the evidence showed that the defendant

11:07:45  3    continued to upgrade his computer video and amass his

11:07:50  4    own personal jihad library as this investigation

11:07:56  5    continued.   And we showed from the evidence that as

11:07:59  6    late as January 2 of 2006, so roughly a month, slightly

11:08:04  7    less than a month and a half before his arrest, he was

11:08:10  8    still accumulating documents and saving them.    In

11:08:14  9    addition, we know from the evidence that the defendant

11:08:16  10   totally independent of Darren Griffin was already

11:08:18  11   registered on the Ekhlaas forum.   And our memo again --

11:08:24  12              THE COURT:  Can you spell that for Tracy,

11:08:26  13   please?

11:08:26  14              MR. GETZ:  Yes, Your Honor.  That's

11:08:30  15   E-K-H-L-A-S-S.

11:08:33  16              MR. HERDMAN:  E-K-H-L-A-A-S.

11:08:45  17              MR. GETZ:  On that site, as the evidence

11:08:47  18   shows and we make reference in our memorandum on page 46

11:08:51  19   and 47, the defendant posted a number of violent and

11:08:54  20   hateful statements.  One of them, for example, is asking

11:08:58  21   God to kill Jews and Americans, and he also repeatedly

11:09:03  22   proclaimed in postings that, "I am a terrorist."

11:09:07  23              In addition, on the following page, 48 and

11:09:10  24   49 of our memo --

11:09:13  25              MR. BOSS:  Your Honor, could we have that

11:09:15  1   site again, please?

11:09:16  2            MR. GETZ:  The link's in our memorandum, and

11:09:19  3   the descriptions are on pages 46 and 47 of our

11:09:24  4   sentencing memo.

11:09:26  5            MR. BOSS:  Can you tell us what the evidence

11:09:27  6   was specifically?

11:09:29  7            MR. HARTMAN:  There was no evidence of that

11:09:30  8   that came out at trial.

11:09:34  9            MR. HERDMAN:  That's true.  Well, it's

11:09:36  10  quite extensive in our memo.  There's a whole paragraph

11:09:39  11  devoted to this.  I could walk the Court and counsel

11:09:42  12  through it if you gave me a minute.  It's pretty simple

11:09:45  13  the way that we were able to determine this.  With the

11:09:49  14  indulgence of the Court, I can do so.

11:09:52  15            THE COURT:  Go ahead.  You said 46 and 47,

11:09:56  16  Mr. Getz, or 36 and 37?  You may have a different

11:10:03  17  version of it because I created an Adobe format.  The

11:10:08  18  pagination may be off a little bit.

11:10:09  19            I've got it.

11:10:11  20            MR. HERDMAN:  Your Honor, I'm sure you

11:10:14  21  remember the testimony from Evan Kohlmann related to --

11:10:19  22            THE COURT:  I do.  And nature of whatever

11:10:21  23  you call it, web page forum.

11:10:25  24            MR. HERDMAN:  I'm sure you remember the

11:10:27  25  testimony from Evan Kohlmann; he had the entire page

11:10:32  1    from Ekhlaas.   You remember all the testimony about

11:10:34  2    cookies that came in.   There was a cookie -- I see

11:10:42  3    Tracy smiling, before lunch.

11:10:44  4                    THE COURT:  Still is.

11:10:45  5                    MR. HARTMAN:  This, I have to object because

11:10:47  6    we need -- we have to have expert testimony.  We didn't

11:10:50  7    have a chance to have an expert to refute the testimony.

11:10:55  8    This is beyond what we can just determine.

11:10:57  9                    THE COURT:  Well, I'm going to overrule that

11:10:59  10   for two reasons.   Number one, at least the document was

11:11:07  11   filed October 5.   Basically Mr. Herdman is putting some

11:11:14  12   legs underneath these paragraphs.   And had he thought

11:11:19  13   you needed that, you could and should have asked him for

11:11:23  14   it.   And once again, sentencing tends to be somewhat of

11:11:28  15   an evidentiary free-for-all.   I try to be attentive to

11:11:32  16   the rules of evidence, but I'm going to let him

11:11:38  17   continue.   And I do remember pretty vividly Mr.

11:11:42  18   Kohlmann's testimony about what this Ekhlaas site was

11:11:49  19   all about.

11:11:50  20                   MR. HERDMAN:  I would point out for the

11:11:51  21   record, Your Honor --

11:11:52  22                   THE COURT:  Again, Mr. Hartman, in the

11:11:54  23   course of post-sentencing, post-trial work you find out

11:11:58  24   that the government has affirmatively misstated

11:12:03  25   something, then file the appropriate papers.

11:12:07  1          MR. HARTMAN:  For the record, my objection

11:12:11  2    about an expert was that I think they need an expert to

11:12:13  3    establish this material.   Just referring to what Mr.

11:12:19  4    Kohlmann's report was and saying that they looked at the

11:12:22  5    computer information I don't think is specific.   This

11:12:26  6    was highly technical stuff that came out in the trial in

11:12:31  7    terms of the website evidence.   And I think it takes

11:12:36  8    expertise to trace the postings, and I think it takes

11:12:41  9    expertise beyond what the government has.

11:12:43  10          MR. HERDMAN:  And, Your Honor, to the extent

11:12:45  11   that any expert witness provided a foundation for this,

11:12:48  12   it was provided through the testimony of Joe Corrigan

11:12:52  13   who testified to this particular cookie in his

11:12:56  14   testimony.   In that cookie there's data that

11:12:59  15   establishes a user ID.   Really what Evan Kohlmann's

11:13:03  16   expert report is is really just fact testimony is that

11:13:05  17   he took that user ID 4343, he ran it through an archive,

11:13:11  18   and he came up with all of the postings that were made a

11:13:15  19   user named Al Philistine, which was using user ID 4343.

11:13:20  20   Some of those posts were -- one of them in particular

11:13:23  21   was a response to a bulletin board entry that said, Here

11:13:29  22   is a link to a video showing manufactured rockets and an

11:13:35  23   attack on a U.S. base in Iraq.   And to that further

11:13:39  24   down in the bulletin board, Al Philistine, which the

11:13:42  25   government contends is Marwan El-Hindi, responded,

11:13:44  1  essentially:  Yes, this is great that you did this.

11:13:49  2  May God kill Jews and Americans.

11:13:52  3          THE COURT:  I'm going to overrule the

11:13:53  4  objection.  I think the foundation was laid during the

11:13:58  5  course of the trial, and you may continue.  And I just

11:14:02  6  can't recall whether this was ever referenced or came in

11:14:08  7  during the trial, but in any event, I'll take it under

11:14:11  8  consideration.

11:14:12  9          MR. GETZ:  In addition, Your Honor will

11:14:13  10 recall the slide show, the placement of the IED that was

11:14:20  11 the subject of one of the explosives.

11:14:22  12         THE COURT:  Is that the roadside, Mr. Getz?

11:14:25  13 Is that the roadside, kind of the little hillside or

11:14:29  14 whatever?

11:14:30  15         MR. GETZ:  That's correct, Your Honor.   A

11:14:32  16 series of photographs showing --

11:14:34  17         THE COURT:  I remember it.

11:14:35  18         MR. GETZ:  I would remind the Court that

11:14:37  19 that was a slide show that was obtained by this

11:14:39  20 defendant as a result of his membership on a particular

11:14:41  21 e-mail list, which was the Islamic Army of Iraq e-mail

11:14:46  22 list.  Again, something that he had joined, had signed

11:14:48  23 up for and had become a member of totally independent of

11:14:52  24 Darren Griffin.  And as you will also recall from the

11:14:58  25 trial evidence --

|         |    |                                                            |
|---------|----|------------------------------------------------------------|
| 11:15:00 | 1  | THE COURT:  Was that the one that showed --                |
| 11:15:05 | 2  | maybe it was a different one -- an artillery shell and     |
| 11:15:08 | 3  | how you could wire up an artillery shell?                  |
| 11:15:12 | 4  | MR. GETZ:  Your Honor, we can bring this up.               |
| 11:15:16 | 5  | MR. HERDMAN:  Would you like to review the                 |
| 11:15:17 | 6  | exhibit?  I can pull it up.                                 |
| 11:15:19 | 7  | THE COURT:  I just can't recall.                           |
| 11:15:21 | 8  | MR. HERDMAN:  It did depict what appears to                |
| 11:15:24 | 9  | be an artillery shell.                                      |
| 11:15:26 | 10 | MR. GETZ:  Ultimately as part of that slide               |
| 11:15:28 | 11 | show there was also a close-up photograph of the device,   |
| 11:15:33 | 12 | and I think parts were labeled and so forth.               |
| 11:15:36 | 13 | THE COURT:  I think that's what I'm                        |
| 11:15:38 | 14 | recalling.  Can I ask you this:  Does the record show      |
| 11:15:41 | 15 | or are you able to represent the period of time that he    |
| 11:15:47 | 16 | was on that e-mail list?  In other words, how long, for    |
| 11:15:52 | 17 | what period of time he would have been getting whatever    |
| 11:15:55 | 18 | it is they were sending out?                                |
| 11:15:58 | 19 | MR. GETZ:  I'm not sure that we're able to                |
| 11:16:00 | 20 | show or have evidence of when he became a member.          |
| 11:16:04 | 21 | MR. HERDMAN:  Your Honor, what I can do is I               |
| 11:16:08 | 22 | know there were -- it would be impossible for us to        |
| 11:16:11 | 23 | establish when he signed up for it.  But there would be    |
| 11:16:15 | 24 | some discrete dates where he received mailings from        |
| 11:16:19 | 25 | them.  I could try to get those right now.                 |

11:16:21  1           THE COURT:  That's fine.   If you would,

11:16:23  2  please.   Again, I think it will make a difference

11:16:26  3  whether somehow he got an e-mail and opened it up and so

11:16:30  4  forth, or opened it up rather than trashing it.

11:16:36  5  Whatever.

11:16:37  6           MR. GETZ:  Correct, Your Honor.  The key

11:16:38  7  point here is to remember rather than just opening up by

11:16:42  8  accident, seeing what it was and saying, I don't want

11:16:45  9  this, and getting rid of it, he sent it to Darren

11:16:47  10 Griffin.   And as the Court may recall from the

11:16:49  11 evidence, they also had a discussion where the defendant

11:16:53  12 was asking Darren Griffin where he could get those

11:16:55  13 batteries, those kinds of batteries that were used in

11:16:58  14 the device.

11:17:03  15           There's also computer evidence from the

11:17:05  16 defendant's computer that showed that the defendant was

11:17:08  17 viewing the video about the black powder as late as

11:17:13  18 November of 2005.   One of the things I would like to

11:17:18  19 point out for the Court, the Court has talked about how

11:17:23  20 it believes a cookie cutter approach to sentencing is

11:17:28  21 not appropriate, that these defendants need to be looked

11:17:30  22 at individually.   And the government agrees.   And we

11:17:33  23 think that the defendants in this case didn't all fit

11:17:38  24 the same role, the same position, have the same, in a

11:17:43  25 sense, responsibility.

11:17:44   1            THE COURT:  Culpability, the same

11:17:47   2   culpability.

11:17:49   3            MR. GETZ:  To some extent, Your Honor, but I

11:17:50   4   think what I'd like the Court to focus on really is what

11:17:53   5   was their role or position in the activities that were

11:17:56   6   going on.   What was the group dynamics here?  I think

11:18:01   7   it's important to note that the defendant, this

11:18:03   8   defendant was in his 40s during the course of this

11:18:05   9   conspiracy.   He was actually old enough to be the

11:18:09  10   father to the four co-conspirators in this case.   I

11:18:13  11   think it becomes clear from the evidence that he did not

11:18:16  12   view his role, nor, I'm sure, that anybody else viewed

11:18:20  13   his role as being a battlefield warrior himself.   His

11:18:24  14   role and the role that he carried out was to recruit, to

11:18:30  15   encourage and to facilitate the participation of

11:18:34  16   protégés.   You'll recall, in fact, the trial testimony

11:18:37  17   of Mikaeil Almozrouei.

11:18:40  18            THE COURT:  Maybe a little slower.

11:18:46  19            MR. GETZ:  There was a witness, Mikaeil

11:18:50  20   Almozrouei, who testified that the defendant had

11:18:52  21   approached him and a group of other younger men after a

11:18:56  22   religious service and asked if he was interested in

11:19:01  23   attending a training camp in Afghanistan.   The Court

11:19:04  24   has already indicated he's well aware of the defendant's

11:19:09  25   recruitment of Khaleel and Zubair Ahmed during this

11:19:14   1    conspiracy.   As a reminder, Government's Exhibit 5, a

11:19:17   2    photograph taken of the defendant and the Ahmeds in

11:19:25   3    Cairo.   And I think that says something about his

11:19:32   4    relationship and his role.

11:19:36   5              The defendant clearly knew what their

11:19:38   6    purpose was when they traveled to Egypt, that they were

11:19:41   7    there to meet up with a mujahidin facilitator or someone

11:19:45   8    who could help them get to either a training camp or

11:19:48   9    ultimately onto the battlefield to kill American troops.

11:19:51  10    It's also clear from the evidence that he knew Griffin

11:19:55  11    to be an extremist or jihadist, even referred to him as

11:20:00  12    a jihadi on one particular occasion.

11:20:07  13              THE COURT:   It's hard not to know that the

11:20:10  14    way Griffin was holding himself out, the role Griffin

11:20:15  15    was playing.   I think perhaps more significantly, I

11:20:21  16    used the flypaper metaphor yesterday, that's what drew

11:20:25  17    others to Griffin, because they knew him as a source for

11:20:28  18    getting, quote, "training," close quote, and otherwise

11:20:31  19    facilitating or putting into action going forward with

11:20:35  20    what it was they were talking about.

11:20:36  21              MR. GETZ:   Exactly the point, Your Honor.

11:20:38  22    Obviously the Ahmeds held themselves out to him as being

11:20:45  23    jihadists.   And so he immediately -- he wasted no time

11:20:50  24    putting those parties together.   The evidence showed

11:20:54  25    that he brought them up to Darren Griffin almost

11:20:59  1  immediately upon his return from Egypt without any

11:21:02  2  prompting.   On June 29, 2004, this is a week before he

11:21:07  3  brought them to the ICNA conference in Cleveland, he

11:21:12  4  again brought them up to Darren Griffin.   At one point

11:21:15  5  he even told Darren that the Ahmeds wanted to be

11:21:18  6  professional snipers.

11:21:21  7          We know from the evidence the defendant also

11:21:24  8  knew or should have surmised the interest of Zubair's

11:21:29  9  younger sister, Yasmin Ahmed, in sniping.   She was one

11:21:34  10  of the students that was recruited to go to medical

11:21:37  11  school.   In fact, I think the evidence may be she was

11:21:40  12  the first student that was recruited through the EMSS

11:21:44  13  Corporation.

11:21:45  14          THE COURT:  Whose sister was she?   I know

11:21:48  15  it's there.   I know I've heard it.

11:21:50  16          MR. GETZ:  This is Zubair Ahmed's younger

11:21:53  17  sister.

11:21:56  18          The e-mail address she used and the identity

11:22:00  19  she used was Knife Sniper.   And this is, of course, an

11:22:05  20  e-mail that she used in communication with the

11:22:08  21  defendant, so he would have seen that.

11:22:10  22          Now, defendant continued to pursue the

11:22:13  23  Ahmeds even after introducing them to Griffin.   The

11:22:15  24  evidence showed he pushed or pressed Darren Griffin to

11:22:20  25  copy training materials onto CDs that they could take to

11:22:24  1    the Ahmeds in Chicago when he felt that they weren't as

11:22:28  2    involved as he wanted them to be.   They hadn't at least

11:22:31  3    come to Toledo to train with them.   He suggested

11:22:34  4    calling Zubair to ask him, and actually what he states

11:22:38  5    on the recording is what he wants to tell Zubair is:

11:22:41  6    Zubair, Zubair, here's what's going on; are you with us

11:22:45  7    or not?   And I think the key phrase that he uses is,

11:22:52  8    "Are you with us or not?"  Obviously he's not referring

11:22:55  9    to Zubair and Khaleel at that time because that's who

11:22:58  10   he's talking to.   Who is the "us"?  Well, clearly it's

11:23:01  11   the group that he associates himself with, which is

11:23:04  12   Darren Griffin, Mohammad Amawi, and Wassim Mazloum.

11:23:11  13        The Court may recall the first meeting

11:23:13  14   between the defendant and Amawi which was video recorded

11:23:15  15   and shown at trial was at Amawi's apartment.   This was

11:23:19  16   in early February of 2005.   During that meeting they

11:23:24  17   viewed and discussed violent jihadist videos and

11:23:27  18   websites while actually watching them in Amawi's bedroom

11:23:32  19   on his computer.   Much of the discussion that took

11:23:35  20   place, was recorded, was in Arabic, which, of course,

11:23:37  21   excluded Darren Griffin, who didn't speak that language.

11:23:41  22   And yet from this very --

11:23:42  23        THE COURT:  In other words, I gather the

11:23:45  24   point you're making is they may have just met, but they

11:23:48  25   rather quickly began manifesting what I referred to

11:23:53  1   earlier as a joint predisposition.

11:23:55  2           MR. GETZ:  Yes, Your Honor.  So quickly at

11:23:57  3   that meeting the defendant invites Amawi to come to his

11:24:00  4   home.  And, in fact, it's less than two weeks later

11:24:06  5   that the defendant, in fact, hosts the entire group on

11:24:12  6   February 16, 2005.  Obviously the Court is well aware

11:24:16  7   of that meeting.  He hosts them in his home.  That's

11:24:19  8   in the presence of his children, Your Honor.  The Court

11:24:21  9   may recall the video that was shown, a fairly lengthy

11:24:26  10  video of that meeting.

11:24:27  11          THE COURT:  I do.

11:24:28  12          MR. GETZ:  Government's Exhibit 6.

11:24:31  13          THE COURT:  At least one child in the living

11:24:34  14  room or whatever.

11:24:37  15          MR. GETZ:  That would be just to remind the

11:24:41  16  Court of many of the scenes that we saw in that video

11:24:44  17  where the defendant's younger children are present

11:24:47  18  sitting there throughout listening to these discussions.

11:24:55  19  The substance of those discussions and the substance of

11:24:57  20  that meeting actually the Court accurately described in

11:25:02  21  its earlier opinion and order when it denied the

11:25:05  22  defendant's motion for an acquittal after the trial.

11:25:13  23          If I have the Court's indulgence, I would

11:25:15  24  like to read briefly from the Court's order just to

11:25:18  25  remind the Court of how it perceived that meeting.  The

11:25:23  1  Court stated on page 5 of its opinion and order that the

11:25:26  2  evidence confirming the existence of agreement between

11:25:30  3  El-Hindi, Amawi, and Mazloum to obtain training to

11:25:36  4  prepare for overseas jihad arose during the course of a

11:25:40  5  supper meeting video recorded by Griffin at El-Hindi's

11:25:44  6  residence on February 16, 2005.  Shortly after Griffin

11:25:50  7  arrived, El-Hindi described a website being

11:25:52  8  reconstructed as a source for jihadist videos.  Griffin

11:25:57  9  asked Mazloum if he had seen the Al-Ansar website --

11:26:08  10  THE COURT:  A little slower, Mr. Getz.  I

11:26:11  11  know I told you guys I want to get this done today.

11:26:14  12  But go ahead.

11:26:16  13  MR. GETZ:  -- which Griffin touted as,

11:26:18  14  quote, a good website.  We're getting a lot of

11:26:23  15  information on there.  And after the brothers of the

11:26:28  16  Mujahidin, they're sending videos of their operations

11:26:35  17  and everything too.  Really good.  It's really good.

11:26:40  18  End of quote.

11:26:43  19  Later on page 6 the Court writes, "Later

11:26:48  20  during the meeting El-Hindi commented about fear on the

11:26:53  21  part of U.S. military personnel of snipers.  This was

11:27:00  22  followed by a discussion between El-Hindi, Amawi, and

11:27:06  23  Mazloum in Arabic about a jihadist video of the

11:27:13  24  beheading of an Egyptian traitor.  This in turn was

11:27:19  25  followed by viewing via El-Hindi's computer of online

11:27:26　1　jihadist videos."

11:27:32　2　　　　　THE COURT:  That's a summary of the February

11:27:34　3　16 session.

11:27:37　4　　　　　MR. GETZ:  Correct, Your Honor.  I just

11:27:39　5　wanted to remind the Court of the Court's perception and

11:27:41　6　its recollection of that particular meeting on February

11:27:44　7　16, and again remind the Court that during that meeting,

11:27:48　8　including that discussion of the beheading of the

11:27:51　9　Egyptian and other discussions, much of which again were

11:27:56　10　in Arabic, which excluded only Griffin, not the

11:27:59　11　defendant's children or any of the other -- the

11:28:04　12　defendant or his co-conspirators.

11:28:14　13　　　　　In addition you might recall during that

11:28:16　14　meeting when there was a discussion about what the

11:28:18　15　mujahidin need the most.  And Amawi and Mazloum are

11:28:22　16　talking about money, the mujahidin need money, and it's

11:28:26　17　this defendant that asserts and pushes the idea that,

11:28:30　18　No, what the mujahidin need is manpower.  Now, if this

11:28:35　19　defendant was looking for a way to scam someone into

11:28:40　20　turning some money over to him, this was the perfect

11:28:44　21　opportunity.  And I believe the Court knows from the

11:28:46　22　evidence in both of these cases that when this defendant

11:28:48　23　sees an opportunity to make some money, he's pretty

11:28:52　24　quick to jump on it.  He didn't jump on that one.  He

11:28:55　25　didn't say, Yeah, you're right; they need money; let's

11:28:57  1    find some ways to raise some funds, and I'll take charge
11:29:01  2    of that.   He says, No, what they need is manpower.
11:29:04  3    He's encouraging them to prepare themselves and train
11:29:07  4    themselves to assist in the cause.
11:29:13  5             THE COURT:  What we need or what they need
11:29:15  6    is manpower?
11:29:16  7             MR. GETZ:  They're talking about what the
11:29:18  8    mujahidin need.
11:29:19  9             THE COURT:  So he said rather than "we" but
11:29:21  10   "they"?
11:29:22  11            MR. GETZ:  What they need.
11:29:24  12            THE COURT:  That's fine.
11:29:28  13            MR. GETZ:  I would also assert, Your Honor,
11:29:29  14   the defendant didn't limit his family's involvement in
11:29:32  15   these activities to just his children.   There's also
11:29:34  16   trial evidence that included instances where the
11:29:38  17   defendant spoke of his -- of encouraging his new young
11:29:42  18   wife to also view videos of beheadings and battlefield
11:29:46  19   deaths.   There are at least four links in our
11:29:49  20   memorandum; in my copy it's on page 48.   I apologize
11:29:54  21   for not knowing what page it is on the Court's copy.
11:29:57  22   But those links are there if the Court would want to
11:29:59  23   review them.
11:30:09  24            Also I think the Court had pointed this out
11:30:11  25   at some earlier point, when Darren Griffin is explaining

11:30:15  1    what his purpose is in training and that his goals and

11:30:19  2    objectives are, making it very clear that this is

11:30:22  3    training for jihad, the defendant clearly responds to

11:30:26  4    that, "I understand."   So there's no question he knew

11:30:32  5    what kind of training was being talked about and what

11:30:35  6    these individuals were working to prepare themselves

11:30:40  7    for.

11:30:40  8             Now, the defendant was in a position to and

11:30:43  9    was able to mold and manipulate these younger

11:30:46  10   individuals because the evidence showed he was respected

11:30:49  11   as a religious elder.   The evidence shows Amawi

11:30:53  12   referred to him as sheik.   You'll hear testimony from

11:30:57  13   Dr. Kaushal that the defendant was well respected around

11:31:01  14   the country as a religious leader.   You'll also hear

11:31:06  15   that Yasmin Ahmed, again Zubair's younger sister, told

11:31:11  16   Kaushal that the defendant was teaching her to become a

11:31:13  17   complete Muslim woman.

11:31:19  18             We learned at the defendant's bond hearing

11:31:21  19   that he had been assisting at some point, and I mean at

11:31:25  20   the Toledo area corrections facility; you'll hear again

11:31:28  21   testimony from Dr. Kaushal that the defendant was

11:31:31  22   converting inmates to Islam.   Now, there's nothing

11:31:35  23   wrong with sharing your religious beliefs.   The

11:31:38  24   government isn't making that contention.   The

11:31:40  25   importance of the activity is, again, though, that it

11:31:42  1   shows the defendant has this leadership role and purpose

11:31:47  2   in his activities.

11:31:49  3          Now, all that, Your Honor, demonstrates why

11:31:51  4   a sentence of life is specified by the sentencing

11:31:55  5   guidelines and is requested and recommended by the

11:31:58  6   government, is necessary to protect the public from this

11:32:01  7   particular defendant.

11:32:02  8          THE COURT:  I gather what you're saying, in

11:32:04  9   reciting some of those activities, that he's accustomed

11:32:08  10  to working with younger individuals and providing a

11:32:11  11  sense of guidance?

11:32:12  12         MR. GETZ:  Correct, Your Honor.  And when

11:32:13  13  you're looking to find activities by this defendant as

11:32:17  14  to going out at a shooting range, for example, or

11:32:20  15  running through the woods playing paint ball, or

11:32:24  16  collecting weapons and explosives to use at some later

11:32:28  17  date, that wasn't his role.  And it was clear from the

11:32:30  18  evidence, it's clear from his activities, it's clear

11:32:33  19  from who he is and how he behaves, that that was not his

11:32:37  20  role.  Now, one of his roles is he expressed to the

11:32:40  21  group at one of the meetings was to be a fund raiser.

11:32:44  22  I'm the guy that can get you to the grants, and we can

11:32:47  23  use that.  But in addition, it's very clear that these

11:32:51  24  individuals looked up to him, respected him as an elder

11:32:54  25  both because of his age, but also because of his

11:32:57  1   religious devoutness and his ideology.  So I would

11:33:06  2   submit to the Court he may have been bordering on too

11:33:10  3   advanced an age to be on the battlefield himself at 42,

11:33:14  4   43, 44, 45, but the evidence has showed that he wasn't

11:33:20  5   too old to recruit, which he did, to encourage these

11:33:25  6   recruits, to offer his support to them, to attempt to

11:33:29  7   facilitate their activities, to motivate them and to

11:33:32  8   mentor them.  And, Your Honor, he won't be too old to

11:33:35  9   do that at 55 years old.  He won't be too old to do

11:33:39  10  that at 65 years old.  And he won't even be too old to

11:33:43  11  do that at 75 years old.  We know the defendant is

11:33:48  12  steadfast in his ideology.

11:33:52  13        THE COURT:  What you're saying is that's the

11:33:54  14  kind of material support that one quite literally never

11:34:05  15  outgrows.

11:34:07  16        MR. GETZ:  Correct, Your Honor, the only

11:34:09  17  sentence that will successfully deter the defendant and

11:34:11  18  protect the public from his future crime, that includes

11:34:15  19  his incessant thievery, that's something the public also

11:34:22  20  needs to be protected from, and we feel the only

11:34:25  21  successful deterrence is a life sentence.  He's shown

11:34:29  22  no hesitance to indoctrinate even his younger children

11:34:32  23  in his hateful and extremist beliefs.

11:34:35  24        THE COURT:  Well, whether he indoctrinated

11:34:37  25  or exposed them, the report shows he certainly exposed

them.

MR. GETZ:  Your Honor, this is a man who admittedly had a happy childhood.  He was given an opportunity to enter into this country as a young man. He was able to start businesses.  He was able to obtain an education, raise a large family, relocate from city to city, freely practice his religion, and ultimately become a full-fledged citizen of this country.  And yet his response is to recruit other younger hate-filled men and try to assist them in acquiring the training and resources they need the to kill American soldiers.

A man who not only allows but encourages his young children and wife to view violent beheadings and battlefield deaths, lest they grew up not as consumed as he is with bloodlust for Jews and U.S. soldiers. That's the kind of man that this is, Your Honor.

I believe the two pictures, Government's Exhibit 5 and Government's Exhibit 6, say it all.  The photo of the defendant with his two charges in Egypt, and the photo of the meeting in his own home with his young children there participating, hearing, listening to everything that goes on.  That's three generations of hate, Your Honor, that are represented in those photographs, or at least potentially.

I don't know, I probably don't need to

11:36:35  1    remind the Court since it came up earlier today of the

11:36:38  2    evidence that showed the phone contacts and the

11:36:42  3    communications that continued between this defendant and

11:36:45  4    co-conspirators.  As we indicated, there were even calls

11:36:53  5    on the satellite phone as late as two weeks before the

11:36:57  6    arrest.  So again, as we indicate, we don't know what

11:37:00  7    the substance of those calls were.  But the evidence

11:37:03  8    does show that there was communication that was going

11:37:05  9    on.  I believe that there was trial evidence that

11:37:10  10   showed -- that charted out the number of telephone

11:37:14  11   communications between all of the defendants.  This is

11:37:28  12   a chart that was taken from government trial exhibits.

11:37:32  13   We showed this at trial.

11:37:43  14        THE COURT:  For the record, do you recall

11:37:46  15   what exhibit number it is?

11:37:48  16        MR. HERDMAN:  It was in summation, a

11:37:51  17   demonstrative exhibit.

11:37:53  18        THE COURT:  I understand.

11:37:54  19        MR. GETZ:  These show the total number of

11:37:56  20   phone contacts that were shown by the phone records.

11:37:59  21        THE COURT:  Does it have an exhibit number?

11:38:02  22   If not --

11:38:04  23        MR. GETZ:  This would have been Government's

11:38:06  24   Exhibit Exhibits 126A through 126G, also 177 and 178.

11:38:14  25        MR. HERDMAN:  Do you want to mark it for

| | |
|---|---|
| 11:38:16 | 1 |

sentencing?

MR. GETZ:  We'll mark this as sentencing Exhibit 7.

THE COURT:  Were these trial exhibits?

MR. GETZ:  The exhibits referenced at the top were, the phone records themselves were trial exhibits.

THE COURT:  But this particular item?

MR. GETZ:  This is just a summary of what those exhibits show, Your Honor.

THE COURT:  I don't recall seeing this.

MR. GETZ:  This is just a summary.  It was used in the summation, Your Honor.  I'll mark this as Sentencing Exhibit 7.  But again, it shows the number of contacts that occurred between all of the individuals and the co-conspirators independent of Darren Griffin, Your Honor.

THE COURT:  What Exhibit number is that?

MR. HERDMAN:  It's Number 7, El-Hindi Sentencing Exhibit.

MR. GETZ:  I'm sorry, El-Hindi sentencing Exhibit Number 7.

So, Your Honor is correct that it states that Darren Griffin was somewhat central to bringing these individuals together who may or may not have found

11:39:34  1  each other, but the evidence clearly showed that they

11:39:39  2  shared the same interests, the same goals, the same

11:39:43  3  purposes once brought together, and it wasn't Darren

11:39:46  4  Griffin who was necessarily in the middle of all of

11:39:48  5  their connectivity.

11:39:55  6            THE COURT:  And I understand that.   And I

11:39:56  7  didn't say it -- my point simply was he played a

11:40:02  8  significant role along the way.   But that does not

11:40:08  9  exculpate any of the defendants or undercut the jury's

11:40:12  10  verdict.   I do think it is a factor in trying to assess

11:40:16  11  particularly ultimately the seriousness of these

11:40:22  12  offenses and the history and characteristics of these

11:40:28  13  defendants and so forth.

11:40:32  14            MR. GETZ:  I understand.

11:40:32  15            THE COURT:  Mr. Hartman pointed out -- I

11:40:35  16  think it was a fair point for him to make and for me to

11:40:37  17  take into consideration.   Essentially what he's saying

11:40:41  18  at this stage, Judge, keep in mind just where Darren

11:40:45  19  Griffin was and how important he was to what was going

11:40:50  20  on and to -- as a facilitator or enabler, from how he

11:40:58  21  holds himself out to the kinds of subjects he would

11:41:02  22  discuss with him, sometimes raise on his own, and

11:41:06  23  sometimes in response to things the defendants were

11:41:08  24  saying.   Go ahead.

11:41:11  25            MR. GETZ:  Your Honor, again, the important

11:41:13  1  thing to take away from this --

11:41:15  2          THE COURT:  Let me also say, I wasn't -- I

11:41:22  3  made some notes that I agree with the government that

11:41:28  4  the consequences of fully accomplishing successful

11:41:35  5  terrorism can be so substantial and so dangerous, in

11:41:45  6  particular the kind of terrorism involving weapons of

11:41:50  7  mass destruction which fortunately we have not seen,

11:41:53  8  though other countries, Japan comes to mind, I believe

11:41:56  9  there was a poison attack in the subway some years ago,

11:42:02  10  that those consequences are -- can be so devastating, so

11:42:13  11  difficult to detect and deflect and deter that I do

11:42:23  12  believe that the government is justified in using the

11:42:28  13  efforts such as this, which I refer to as casting the

11:42:32  14  net, even though it doesn't know what kind of fish might

11:42:37  15  swim into it, sharks or minnows, it is imperative for

11:42:47  16  the government in the interest of protecting all of us,

11:42:50  17  whether here or us abroad or others abroad or wherever,

11:42:55  18  that it feel free and justified to -- for these kinds of

11:42:59  19  activities, before the bud has even sprouted, so to

11:43:05  20  speak, to nip them and to defeat them.  And I also

11:43:10  21  think that in this setting and situation, to the extent

11:43:20  22  what the government did in this case and may be doing or

11:43:25  23  have done in other cases that will be coming to the

11:43:28  24  public attention in due course, that maybe persons who

11:43:34  25  might otherwise be inclined to do what these defendants

11:43:37  1    did, even though, quote, they did nothing, close quote,

11:43:43  2    to make them cautious and on guard and ultimately to do

11:43:49  3    as people in the Mosque did who were approached and turn

11:43:53  4    their backs and walk away and say, I want nothing to do

11:43:57  5    with it.   And who knows, some of those individuals may

11:44:03  6    share some of the views about our government and its

11:44:09  7    policies and what we're doing in Iraq and elsewhere;

11:44:15  8    that they have the sound common sense to say, Hey, what

11:44:19  9    I think and may say to others about what I think, I'm

11:44:27  10   not going to go there.   And my sense is that the kind

11:44:37  11   of investigation that the government conducted here is

11:44:41  12   appropriate and, in the context of the concerns that the

11:44:48  13   government on behalf of all of us quite properly had,

11:44:52  14   it's never too early to stop terrorism.

11:45:05  15          MR. GETZ:   Thank you, Your Honor.

11:45:07  16          THE COURT:   Provided, of course, the

11:45:11  17   government employs lawful methods, and I consider these

11:45:14  18   methods to be lawful.

11:45:18  19          MR. GETZ:   Those are difficult decisions

11:45:20  20   that are made by the people who are out there trying to

11:45:24  21   protect our community.   And sometimes they're made

11:45:28  22   correctly, sometimes maybe they're not.   Hopefully the

11:45:33  23   decisions are made in a fashion that's timely enough

11:45:37  24   that does prevent the kind of attacks that happened in

11:45:41  25   Japan that the Court referenced.

11:45:43  1          But what I want to remind the Court here is

11:45:46  2  just all of those instances that the evidence has

11:45:49  3  demonstrated where this defendant was acting

11:45:52  4  independently of Darren Griffin.   And the Court touched

11:45:56  5  on this in the sentencing of defendant Amawi, in talking

11:46:01  6  about this analysis of Darren Griffin stepped in, Darren

11:46:07  7  Griffin introduced himself to Mohammad Amawi, they

11:46:09  8  engaged in these activities, but what's to say if it

11:46:13  9  hadn't been Darren Griffin, that he wouldn't have found

11:46:16  10  somebody else to assist him or at some point if he had

11:46:19  11  become discouraged with Darren Griffin he would have

11:46:21  12  looked elsewhere.   What we don't know is given the

11:46:25  13  proclivity that the evidence shows for this defendant to

11:46:28  14  be seeking out some of this information, to be

11:46:31  15  expressing these kinds of views that he had, and to be

11:46:34  16  soliciting and attempting to recruit other individuals,

11:46:38  17  again, independent of Darren Griffin, that he may have

11:46:43  18  gone down this avenue in way that was not detected by

11:46:46  19  the government.

11:46:48  20          I just want to say finally, Your Honor, this

11:46:50  21  is a defendant who has demonstrated no remorse.  He's

11:46:53  22  accepted no responsibility for any of his activities,

11:46:56  23  and he certainly has shown no respect for the law.

11:47:01  24          The sentencing factors of Title 18, Section

11:47:04  25  3553 that the Court has to consider, and the Court is

11:47:08   1    well aware of these, but it's important to note I think

11:47:12   2    or to remind ourselves that the sentence, the statute

11:47:16   3    itself says the sentence needs to be sufficient but not

11:47:19   4    greater than necessary to comply with the purposes --

11:47:24   5              THE COURT:  You --

11:47:25   6              MR. GETZ:  -- sufficient but not greater

11:47:27   7    than necessary to comply with the purposes in paragraph

11:47:32   8    2.  And those purposes are the need for the sentence to

11:47:37   9    reflect the seriousness of the offense, to promote

11:47:42  10    respect for the law, and provide just punishment for the

11:47:46  11    offense to afford adequate deterrence to criminal

11:47:51  12    conduct, and to protect the public from further crimes

11:47:56  13    of the defendant, and also to provide for any needed

11:48:03  14    educational, vocational training and so forth.

11:48:06  15              Again, looking to the purpose of sentencing

11:48:09  16    as set forth in that statute, the government submits

11:48:13  17    that the only sentence that successfully meets those

11:48:16  18    purposes for this defendant, given his role, given his

11:48:20  19    background, given his characteristics, is a sentence of

11:48:24  20    life.  And again, I would tell the Court, yeah, it

11:48:27  21    would not be appropriate to compare this defendant to

11:48:31  22    Defendant Amawi or to Defendant Mazloum on the basis of,

11:48:35  23    well, this one actually got a gun, this one didn't; this

11:48:38  24    one went and shot a gun, this one didn't.  They should

11:48:41  25    be looked at individually in terms of what was their --

| | | |
|---|---|---|
| 11:48:46 | 1 | THE COURT:  That's an all I was trying to |
| 11:48:47 | 2 | say. |
| 11:48:47 | 3 | MR. GETZ:  -- their purpose and their goal. |
| 11:48:49 | 4 | And we agree, Your Honor.  This defendant had a role |
| 11:48:51 | 5 | and a purpose in these activities that was different |
| 11:48:54 | 6 | from the other two defendants.  And it was based on his |
| 11:48:57 | 7 | history, his particular individual characteristics, |
| 11:49:00 | 8 | including his recognition and the respect that he was |
| 11:49:04 | 9 | given as an elder.  And we can see from activities |
| 11:49:09 | 10 | outside of what occurred in this conspiracy that he |
| 11:49:13 | 11 | has -- |
| 11:49:14 | 12 | THE COURT:  I gather what you're saying to |
| 11:49:15 | 13 | some extent -- candidly, I haven't thought about this -- |
| 11:49:19 | 14 | but look at what he was up to.  To some extent -- and |
| 11:49:22 | 15 | I'm putting words in your mouth, but I think it's what |
| 11:49:25 | 16 | you're saying.  To the extent that I view Griffin as |
| 11:49:29 | 17 | kind of a promoter from outside, Mr. El-Hindi became a |
| 11:49:33 | 18 | promoter from within and supplemented and complemented |
| 11:49:39 | 19 | the sorts of things that Griffin was talking about and |
| 11:49:43 | 20 | which were being talked about with Griffin. |
| 11:49:45 | 21 | MR. GETZ:  Correct, Your Honor. |
| 11:49:50 | 22 | And the only other thing at this point, I |
| 11:49:52 | 23 | would ask if the Court has any concerns that we haven't |
| 11:49:56 | 24 | addressed, it's given thought to any particular issues |
| 11:50:02 | 25 | or items that came up with our sentencing memorandum |

11:50:05  1    that you thought needed more fully explored, we would

11:50:08  2    invite the opportunity to either address those or

11:50:10  3    provide additional evidence, bring up any of those links

11:50:15  4    if the Court feels the need to view those.

11:50:18  5              THE COURT:  Okay.

11:50:20  6              MR. GETZ:  Thank you, Your Honor.

11:50:27  7              Also, Your Honor -- I'm sorry.  We would ask

11:50:29  8    the Court for purposes of the record and for this

11:50:32  9    hearing that the Court admit all of our exhibits, 1

11:50:37  10   through 7, and the copy of the trial exhibit from the

11:50:42  11   fraud trial, Government's Exhibit 10C, I believe.

11:50:47  12             THE COURT:  Okay.

11:50:49  13             MR. HARTMAN:  I object to admission of the

11:50:50  14   summary exhibit, Judge, because -- for a number of

11:50:55  15   reasons.  Number one, the calls on there that are

11:50:58  16   represented going to Zubair was the house where the

11:51:03  17   Ahmeds lived.  Mr. El-Hindi had numerous contacts with

11:51:08  18   Zubair's father, numerous contacts with Zubair's sister,

11:51:11  19   and we have no way of knowing who those calls were.  In

11:51:14  20   addition to that, the calls that are represented as

11:51:16  21   coming from Amawi on the satellite phone, the trail

11:51:20  22   evidence showed that a number of times Griffin grabbed

11:51:23  23   that satellite phone and called El-Hindi.

11:51:29  24             In addition to that, the calls

11:51:35  25   representing --

| | |
|---|---|
| 11:51:36 | 1 |
| 11:51:37 | 2 |
| 11:51:38 | 3 |
| 11:51:44 | 4 |
| 11:51:47 | 5 |
| 11:51:51 | 6 |
| 11:51:54 | 7 |
| 11:51:56 | 8 |
| 11:51:59 | 9 |
| 11:52:02 | 10 |
| 11:52:04 | 11 |
| 11:52:07 | 12 |
| 11:52:08 | 13 |
| 11:52:08 | 14 |
| 11:52:10 | 15 |
| 11:52:13 | 16 |
| 11:52:14 | 17 |
| 11:52:18 | 18 |
| 11:52:21 | 19 |
| 11:52:36 | 20 |
| 11:52:38 | 21 |
| 11:52:39 | 22 |
| 11:52:43 | 23 |
| 11:52:46 | 24 |
| 11:52:51 | 25 |

THE COURT:  Go ahead, finish up.

MR. HARTMAN:  The calls that the government claims were between he and Amawi were AZ Travel calls, and he was doing business with AZ Travel, and that explains some of those calls.  Without some more background for who made the calls and why, I don't think that should be considered at all.

THE COURT:  Okay.  Those are very fair points.  I'm going to admit it; I'll overrule the objection, but it certainly goes to the weight.  It shows that there may have been some contact --

MR. HARTMAN:  There may --

THE COURT:  -- beyond that.

MR. HARTMAN:  We don't know.

THE COURT:  That's a very fair point.

MR. HARTMAN:  We were going to begin with our witnesses, which we think we'll take about an hour with.  Would the Court like to do that now or break for lunch?

THE COURT:  The witnesses plus the transcripts?

Whatever way you want to go, and I'll excuse Tracy during the transcript portion.  Because I'll just give her the transcripts for the record.  I'd just as soon move on, get some witnesses done, then we'll break

11:52:54  1    for lunch.

11:52:55  2              MR. HARTMAN:  We're going to begin with our

11:52:57  3    live witnesses.  Mr. Boss will handle that.  What I

11:53:00  4    envision, Judge, is after we get completed with our

11:53:03  5    witnesses, I'm going make some argument to the Court,

11:53:06  6    then Mr. El-Hindi will address the Court himself, at

11:53:10  7    which time I will have a couple of follow-up closing

11:53:13  8    remarks.  If that's okay with the Court.

11:53:16  9              THE COURT:  Yeah.

11:53:22  10             MR. BOSS:  Judge, for the record it was our

11:53:24  11   intention to present video conference witnesses.

11:53:28  12   Unfortunately, due to logistical problems, two

11:53:32  13   statements had to be taken -- or pardon me, three

11:53:34  14   statements had to be taken yesterday.  They were done

11:53:37  15   by video conference.  They have been reduced to

11:53:42  16   transcript, which we will offer into evidence, along

11:53:45  17   with a copy of the tape.  Unfortunately, the

11:53:48  18   videotape --

11:53:50  19             THE COURT:  I've got to do some lip-syncing.

11:53:54  20   Apparently you notified me during the break that for

11:54:01  21   various reasons, not the least of which you had to put

11:54:04  22   all of this together on very short notice, you asked

11:54:07  23   that I postpone the sentencing because the witnesses

11:54:11  24   were not going to be available at all during the day.

11:54:16  25   I said no.  I said at least get their testimony.  And

| | | |
|---|---|---|
| 11:54:20 | 1 | it turned out that you were not able to, quote, video |
| 11:54:26 | 2 | and audio record into one recording.  And that actually |
| 11:54:32 | 3 | I guess the audio was not recorded, but Angela, the |
| 11:54:37 | 4 | court reporter, took it. |
| 11:54:39 | 5 | MR. BOSS:  That's exactly the point. |
| 11:54:40 | 6 | THE COURT:  That's fine. |
| 11:54:41 | 7 | MR. BOSS:  So those three witnesses will be |
| 11:54:43 | 8 | presented by means of simply the transcripts, which will |
| 11:54:46 | 9 | be read.  As well, there are a couple of live witnesses |
| 11:54:53 | 10 | we have today.  Manal El-Hindi. M-a-n-a-l. |
| 11:55:15 | 11 | (The witness was sworn by the clerk.) |
| 11:55:33 | 12 | THE COURT:  You may be seated.  It's quite |
| 11:55:36 | 13 | uncomfortable, but can you slide the chair up so you're |
| 11:55:39 | 14 | about this distance from the microphone.  Too close its |
| 11:55:47 | 15 | fuzzy. |
| 11:55:57 | 16 | Will you tell me your name, please. |
| 11:56:01 | 17 | THE WITNESS:  Manal El-Hindi, M-a-n-a-l. |
| 11:56:06 | 18 | THE COURT:  M-a-n-a-l. |
| 11:56:10 | 19 | THE WITNESS:  M-a-n-a-l. |
| 11:56:11 | 20 | THE COURT:  El-Hindi? |
| 11:56:13 | 21 | THE WITNESS:  Yeah. |
| 11:56:14 | 22 | THE COURT:  And you are related to Marwan |
| 11:56:16 | 23 | El-Hindi? |
| 11:56:19 | 24 | THE WITNESS:  Yeah, I'm his sister. |
| 11:56:20 | 25 | THE COURT:  You're his? |

11:56:22   1              THE WITNESS:  His sister.

11:56:24   2              THE COURT:  Where do you live, what town or

11:56:26   3    city?

11:56:27   4              THE WITNESS:  I live in Chicago.

11:56:29   5              THE COURT:  How long have you lived in

11:56:30   6    Chicago?

11:56:31   7              THE WITNESS:  Three years.

11:56:32   8              THE COURT:  Before that where did you live?

11:56:34   9              THE WITNESS:  North Carolina.

11:56:37  10              THE COURT:  And are you a native born

11:56:39  11    American, or were you born elsewhere?

11:56:42  12              THE WITNESS:  I was born in Jordan.

11:56:43  13              THE COURT:  When did you come to this

11:56:44  14    country?

11:56:45  15              THE WITNESS:  In 1993.

11:56:49  16              THE COURT:  Have you since become a citizen?

11:56:51  17              THE WITNESS:  Not really.  I have the green

11:56:53  18    card.

11:56:54  19              THE COURT:  And don't assume that I mean

11:56:58  20    anything negative by that.  I am well aware of, from

11:57:03  21    conducting naturalizations, that can be an extremely

11:57:07  22    difficult decision because it represents in some sense

11:57:13  23    an abandonment of one's own heritage.

11:57:17  24              Okay.  Mr. Boss, go ahead.

11:57:18  25              MR. BOSS:  Thank you, Judge.

```
11:57:20   1                          -  -  -

11:57:20   2              MANAL EL-HINDI, DIRECT EXAMINATION

11:57:20   3    BY MR. BOSS:

11:57:20   4       Q.  Manal, you're the younger sister of Marwan

11:57:23   5    El-Hindi?

11:57:23   6       A.  No, I have another younger sister.  I'm the --

11:57:28   7    I'm number four in the family.

11:57:31   8       Q.  Marwan, I believe, is 46 years old now.  How old

11:57:34   9    are you?

11:57:35  10       A.  I'm 39.

11:57:37  11       Q.  And where did you grow up at?

11:57:40  12       A.  I grow up in Jordan.

11:57:42  13       Q.  In Jordan.  And was Marwan part of the family

11:57:45  14    with you as you were growing up?

11:57:47  15       A.  Yes.

11:57:47  16       Q.  And you moved to the U.S. about -- was it 19

11:57:50  17    years ago, did you say?

11:57:51  18       A.  Fourteen years ago.

11:57:54  19       Q.  Fourteen years ago.  You came here with your

11:57:57  20    husband?

11:57:57  21       A.  Yes.

11:57:58  22       Q.  How was he employed?

11:58:00  23       A.  We came here for him to do his internal medicine.

11:58:06  24    We lived in New Jersey, then we moved to North Carolina

11:58:10  25    to serve in an underserved area.
```

11:58:13  1      Q.   Your husband --

11:58:15  2               THE COURT:   Serve in what area?

11:58:16  3               THE WITNESS:   In underserved area.

11:58:20  4      Q.   He's a physician; is that correct?

11:58:22  5      A.   Yes.

11:58:25  6      Q.   Do you work outside of the house?

11:58:26  7      A.   No, just on Sunday I teach on Sunday school.

11:58:30  8      Q.   And are you trained or do you have an educational

11:58:33  9  background?

11:58:34  10     A.   Yes, I have a bachelor's in medical and

11:58:41  11 biological analysis.

11:58:42  12     Q.   I understand you have some children?

11:58:44  13     A.   Yeah, I have four kids.

11:58:45  14     Q.   How old are they?

11:58:46  15     A.   I have 13, 11, nine and seven years old.

11:58:52  16     Q.   I understand Marwan El-Hindi has a large family

11:58:55  17 as well, a number of children; seven, I believe?

11:58:57  18     A.   Yeah.

11:58:59  19     Q.   Did you travel with your children this last year

11:59:03  20 for a family get-together in Jordan?

11:59:05  21     A.   Yes.

11:59:05  22     Q.   And can you just tell us briefly about that?  The

11:59:11  23 El-Hindi family in Jordan has a large family home if I'm

11:59:14  24 not mistaken?

11:59:15  25     A.   Yes.

11:59:16  1    Q.   Somewhat similar to the image we had that Mr.

11:59:19  2    Amawi presented earlier?

11:59:20  3    A.   Yes.

11:59:20  4    Q.   Were you in court when that was presented?

11:59:22  5    A.   Yes.

11:59:23  6    Q.   So is there an El-Hindi family home that's

11:59:25  7    similar to that?

11:59:26  8    A.   Yeah, it is similar to this.   We're accustomed

11:59:31  9    to building a big house for the whole family, and then

11:59:38  10   each member of the family will have his own floor.

11:59:41  11   Q.   Did all the children get together in Jordan,

11:59:43  12   including Mr. El-Hindi's children?

11:59:44  13   A.   Yes, there were 23 children in the house.

11:59:50  14   Q.   How long did all 23 children and these adults

11:59:53  15   stay together?   How long were you all together this

11:59:58  16   summer?

11:59:58  17   A.   Two and a half months.

12:00:00  18   Q.   That's very nice.   How many siblings did you

12:00:03  19   grow up with along with Marwan?   How many brothers and

12:00:06  20   sisters?

12:00:06  21   A.   We are four brothers and three sisters.

12:00:10  22   Q.   When you came to the United States, Marwan was

12:00:12  23   already here; is that right?

12:00:14  24   A.   Yes.

12:00:14  25   Q.   And did you stay in touch with him after you

12:00:17  1    arrived?

12:00:17  2        A.  Yes.   Always.

12:00:19  3        Q.  What was the frequency of your communication with

12:00:22  4    Marwan El-Hindi?

12:00:24  5        A.  Well, he used to visit me when I was -- when we

12:00:28  6    first came to Pennsylvania, then New Jersey, then North

12:00:33  7    Carolina.   And he was with me in Pennsylvania --

12:00:37  8    visited me in Pennsylvania lots of times because I was

12:00:40  9    knew to the country, and he wanted to keep in touch with

12:00:44  10   me.   He visited with me also in New Jersey and in North

12:00:47  11   Carolina.

12:00:48  12       Q.  Did you stay in touch by phone as well?

12:00:50  13       A.  Yes.

12:00:51  14       Q.  When did you move to Chicago?  Do you recall?

12:00:53  15       A.  After Marwan's arrest.

12:00:55  16       Q.  You moved there after his arrest?

12:00:57  17       A.  Yeah.

12:00:59  18       Q.  And prior to his arrest, in let's say the last

12:01:02  19   couple years before his arrest, did you have contact

12:01:05  20   with him frequently?

12:01:06  21       A.  Yes.

12:01:06  22       Q.  Was it by phone?

12:01:07  23       A.  It was by phone, and he visited me also in North

12:01:12  24   Carolina, he and my other brother Yousef.

12:01:15  25       Q.  How often would you speak with him by phone in

12:01:18  1   those last couple years before his arrest?

12:01:20  2       A.  Sometimes every day, sometimes every week,

12:01:22  3   sometimes every other week.

12:01:27  4       Q.  How would you describe Marwan El-Hindi?  How was

12:01:29  5   his character?

12:01:30  6       A.  Well, Marwan is a kindhearted man.  Like, as a

12:01:33  7   brother he's very compassionate, he's very kindhearted.

12:01:39  8   He always expressed his love for his sisters.  So I

12:01:46  9   find it hard to, you know, to hear all those accusations

12:01:50  10  against him.

12:01:50  11      Q.  I understand that your father and Marwan's father

12:01:53  12  passed away a couple years ago.

12:01:55  13      A.  Yes.

12:01:56  14      Q.  Do you remember when that was approximately?

12:01:58  15      A.  It was, I think, in November, '94.

12:02:04  16      Q.  And was that -- obviously it's an important event

12:02:08  17  for you, but I understand that you had a bit of a

12:02:11  18  wake-up call as a result of that?

12:02:12  19      A.  Yeah.  Actually I -- before that I didn't wear

12:02:15  20  the Islamic hijab.

12:02:17  21      Q.  Didn't wear the?

12:02:19  22      A.  Hijab, the headdress.

12:02:21  23      Q.  The Muslim headdress?

12:02:23  24      A.  Yeah.

12:02:24  25          And I went to Jordan, and I saw my father was

12:02:26  1  dying there, so it was a wake-up call for me because for

12:02:30  2  Muslim woman, I know that a Muslim woman should wear the

12:02:35  3  Islamic hijab, or the headdress.

12:02:38  4    Q.  And you had not been doing that before that?

12:02:40  5    A.  No.  And my father wanted me to wear the Islamic

12:02:46  6  hijab since, like, when I was 14, 15 years old.  And

12:02:52  7  seeing my father dying, I, you know, it was a wake-up

12:02:56  8  call for me.

12:02:56  9    Q.  Did you make other changes in terms of your

12:03:02  10  devotion to Islam?

12:03:03  11            THE COURT:  I apologize.  How do you spell

12:03:05  12  hijab.

12:03:06  13            THE WITNESS:  H-i-j-a-b.

12:03:14  14            THE COURT:  Restate the question.

12:03:15  15  BY MR. BOSS:

12:03:15  16    Q.  Did you have other changes?  How else is a

12:03:18  17  Muslim woman in day-to-day activities -- I remember the

12:03:22  18  first time I met you, I extended my hand to shake your

12:03:25  19  hand, and you declined.

12:03:27  20    A.  Yeah.  Actually, like we're accustomed to wearing

12:03:31  21  the hijab, and Muslim women prefers not to shake hands

12:03:36  22  with a man.  It's not obligation in Islam, but it is --

12:03:40  23  like, it gives you, we believe -- in Islam we believe

12:03:44  24  that it will give you more good deeds to go to Gennah or

12:03:48  25  Heaven.

12:03:49   1           THE COURT:  How do you spell that?  I'm

12:03:50   2   sorry.

12:03:52   3           THE WITNESS:  Gennah, G-e-n-n-a-h.

12:04:01   4       So I started not to shake hands with men

12:04:04   5   too, like wearing the hijab.

12:04:06   6   BY MR. BOSS:

12:04:06   7   Q.  And I understand that that's become a difficult

12:04:09   8   thing to say.

12:04:11   9   A.  Yeah.  Because, like, every time I want -- like,

12:04:15  10   every time an American man wants to shake hands with me,

12:04:21  11   I say, excuse me, and I'll start explaining for him like

12:04:25  12   how -- why I'm doing this, you know.  And it became

12:04:29  13   difficult because, you know, we entertain people a lot,

12:04:33  14   and we see people a lot.  So I didn't want them to feel

12:04:40  15   that, you know, they're insulted or anything like that.

12:04:44  16   So I started shaking, you know, hands.

12:04:47  17   Q.  If you become -- declining shaking one's hand, I

12:04:53  18   take it it doesn't mean that you have become a

12:04:56  19   fundamentalist or a radical person?

12:04:57  20   A.  No.  No.

12:05:01  21   Q.  Did Marwan have any discussions with you about

12:05:04  22   the war in Iraq?

12:05:06  23   A.  No.

12:05:08  24   Q.  What type of things would he normally be talking

12:05:11  25   about with you and family members?

12:05:13  1    A.  Just, like, family matters.

12:05:16  2    Q.  What was the focus of his attention, if you know,

12:05:18  3  in your discussions with him when you spoke with him

12:05:21  4  almost daily?

12:05:22  5    A.  His kids.

12:05:23  6    Q.  His kids.   I understand in the last couple years

12:05:31  7  before Marwan was arrested that he was raising the

12:05:33  8  children by himself essentially?

12:05:35  9    A.  Yes.

12:05:36  10   Q.  He did get married again?

12:05:38  11   A.  Yes.

12:05:41  12   Q.  Did the children occupy most of his time?

12:05:44  13   A.  Actually, all of his time.

12:05:52  14   Q.  The family -- I know that you've come here from

12:05:56  15  Chicago, and your other brothers arrived from Dubai.

12:06:01  16  Is the family still supportive of Marwan?

12:06:04  17   A.  Yeah.   All of them.

12:06:05  18   Q.  And if Marwan is later released from prison, will

12:06:09  19  the family be there to assist him in reestablishing his

12:06:13  20  life?

12:06:13  21   A.  Yes.   Of course.

12:06:15  22   Q.  Do you know what Marwan advised his children

12:06:18  23  regarding the United States?

12:06:20  24   A.  Yeah.   He was always telling them, even after

12:06:23  25  his arrest, that, you know, this is your country.   You

12:06:27  1    were born here.   You are an American.   He didn't want

12:06:30  2    them to go to Jordan.   And actually, after his arrest I

12:06:35  3    went to visit him in the detention center in Milan,

12:06:41  4    Michigan, and he was talking to me about the accusations

12:06:44  5    that prosecutors are telling, you know, everyone about.

12:06:49  6    And he was, like, how could I do these things?   Like, my

12:06:55  7    kids are American.   How can I, you know, do things to

12:06:59  8    hurt Americans?   Like, he was telling me that those

12:07:03  9    accusations are all, like, lies; and I don't do this,

12:07:08  10   and I can't do this.   My kids are American.   I'm not

12:07:11  11   that kind of a man who hurts, you know, people.   And he

12:07:15  12   is not the kind of a man who can hurt anyone.   He's

12:07:18  13   very kindhearted as a brother and as a son, as a father.

12:07:22  14   He's very kindhearted.

12:07:24  15        Q.   Before I allow the prosecuting attorney to ask

12:07:26  16   you any questions that they have, is there anything else

12:07:28  17   that you think that the Judge should know from you

12:07:30  18   before I sit down?

12:07:32  19        A.   Yeah.   Actually, like, even also after his

12:07:35  20   arrest Marwan was telling me that I thought that he was

12:07:40  21   scared, and he was telling me that he's not scared

12:07:44  22   because he believes in the justice system in the United

12:07:47  23   States, and he believes that the Judge will be fair.

12:07:50  24   So -- but until now, I am scared.   My life has changed,

12:07:57  25   like, a lot since then.   I'm not allowing, you know, my

```
12:08:05   1    kids to watch TV or to see the news or to express their
12:08:10   2    feelings about the war, or I'm not expressing my
12:08:14   3    feelings about anything because I'm scared that whatever
12:08:16   4    happen to Marwan will happen to me or my children.   So
12:08:22   5    it's just like this is not the life we, you know, seeked
12:08:26   6    here in America.   I thought that this is the country of
12:08:29   7    freedom, the freedom of speech.   And now, like, okay,
12:08:32   8    if you're against, like, the war or against anything
12:08:35   9    that the government has to do, so it's like you can't
12:08:41   10   express your feelings.
12:08:45   11             MR. BOSS:  Thank you.
12:08:52   12             MR. GETZ:  No questions.
12:08:54   13             THE COURT:  Ma'am, you may step down.
12:09:01   14             MR. BOSS:  By means of transcript and
12:09:02   15   videotape, we'll call -- the order of the tape has three
12:09:13   16   depositions back to back.   And we can obviously
12:09:17   17   interrupt them at any time, even right now.
12:09:22   18             THE COURT:  Do you have another live
12:09:24   19   witness?
12:09:25   20             MR. BOSS:  We do have one other live witness
12:09:27   21   present.   And we have a witness who we were intending
12:09:30   22   to call by telephone.
12:09:32   23             THE COURT:  Why don't we -- we'll follow the
12:09:36   24   sequence.   Why don't we do this, then we'll take a
12:09:39   25   break.   How long do you think it will take?
```

12:09:42  1          MR. BOSS:  I would think the total will be

12:09:45  2   less than an hour, maybe a touch over if Mr. Getz

12:09:49  3   continues his cross-examination in a similar fashion.

12:10:01  4          (Discussion had off the record.)

12:10:04  5          MR. GETZ:  Just, Your Honor, this puts us in

12:10:05  6   somewhat of a difficult position in that Mr. Boss still

12:10:11  7   hasn't affirmatively told us if Dr. El-Hindi is going to

12:10:15  8   testify via phone, the government as a whole, would

12:10:19  9   testify via telephone.  My understanding is if he was

12:10:22 10   going to testify at all, it would be by TV.

12:10:27 11          THE COURT:  Unfortunately the Court IT test

12:10:30 12   failed, and they weren't able to establish a test with

12:10:34 13   the proposed IT test site in Budapest.

12:10:36 14          MR. BOSS:  Maybe if they can give it a try

12:10:38 15   again and have them work on it.

12:10:45 16          THE COURT:  They've tried, and it doesn't

12:10:47 17   work.

12:10:48 18          I'll overrule the government's objection and

12:10:50 19   let him -- this is the brother?

12:10:52 20          MR. BOSS:  Yes.

12:10:53 21          MR. SOFER: Just to clarify --

12:10:56 22          MR. HERDMAN:  What's holding up the decision

12:10:58 23   by the defense as to whether to call him?  Yousef is a

12:11:01 24   different witness in the sense it could require more

12:11:04 25   preparation for cross-examination.

| | | |
|---|---|---|
| 12:11:07 | 1 | MR. HARTMAN:  He's on our witness list. |
| 12:11:10 | 2 | MR. HERDMAN:  I understand. |
| 12:11:12 | 3 | MR. BOSS:  Judge, could we have five |
| 12:11:14 | 4 | minutes, please? |
| 12:11:15 | 5 | MR. HERDMAN:  I don't think it's a |
| 12:11:17 | 6 | ridiculous request to ask if they're going to call him |
| 12:11:20 | 7 | or not. |
| 12:11:21 | 8 | THE COURT:  That's fair.  Why don't you |
| 12:11:25 | 9 | take five minutes.  In any event, we don't need Tracy |
| 12:11:29 | 10 | for at least a half an hour, right? |
| 12:11:34 | 11 | MR. BOSS:  That's correct, Judge. |
| 12:11:34 | 12 | (Transcripts are read into the record.) |
| 13:28:45 | 13 | (Recess taken.) |
| 13:32:05 | 14 | MR. BOSS:  As a follow-up to the last |
| 13:32:08 | 15 | witness, Dr. Mark Kaushal, EMSS, who gave testimony to |
| 13:32:12 | 16 | his business at the time, Source America and its |
| 13:32:15 | 17 | relationship with EMSS, we'd offer Defendant's |
| 13:32:18 | 18 | Sentencing Exhibits 1 and 2, a brochure essentially that |
| 13:32:24 | 19 | depicts, if I may, contact information in the printed |
| 13:32:44 | 20 | university materials for Marwan El-Hindi's business, |
| 13:32:48 | 21 | EMSS, including his phone number, as well as contact |
| 13:32:55 | 22 | information.  It also shows Source America in its |
| 13:32:59 | 23 | contact information.  It is printed distinctly for |
| 13:33:05 | 24 | Comenius University in Bratislava.  We also offer |
| 13:33:10 | 25 | Defendant's Exhibit 2, a catalog for information for |

13:33:13  1  students coming to Comenius University.

13:33:17  2          THE COURT:  Any objection?

13:33:31  3          MR. HERDMAN:  I would point out the contact

13:33:33  4  information that is on that brochure is that of Marwan

13:33:35  5  El-Hindi prior to his current address, so I just would

13:33:38  6  ask Mr. Boss what's the date of that particular

13:33:42  7  document?  It's certainly not current is, I guess, the

13:33:44  8  point.

13:33:45  9          MR. BOSS:  It isn't being offered for

13:33:47  10  currency.  It's the fact Source America and EMSS worked

13:33:50  11  together, in hand with the University.

13:33:57  12          We call Mohammed El-Hindi.

13:34:13  13          (The witness was sworn by the clerk.)

13:34:57  14          THE COURT:  Will you tell me your name.

13:34:59  15          THE WITNESS:  My name is Mohammed Othman

13:35:02  16  El-Hindi.

13:35:02  17          THE COURT:  Your middle name, how do you

13:35:05  18  spell that.

13:35:06  19          THE WITNESS:  El-Hindi, E-l H-i-n-d-i.

13:35:10  20          THE COURT:  You said --

13:35:12  21          THE WITNESS:  My father's name is --

13:35:14  22          MR. BOSS:  I can volunteer for the Court his

13:35:20  23  middle name is Othman, O-t-h-m-a-n.

13:35:24  24          THE COURT:  And where do you live?

13:35:26  25          THE WITNESS:  I live in the United Arab

13:35:31  1   Emirates.

13:35:31  2              THE COURT:  UAE.  What city there?

13:35:35  3              THE WITNESS:  Living in Sharjah; this is

13:35:37  4   next to Dubai, five kilo.

13:35:42  5              THE COURT:  And how do you spell the

13:35:44  6   community?

13:35:46  7              THE WITNESS: S-h-a-r-j-a-h.

13:35:52  8              THE COURT:  How long have you lived in the

13:35:54  9   UAE?

13:35:56  10             THE WITNESS:  Thirteen years almost.

13:35:58  11             THE COURT:  What do you do?

13:35:59  12             THE WITNESS:  I'm working with internet

13:36:03  13  supervisor for internet service provider, so I'm

13:36:07  14  handling the operation issues.

13:36:10  15             THE COURT:  How long have you had that job?

13:36:12  16             THE WITNESS:  After my graduation, almost 13

13:36:17  17  years.

13:36:17  18             THE COURT:  Okay.  And what's your

13:36:19  19  education?

13:36:19  20             THE WITNESS:  My education is computer

13:36:21  21  information system.

13:36:22  22             THE COURT:  Where did you get your degree?

13:36:24  23             THE WITNESS:  I get my degree in An-Najah

13:36:29  24  University.

13:36:29  25             THE COURT:  Are you a native of Palestine?

13:36:32   1                THE WITNESS:  A native of Palestine.

13:36:35   2   Originally from Palestine.   Yes, originally from

13:36:38   3   Palestine.

13:36:39   4                THE COURT:  You are Mr. El-Hindi's brother,

13:36:40   5   I take it?

13:36:41   6                THE WITNESS:  Yes.

13:36:42   7                THE COURT:  Older or younger?

13:36:43   8                THE WITNESS:  He is the -- I am number three

13:36:49   9   in the boys.   I have a second -- the fourth one's name

13:36:56  10   is Ahmed.   I'm older than him.

13:36:59  11                THE COURT:  Go ahead.

13:37:01  12                MR. BOSS:  Thank you, Judge.

13:37:06  13                          - - -

13:37:06  14          MOHAMMED OTHMAN EL-HINDI, DIRECT EXAMINATION

13:37:07  15   BY MR. BOSS:

13:37:07  16   Q.   Mr. El-Hindi, when did you arrive from the UAE?

13:37:10  17   A.   Last Friday.

13:37:11  18   Q.   If any of my questions are difficult for you to

13:37:15  19   understand, please stop me and ask for a clarification.

13:37:17  20   A.   Thank you very much.

13:37:19  21   Q.   The company that you work for in the UAE, is it a

13:37:25  22   large company?

13:37:26  23   A.   It's an enterprise company.   Yes.   It's a big

13:37:30  24   company.

13:37:31  25   Q.   How big?

| | | |
|---|---|---|
| 13:37:32 | 1 | A.   It is enterprise. |
| 13:37:33 | 2 | Q.   Enterprise.   By that you mean international? |
| 13:37:35 | 3 | A.   Yes, it's international.   They have a monthly -- |
| 13:37:43 | 4 | Q.   How many people are employed there? |
| 13:37:45 | 5 | A.   In the UAE, 7,000. |
| 13:37:48 | 6 | Q.   You've been with them 13 years? |
| 13:37:51 | 7 | A.   13 years. |
| 13:37:52 | 8 | Q.   Are you a supervisor or executive now? |
| 13:37:54 | 9 | A.   Supervisor for internet services. |
| 13:37:57 | 10 | Q.   Very good.   Mr. El-Hindi, your relation to |
| 13:38:00 | 11 | Marwan, he is your oldest brother? |
| 13:38:02 | 12 | A.   Yes. |
| 13:38:03 | 13 | Q.   And how old are you? |
| 13:38:04 | 14 | A.   I am 38. |
| 13:38:07 | 15 | Q.   38? |
| 13:38:08 | 16 | A.   38. |
| 13:38:08 | 17 | Q.   How old were you when Marwan moved to the United |
| 13:38:12 | 18 | States? |
| 13:38:12 | 19 | A.   I -- when he moved to the United States, I was in |
| 13:38:17 | 20 | the high school. |
| 13:38:20 | 21 | Q.   Have you kept in touch with him since he moved to |
| 13:38:25 | 22 | the United States? |
| 13:38:25 | 23 | A.   Yes, by telephone. |
| 13:38:27 | 24 | Q.   How frequently did you talk to him? |
| 13:38:29 | 25 | A.   Talk to him almost -- you know, depends on the |

| | | |
|---|---|---|
| 13:38:34 | 1 | family occasions, or if you can say sometimes weekly, |
| 13:38:39 | 2 | sometimes two in a month, something like this.  And |
| 13:38:45 | 3 | then an hour, you know, then holiday. |
| 13:38:51 | 4 | Q.  Holiday? |
| 13:38:51 | 5 | A.  Holidays, exactly. |
| 13:38:53 | 6 | THE COURT:  Maybe 20, 25 times a year? |
| 13:38:57 | 7 | THE WITNESS:  A year, smaller than that. |
| 13:38:59 | 8 | Smaller. |
| 13:39:00 | 9 | Q.  More than that? |
| 13:39:01 | 10 | A.  Yes. |
| 13:39:01 | 11 | THE COURT:  More than that? |
| 13:39:03 | 12 | THE WITNESS:  More than that. |
| 13:39:05 | 13 | Q.  I understand Marwan operated a business that |
| 13:39:08 | 14 | we've heard about called EMSS. |
| 13:39:10 | 15 | A.  Yes. |
| 13:39:10 | 16 | Q.  And that your other brother, Yousef, was also |
| 13:39:13 | 17 | involved in that business? |
| 13:39:14 | 18 | A.  Yes. |
| 13:39:15 | 19 | Q.  Did you do anything for them? |
| 13:39:17 | 20 | A.  Registered the domain name, which you can post |
| 13:39:26 | 21 | information for the site, and you reserve it so nobody |
| 13:39:28 | 22 | can take the name. |
| 13:39:29 | 23 | Q.  Did you host the site also or participate in |
| 13:39:32 | 24 | that? |
| 13:39:33 | 25 | A.  Only on that instruction.  Then they give the |

13:39:37  1   design for the site for --

13:39:43  2       Q.   Did you assist in designing the website itself?

13:39:46  3       A.   Not much, but I do the layout only.

13:39:51  4       Q.   Other than that work you did regarding the

13:39:54  5   website of EMSS, when you spoke with Marwan El-Hindi,

13:39:58  6   what types of matters did you speak about?

13:40:00  7       A.   We are talking about family's issues and about we

13:40:05  8   are very close to his kids, especially the first one

13:40:11  9   that come of the family.  I mean to say -- if I can

13:40:18  10  express it.  They are the new member of our family from

13:40:23  11  our brother and sister.

13:40:25  12      Q.   I understand that you also called Marwan after

13:40:28  13  the unfortunate tragedy of 9/11, September 11?

13:40:33  14      A.   Yes.

13:40:33  15      Q.   Why did you call him then?

13:40:34  16      A.   Just to know what is the status.  I call my

13:40:38  17  sister; I call my cousin; I call a lot of friends to

13:40:46  18  know are they okay.

13:40:47  19      Q.   Why were you concerned?

13:40:48  20      A.   Because the concern this is a terrorist attack

13:40:50  21  and they could be at the hotel, they could be at

13:40:54  22  anywhere.

13:40:55  23      Q.   Did you discuss with him conditions regarding

13:40:58  24  Muslims here in the United States?

13:41:00  25      A.   I don't remember that I discussed these issues.

13:41:05  1    Q.  Did you talk about politics with Marwan while

13:41:07  2  talking on the phone?

13:41:09  3    A.  I don't remember if I talk, but almost I do

13:41:13  4  not -- we are not talking politics over the phone.

13:41:20  5    Q.  Did Marwan ever tell you that he thought the

13:41:22  6  conditions in Iraq were bad or the war in Iraq was bad?

13:41:25  7    A.  No, never.

13:41:26  8    Q.  Did he talk to you about Osama bin Laden or

13:41:32  9  Al-Qaeda?

13:41:32  10    A.  Never.

13:41:32  11    Q.  What was the focus of your discussions with him

13:41:35  12  when you did talk?

13:41:35  13    A.  We are talking about family issues, especially

13:41:41  14  his kids, his status.  Sometimes, you know, about what

13:41:49  15  is his condition, and holidays, so this is the issues

13:41:54  16  about.

13:41:55  17    Q.  Now, I heard from Yasmin that you had a family

13:41:59  18  reunion of sorts this summer in Jordan.  Did you go to

13:42:03  19  that?

13:42:03  20    A.  Yasmin?

13:42:06  21    Q.  From your sister Manal.

13:42:08  22    A.  Yes.  Manal.  I join them, and we spent a lot

13:42:13  23  of time with Marwan's family.

13:42:15  24    Q.  Did you take your children as well?

13:42:16  25    A.  Of course, yes.

13:42:17  1    Q.   And the house that you went to, the family

13:42:19  2  reunion was in your family house in Jordan?

13:42:22  3    A.   It is our family's, actually belongs to my

13:42:26  4  father, exactly.

13:42:27  5    Q.   Do you own part of that, or did you have anything

13:42:29  6  to do with building on to it?

13:42:30  7    A.   Actually, we built after my father death.  We

13:42:36  8  built, me and Yousef, we built three stories because

13:42:41  9  it's already the two stories, so we built the three

13:42:44  10  stories.

13:42:44  11    Q.   Now, I understand, you've told me already that

13:42:47  12  there's a tradition about building on to the family

13:42:50  13  house?

13:42:50  14    A.   Exactly.

13:42:51  15    Q.   Can you explain that to the Judge?  How is that

13:42:54  16  done?

13:42:54  17    A.   After my father death, actually, the building is

13:42:58  18  our home and common for all family.  I mean to say it

13:43:03  19  is a wealth that should be distributed as Islam --

13:43:08  20    Q.   Inherited?

13:43:11  21    A.   Okay.  The girls will take this part, and the

13:43:14  22  boys will take this part, and the mother will take this

13:43:17  23  part.

13:43:17  24    Q.   Now, did you discuss with Marwan El-Hindi about

13:43:20  25  whether he wanted to build on to the house?

13:43:22  1      A.   Exactly.   I take all my brother permission to

13:43:26  2  start building on the -- on our home because there

13:43:32  3  should be agreement because I cannot build any spawn, if

13:43:37  4  you want to say, before I did get their permission.

13:43:46  5      Q.   Let me make sure I understand this.   It's my

13:43:48  6  understanding that Marwan, being the oldest son, had the

13:43:51  7  first option of building on to the house; is that

13:43:54  8  correct?

13:43:54  9      A.   Yes.   Exactly.

13:43:56  10     Q.   Did you --

13:43:56  11     A.   This is a type of tradition.   But it's not a

13:43:59  12  type of rule.

13:44:00  13     Q.   Did you ask Marwan if he wanted to build on to

13:44:02  14  the house?

13:44:02  15     A.   I asked him, yes.

13:44:04  16     Q.   What did he say?

13:44:04  17     A.   He says he's not interested of that at all.

13:44:07  18     Q.   Did he tell you why?

13:44:08  19     A.   He tell me because his life is in United States,

13:44:11  20  and he's considering United States is his home country,

13:44:15  21  and he will never think to come back to live in Jordan

13:44:21  22  because he's interested of educating his people there in

13:44:25  23  the United States, and he's considering that one his

13:44:29  24  homeland country.

13:44:42  25     Q.   Have you had discussions with Marwan about how he

13:44:44   1   felt about the United States?

13:44:45   2        A.   About --

13:44:46   3        Q.   Before his arrest, did Marwan tell you how he

13:44:49   4   felt about living in the United States?

13:44:51   5        A.   It's always in our family, you know, it's you

13:44:58   6   feel the pleasure if you live in the United States.

13:45:03   7   Sure, you have a lot of things that can help your

13:45:10   8   family:  Education, freedom, all this stuff.   So this

13:45:14   9   is the most discussion we have discussed with family.

13:45:22  10        Q.   Did Marwan consider the United States his home or

13:45:24  11   elsewhere?

13:45:25  12        A.   Sure.   United States.

13:45:30  13        Q.   That's really just about all I have.   Is there

13:45:33  14   anything else you think the judge needs to hear from you

13:45:35  15   before deciding a proper sentence?

13:45:37  16        A.   Yes.   Actually, my family, Your Honor, we

13:45:44  17   consider it as in Jordan, our El-Hindi family, they

13:45:48  18   consider us as the most educated family in our district,

13:45:55  19   if you want to say.   I do believe that the reason of

13:45:59  20   that is my father.   My father, he was educated in the

13:46:02  21   United States at Ohio.   He graduated from here from

13:46:06  22   University of Ohio.   That was in 1954.   My father

13:46:12  23   educated us that the best place in the world that you

13:46:17  24   can have better education, you have better freedom, you

13:46:21  25   can have multinational country, you can have

13:46:27   1   multinational language, you can say is the United

13:46:30   2   States.   That's why the first step for Marwan is going

13:46:34   3   to the United States.   Actually, I was wishing to come

13:46:36   4   in here to see this great country in reality and to see

13:46:40   5   that how this is a great nation, which I do believe my

13:46:46   6   father, he was 100 percent correct of what he's telling

13:46:51   7   about the United States.

13:46:53   8           MR. BOSS:   Thank you.   The prosecutor might

13:46:55   9   have a couple questions.

13:46:57  10           THE WITNESS:   Thank you.

13:46:57  11                   - - -

13:46:57  12           MOHAMMED OTHMAN EL-HINDI, CROSS-EXAMINATION

13:47:02  13   BY MR. GETZ:

13:47:03  14   Q.   Good afternoon.   A couple questions.   This

13:47:05  15   conversation you had with Marwan where you asked him if

13:47:08  16   he was intending to build on to the family home --

13:47:10  17   A.   Yes.

13:47:10  18   Q.   -- when did that take place?

13:47:11  19   A.   It take after place after my father death.   My

13:47:15  20   father death, it was 2004.   You can say after that one,

13:47:20  21   it was in November, 2004.   So you can say it is

13:47:26  22   after -- you can say six month, seven months, something

13:47:29  23   like that.   But it is after 2004.

13:47:31  24   Q.   So it would have been either late 2004 or early

13:47:35  25   2005, somewhere in that --

13:47:38  1      A.   Yes, in this period of time.

13:47:40  2      Q.   And I take it you're intending to go back and

13:47:43  3  live in Jordan at some point?

13:47:44  4      A.   For myself?

13:47:45  5      Q.   Yes.

13:47:46  6      A.   Yes.   I'm intending to go there because, you

13:47:49  7  know, for Marwan, he's American national.   Okay.  He is

13:47:53  8  holding the citizenship of United States.   But for me,

13:47:58  9  I am -- you can say I'm in the gulf area.   So I will

13:48:05  10  not have the all facilities or all the -- you can say

13:48:12  11  the benefits, which is the people who are holding the

13:48:17  12  citizenship of the gulf to continue my life there.

13:48:26  13              MR. GETZ:  Just a moment.

13:48:26  14              (Discussion had off the record.)

13:48:28  15              MR. GETZ:  Thank you very much.  No other

13:48:29  16  questions.

13:48:30  17              THE WITNESS:  Thank you very much.

13:48:32  18              MR. BOSS:  Thank you very much for coming.

13:48:34  19              THE COURT:  You're free to go or welcome to

13:48:36  20  stay.   Have a safe trip home.

13:48:38  21              THE WITNESS:  Thank you.

13:48:55  22              MR. HARTMAN:  Your Honor, we don't have any

13:48:56  23  more witnesses at this time, so I'd like to present

13:49:04  24  argument to the Court.

13:49:55  25              THE COURT:  Do you have a microphone?

13:49:57  1          MR. HARTMAN:  I don't.  If you'd like me to

13:49:59  2   use it, I can.

13:50:05  3          THE COURT:  You may proceed.

13:50:06  4          MR. HARTMAN:  Thank you.  The Court

13:50:17  5   yesterday and the government both agreed, Judge, that

13:50:24  6   there wasn't another case like ours.  And the

13:50:28  7   government even said we couldn't delay ours long enough

13:50:32  8   so that they would be first.  We don't have the benefit

13:50:38  9   of another Court's ruling.  And as we talked about it,

13:50:44  10  that means that you are going to set a sort of precedent

13:50:47  11  with your sentence in this case.  Not only will this be

13:50:54  12  the first sentencing in a terrorism conspiracy in which

13:51:01  13  the government's informant, if you will, was involved

13:51:05  14  from the beginning, but it will also be sort of a

13:51:13  15  precedent for how different conspirators are going to be

13:51:17  16  treated.  The government clearly is asking you to paint

13:51:23  17  all of these men with the same brush, to take a cookie

13:51:28  18  cutter approach to the sentencing.

13:51:32  19          THE COURT:  I think what you're saying or

13:51:34  20  the direction you're headed in is the labels "terrorism"

13:51:39  21  and "terrorist" are, in a sense, easy to apply, but very

13:51:49  22  difficult to peer behind and make what ought to be

13:51:58  23  distinctions, differences, understand the differences,

13:52:04  24  levels, gradations and so forth.

13:52:07  25          MR. HARTMAN:  You're absolutely correct.

13:52:10   1          THE COURT:  Let's put it this way:  A bank
13:52:12   2   robber is a bank robber.  We all know what a bank robber
13:52:16   3   is.  Usually the question is:  Is he armed or unarmed,
13:52:19   4   and that's it.  And we don't talk about conspiring to
13:52:27   5   provide material support to terrorism and a terrorism
13:52:34   6   case in the sense it's a viewed somewhat differently and
13:52:51   7   somewhat through that prism, to mix metaphors, a label
13:52:58   8   rather than distinct in its individual component.
13:53:03   9          MR. HARTMAN:  You're absolutely right.  And
13:53:05  10   the three defendants in this case all have different
13:53:08  11   levels of culpability.  And --
13:53:13  12          THE COURT:  Let me say this.  Mr. Sofer
13:53:16  13   mentioned this.  And I don't think anybody objected at
13:53:21  14   the outset when I said to the jury, practically all -- I
13:53:24  15   think all of the venire, this isn't a capital T
13:53:30  16   terrorism case.  And a more discrete and finally tuned
13:53:43  17   definition of a terrorist is somebody who plans to bomb,
13:53:47  18   who pulls the trigger, who brings down the airliner, who
13:53:51  19   commits the act that is historically and traditionally
13:53:58  20   defined as terrorism.  And they're using that label
13:54:09  21   sort of more broadly, and I think somewhat inaccurately.
13:54:14  22          MR. HARTMAN:  I think very inaccurately.
13:54:16  23          THE COURT:  It's a shorthand, like any
13:54:18  24   shorthand expression and abbreviation, it can be used,
13:54:29  25   but it simply does not convey or connote fully and

| | |
|---|---|
| 13:54:35 | 1 |
| 13:54:40 | 2 |
| 13:54:44 | 3 |
| 13:54:50 | 4 |
| 13:54:56 | 5 |
| 13:54:58 | 6 |
| 13:54:59 | 7 |
| 13:55:03 | 8 |
| 13:55:15 | 9 |
| 13:55:19 | 10 |
| 13:55:25 | 11 |
| 13:55:29 | 12 |
| 13:55:36 | 13 |
| 13:55:41 | 14 |
| 13:55:48 | 15 |
| 13:55:53 | 16 |
| 13:55:57 | 17 |
| 13:56:00 | 18 |
| 13:56:02 | 19 |
| 13:56:06 | 20 |
| 13:56:11 | 21 |
| 13:56:16 | 22 |
| 13:56:20 | 23 |
| 13:56:24 | 24 |
| 13:56:28 | 25 |

accurately the content of the message that's being communicated.  It might under some circumstances.  But it's good, I think in this situation at least, to set the label to one side and look at the individuals and the individual defendant.  That's what we're here for.

MR. HARTMAN:  I agree.  Maybe the reason for the label is that it's not very sexy to call someone a material supporter.

I think it's amazing that the government has the temerity to stand up here and tell you that these men all deserve the same sentence after Mr. Sofer yesterday stood up and spent so much time hammering the issue that Amawi's conduct was so much worse, that he deserved the highest sentence.  That was clearly the message yesterday.  His conduct was so much worse. How many times he said, "Especially for this defendant" when he was talking about the things that happened and the reasons that there should be a life sentence, "Especially for this defendant."  But then they get up today, and they've changed the tune completely.  They say that El-Hindi deserves the life sentence.

In light of what you said earlier, I think it's pretty clear the Court wasn't thinking that.  But the government can ask for whatever they want. However, they have to accurately portray the evidence

13:56:30  1   when they do that.   And that's not what happened in the

13:56:34  2   government's argument.   The evidence was misstated.

13:56:37  3   And there are some points that I need to correct.

13:56:41  4            THE COURT:  In the argument that Mr. Getz

13:56:44  5   made or the argument that Mr. Sofer made?

13:56:47  6            MR. HARTMAN:  In the argument that Mr. Getz

13:56:48  7   made.

13:56:54  8            First of all, the comment to Zubair Ahmed

13:57:06  9   about, "You're with us or you're not."   El-Hindi never

13:57:09  10  said that to Zubair Ahmed.   The government told you he

13:57:12  11  did.   He didn't.   He said that to Darren Griffin.

13:57:15  12  That's the evidence we heard.

13:57:22  13           The evidence that came out at trial was they

13:57:26  14  couldn't -- there was no proof that El-Hindi registered

13:57:29  15  on the Ekhlaas website.   They couldn't determine that

13:57:33  16  with certainty.

13:57:41  17           THE COURT:  Candidly, I hadn't much thought

13:57:48  18  about that, the number and the Philistine.  I think that

13:57:52  19  the jury could find -- and you're certainly welcome to

13:57:57  20  argue to the contrary because I think that's the purpose

13:58:00  21  of sentencing; we don't know if the jury found that as a

13:58:03  22  fact or not, so I'm not concluding it, but in listening

13:58:07  23  to the evidence at the time, sure, there may be some

13:58:12  24  room for doubt.   I wouldn't be surprised if you asked

13:58:16  25  the 12 jurors:  Did you find the evidence to be proved

13:58:20  1  beyond a reasonable doubt or more likely than not, I

13:58:22  2  think at least it's more likely than not.

13:58:25  3           MR. HARTMAN:  He never referred to himself

13:58:26  4  as the Philistine.  Never did that.  And Darren

13:58:30  5  Griffin used that computer all the time.  Griffin

13:58:33  6  admitted that on the stand.  And Griffin used the term

13:58:36  7  Philistine on February 16.  I don't think we can say

13:58:41  8  it's more likely.

13:58:47  9           El-Hindi never referred to Griffin as a

13:58:50  10  jihadi.  The conversation that was said, El-Hindi was

13:58:53  11  talking about someone else.

13:58:54  12           THE COURT:  In any event, your contention is

13:58:57  13  the proof simply is insufficient, even upon a standard,

13:59:05  14  to conclude that he was the user, he was the accessor of

13:59:10  15  that website.  But I believe Mr. Herdman told me he was

13:59:17  16  the one that caused the cookies to be put on the

13:59:22  17  computer, or was that the e-mail?

13:59:24  18           MR. HARTMAN:  That was the cookies --

13:59:27  19           MR. HERDMAN:  I can answer, if you need it.

13:59:30  20           THE COURT:  That's okay.

13:59:31  21           MR. HARTMAN:  That was the cookies.  And

13:59:33  22  the testimony was also the cookie can get on a website

13:59:36  23  without the user doing anything at all.  The jihadi --

13:59:44  24           THE COURT:  Like barnacles on a boat.

13:59:47  25           MR. HARTMAN:  The jihadi term, El-Hindi was

13:59:49   1    not referring to Griffin as a jihadi.  He was talking

13:59:53   2    to someone else referring to Griffin as a jihadi.  And I

13:59:59   3    just want to be clear about that.

14:00:03   4          Mr. Getz stood up and told you that El-Hindi

14:00:06   5    said he could get them grants, and that's not accurate.

14:00:09   6    On February 16, El-Hindi said -- it's on the recording;

14:00:12   7    he made it very clear:  These grants are not for

14:00:16   8    overseas.  They weren't for the activity that Griffin

14:00:19   9    was talking about.

14:00:33  10          THE COURT:  I believe the government's

14:00:34  11    contention is that it's fair to infer that were other

14:00:40  12    grants obtained, there was a likelihood some of that

14:00:46  13    money may have been applied to the attainment of the

14:00:50  14    objective of the conspiracy.

14:00:51  15          MR. HARTMAN:  It's purely speculation.

14:00:54  16    El-Hindi in the recordings that we heard never said that

14:00:56  17    it was his intention to do that.  He talked about

14:00:59  18    getting grants, and he talked about using the money for

14:01:02  19    different purposes.  He talked about it for a school.

14:01:05  20    He talked about it for a refugee program for Muslims.

14:01:10  21    There were a lot of different things.  But he never

14:01:13  22    said that he was going to use that.  And I think it's

14:01:15  23    too speculative to draw that conclusion.  But this --

14:01:19  24    this is a great example.  These phone calls.

14:01:24  25          THE COURT:  I'm not sure the record knows

14:01:27  1    what you're talking about.

14:01:28  2         MR. HARTMAN:  I am holding Exhibit 7, which

14:01:30  3    is the summary of phone contacts.  And these phone

14:01:34  4    contacts between Amawi and El-Hindi, the ones on the

14:01:41  5    satellite phone I said were Griffin.  The ones to the

14:01:46  6    phone calls -- there was another issue of inaccuracy,

14:01:50  7    but you know what's important?  You know why the

14:01:53  8    government shows these phone calls as being so

14:01:55  9    important, why they harp on things like this?  Because

14:01:58  10   there's no training to show you.  There's no meeting

14:02:02  11   where this stuff happens to show you.  So this is all

14:02:06  12   they have, Judge.

14:02:22  13        Mr. Getz said that Mr. El-Hindi's role was

14:02:26  14   to recruit, encourage, and facilitate the participation

14:02:30  15   of protégés.  He didn't facilitate any participation.

14:02:35  16   There was talk.  There was some talk.  But there was

14:02:39  17   no participation.  I'm going to explain to you later

14:02:44  18   why it's not that clear that El-Hindi recruited the

14:02:49  19   Ahmeds and, in fact, he didn't recruit the Ahmeds.  You

14:02:53  20   told us yesterday or last week that El-Hindi wasn't

14:02:57  21   entitled to the reduction in the sentence level for

14:03:00  22   acceptance of responsibility.  And the reason you

14:03:02  23   thought was because he recruited the Ahmeds.  But you

14:03:05  24   also said you're free to tell me if you think I'm wrong

14:03:09  25   about that.  Respectfully, I think you're wrong about

14:03:12  1    that.    And I will explain that.    But for the

14:03:14  2    government to stand up and say that this is what

14:03:16  3    happened isn't accurate.    They can say that this is

14:03:20  4    what El-Hindi said was going to happen, or this is what

14:03:24  5    he told people.    But there was never any participation

14:03:29  6    that happened as a direct result of his communications.

14:03:34  7              MR. GETZ:  Your Honor, I know Mr. Hartman

14:03:35  8    wants to relitigate this case.    These arguments have

14:03:39  9    nothing to do with mitigation.

14:03:42  10             THE COURT:  Candidly, at least this one I

14:03:45  11   think does, that the issue, in all candor, of reaching

14:03:51  12   out and recruiting people is important.    That's what

14:03:56  13   I'll hear about and hear you out.    Once again, the jury

14:04:00  14   verdict doesn't tell us which of the various factual

14:04:04  15   issues they found.    And I think I'm going to give Mr.

14:04:08  16   Hartman the opportunity to talk about that.    And you

14:04:10  17   can respond.

14:04:10  18             MR. GETZ:  Well, Your Honor, my concern here

14:04:12  19   is if he's talking merely, for example, on this

14:04:14  20   particular point of whether or not the defendant

14:04:17  21   recruited the Ahmeds or didn't recruit the Ahmeds, we

14:04:21  22   could spend the next two days presenting evidence back

14:04:23  23   and forth on that particular point.    All we're doing is

14:04:27  24   going back over the evidence of the case.    It doesn't

14:04:29  25   have anything to do with the purpose of this hearing at

14:04:33  1    this point in the hearing.

14:04:35  2            THE COURT:  I think it does because it goes

14:04:36  3    to the circumstances and nature of the offense.  And I

14:04:41  4    think you are absolutely correct, two days worth of back

14:04:49  5    and forth on this subject is going to be proved -- I'll

14:04:58  6    let you brief that.  Because it is conduct attributed

14:05:03  7    to the defendant that plays a significant role in my

14:05:09  8    decision.  I'm going to let him go ahead.

14:05:12  9            MR. HARTMAN:  The reason I have to do it is

14:05:14  10   because the government stood up and said he facilitated

14:05:16  11   participation.  They're asking for a life sentence.

14:05:19  12   My client's life is on the line.  I'm not going to let

14:05:22  13   them stand up here and say things that didn't --

14:05:24  14           THE COURT:  If he didn't, quote, "recruit"

14:05:27  15   the Ahmeds, how did they come to show up in Cleveland

14:05:31  16   and otherwise be linked in?

14:05:35  17           MR. HARTMAN:  Well, according to the record,

14:05:38  18   El-Hindi was taking them to Cleveland before he ever

14:05:41  19   knew Griffin was going to be there.  The phone call

14:05:44  20   between El-Hindi and Griffin made it very clear,

14:05:49  21   El-Hindi said he was going to the conference with the

14:05:53  22   two boys.  And Griffin said he's going to be there too.

14:05:58  23   It was happenstance that they happened to be there

14:06:02  24   together.  Now, would El-Hindi have gotten those boys

14:06:06  25   together with Griffin some other time, some other way?

14:06:11  1   We don't know that.  But he didn't take them there to

14:06:13  2   Cleveland in order to meet Griffin.

14:06:17  3              THE COURT:  Am I incorrect in recollecting

14:06:20  4   that at some point El-Hindi made some mention about two

14:06:28  5   of them?

14:06:31  6              MR. HARTMAN:  To Griffin?

14:06:32  7              THE COURT:  Yes.  At least in some context

14:06:34  8   or setting which it could be inferred that that was with

14:06:40  9   an eye towards involving them.

14:06:42  10             MR. HARTMAN:  No, that's correct.  He did.

14:06:44  11  He told Griffin, There's two brothers, and they want to

14:06:47  12  train.  And then he laughed.  And then he told Griffin

14:06:50  13  about these brothers.  But El-Hindi --

14:06:53  14             THE COURT:  Was that before or after the

14:06:56  15  July 4?

14:06:57  16             MR. HARTMAN:  That was before the

14:06:58  17  conference.  And Griffin picked up on that.  And

14:07:00  18  Griffin went after that.  El-Hindi got a phone call

14:07:04  19  from Zubair Ahmed's father --

14:07:08  20             THE COURT:  At the very least, whether you

14:07:10  21  call it recruitment or not, I think he is responsible

14:07:15  22  for their involvement.  That may be a distinction that

14:07:24  23  doesn't make a difference, but candidly I think it

14:07:27  24  might.  Once again, we're dealing with semantics.

14:07:30  25             MR. HARTMAN:  But then don't you have to

14:07:32  1   admit he's also responsible for the fact that they

14:07:34  2   didn't have any further involvement and they never ever

14:07:37  3   met with Griffin after July 4?

14:07:39  4            THE COURT:  No, because I attribute that

14:07:43  5   point to them rather than him.

14:07:45  6            MR. HARTMAN:  Well, all the opportunities

14:07:46  7   that he had, he had them in Toledo four times and never

14:07:50  8   took them to see Griffin.

14:07:52  9            THE COURT:  Is that in the record?

14:07:53  10           MR. HARTMAN:  Yes.  He was in Chicago on

14:07:58  11  business with Mark Kaushal, you just heard.  And he

14:08:02  12  went to Chicago on a regular basis.  He never made that

14:08:06  13  meeting happen.  He didn't get called to go get them as

14:08:12  14  a terrorist or a recruiter.  He got called and asked

14:08:15  15  for help.

14:08:18  16           THE COURT:  I understand that.  But then he

14:08:22  17  made some reference to them, and the context of which I

14:08:28  18  recall that being made was in anticipation of possibly

14:08:33  19  getting them involved.  That's all.  So I think I'm

14:08:37  20  perfectly content to moderate the notion of recruitment;

14:08:47  21  but for Mr. El-Hindi, they wouldn't be around.  But for

14:08:52  22  Mr. El-Hindi, the Ahmeds are nowhere in sight.  So in

14:08:58  23  that sense he's at least, quote, responsible.  Whether

14:09:00  24  he sat down with them and said, Boy, do I have a great

14:09:06  25  opportunity for you.  He stopped you from going over

14:09:13   1   when you were unprepared and ill-equipped and not

14:09:16   2   capable and not as useful as you can be, but we'll put

14:09:22   3   this deal together in Toledo, and we're going to train

14:09:25   4   people and train people to train people and teach you

14:09:27   5   how to do this, that, and the other thing, a recruitment

14:09:31   6   pitch, a sales pitch, I'm perfectly -- the typical sales

14:09:38   7   pitch, and I'm perfectly content to say nothing like

14:09:43   8   that ever happened.   But at the very least, they're

14:09:47   9   here because he caused them to be here.   Whatever that

14:09:53  10   means was -- whatever may have been said or not said,

14:09:59  11   take him out, whatever he didn't say, without him, the

14:10:08  12   Ahmeds wouldn't have been involved in this activity.

14:10:10  13            MR. HARTMAN:   Okay.  Yesterday there was an

14:10:12  14   argument by Mr. Bryan that Amawi's -- I forget what it

14:10:17  15   was.   I wish I could cite it for you, but some action

14:10:20  16   that Amawi had taken was somehow minimized by the fact

14:10:26  17   that another time he said something that was contrary.

14:10:30  18   And Mr. Sofer said, No, it's the actions.   It's not the

14:10:37  19   words; it's the actions.   It's what you did.   And the

14:10:40  20   factors under 18 U.S.C. 3553(a), they talk about a

14:10:47  21   defendant's conduct.   They don't talk about the statute

14:10:51  22   of conviction.   They talk about sentencing a defendant

14:10:55  23   based on the defendant's conduct.   And throughout this

14:10:59  24   case, El-Hindi's words and actions don't always meet.

14:11:08  25   In a conspiracy case, your words will get you convicted.

14:11:12  1    Beyond a doubt that is a possibility.   If you're

14:11:17  2    charged with the underlying offense, you need actions.

14:11:22  3    But in a conspiracy case, your words will do it.   But

14:11:25  4    for the purposes of sentencing, we have to examine his

14:11:28  5    conduct and his conduct with the Ahmeds.

14:11:37  6            Although he caused them to be in Cleveland,

14:11:40  7    and he said things from that period on that made it

14:11:45  8    sound like he was going to facilitate their training to

14:11:50  9    get them trained, that was not part of his conduct that

14:11:54  10   he did that.   Was it his intent at the time?   I don't

14:12:00  11   know.   He seemed to indicate it was in his words.   But

14:12:04  12   he never did it.   He never followed through with it.

14:12:09  13   So if we're going to sentence him for his conduct, that

14:12:11  14   has to be an important factor.

14:12:22  15            We are asking the Court --

14:12:29  16            THE COURT:   Recollect for me, the trip to

14:12:31  17   Cleveland was the only time the Ahmeds were in Ohio?

14:12:42  18            MR. HARTMAN:   No, they were in Toledo four

14:12:43  19   times.

14:12:44  20            THE COURT:   Four times.

14:12:45  21            MR. GETZ:   Your Honor, I'm not sure the

14:12:46  22   record indicates that.

14:12:47  23            THE COURT:   I don't think it does.

14:12:52  24            MR. HARTMAN:   I believe we had testimony to

14:12:56  25   that effect from an agent --

14:13:02  1          THE COURT:  Let me ask you this:  Assuming

14:13:05  2   it's in the record, what does the record then show about

14:13:11  3   why they were here and whom they saw and what they did?

14:13:14  4          MR. HARTMAN:  They were here with El-Hindi.

14:13:17  5   I think that's it.  My co-counsel is writing me a note.

14:13:23  6   Can I have just a minute?

14:13:27  7          THE COURT:  You can also stand up, Mr. Boss,

14:13:29  8   and play a little tag team.

14:13:31  9          MR. BOSS:  Thank you, Judge.  Among the

14:13:32  10  matters that are in the record I believe are indications

14:13:35  11  that Yousef El-Hindi was driven to Ohio to Marwan's

14:13:39  12  house by the Ahmed cousins.  We also have phone records

14:13:44  13  that had indicated that they were here.  And I believe

14:13:49  14  that that's the source of Mr. Hartman's four business.

14:13:57  15         MR. HERDMAN:  Judge --

14:13:58  16         MR. HARTMAN:  Judge, this is argument.

14:14:00  17         THE COURT:  Time out.

14:14:06  18         MR. HERDMAN:  I just --

14:14:07  19         THE COURT:  Time out.  It seems to me it's

14:14:09  20  a little like the picture of Mr. Amawi.  I'm not too

14:14:14  21  sure.  The record shows what the record shows.  And

14:14:17  22  I'm not sure it does too much good either way to

14:14:20  23  speculate what might or might not have happened

14:14:29  24         I think, Mr. Hartman, what you're saying is,

14:14:34  25  you brought it up yourself, Judge, they were here four

14:14:37    1    times, and you don't hear anything about that from Mr.

14:14:43    2    Griffin.  We don't have any conversation; we don't have

14:14:45    3    any recorded testimony.  We don't have any evidence of

14:14:49    4    anything that had anything to do with this conspiracy

14:14:53    5    having happened with these so-called recruits.

14:14:57    6                MR. HARTMAN:  That's correct.  And we

14:14:59    7    don't.  And the point is, Judge, what I'm getting to is

14:15:01    8    we don't have any training that was facilitated by

14:15:05    9    El-Hindi.

14:15:07   10                MR. EL-KAHMAWY:  Your Honor, with your

14:15:09   11    permission, what is not in the videos is as important as

14:15:15   12    what is in the videos.  When the Ahmed boys were in

14:15:21   13    Columbus -- in Cleveland, Ohio during ICNA, they spent

14:15:24   14    three days there.

14:15:25   15                THE COURT:  During?

14:15:28   16                MR. EL-KAHMAWY:  The ICNA conference.  And

14:15:31   17    they met on camera once with Darren Griffin.  They

14:15:35   18    never met behind closed doors with Darren Griffin.

14:15:38   19                THE COURT:  Again, we don't know what

14:15:44   20    transpired off camera, literally and figuratively.  I

14:15:52   21    can't consider that.  But we don't have any testimony.

14:16:02   22    And I think ultimately, Mr. Hartman, that's the point

14:16:04   23    you're making.

14:16:05   24                MR. HARTMAN:  That's correct.  There are a

14:16:07   25    lot of things that were discussed yesterday that I think

14:16:09  1    the Court has a handle on that apply to all three

14:16:14  2    defendants.    And I don't want to be repetitive.    I'm

14:16:16  3    going to move on and talk specifically about three of

14:16:20  4    the factors under 18 USC 3553.

14:16:25  5         THE COURT:  What else would you contend were

14:16:30  6    misstatements by Mr. Getz?  You said, Either you're with

14:16:36  7    us or against us, the Ekhlaas website having nexus with

14:16:43  8    Mr. El-Hindi or he having nexus or connection with it.

14:16:48  9    You used the question of using his experience with

14:16:54  10   grants to generate money.

14:16:58  11        MR. HARTMAN:  Referring to Griffin as a

14:17:03  12   jihadi.

14:17:11  13        THE COURT:  You say somebody else referred

14:17:13  14   to him in that fashion, or he was repeating someone

14:17:17  15   else?

14:17:17  16        MR. HARTMAN:  Correct.

14:17:22  17        And asking Zubair, Are you with us or not.

14:17:25  18        THE COURT:  I got that.    And the issue of,

14:17:28  19   quote, recruitment.    Anything else?

14:17:30  20        MR. HARTMAN:  Well, I think there are some

14:17:32  21   other things on which I disagree in interpretation with

14:17:34  22   the government as we go through that will come up.

14:17:37  23        THE COURT:  That's different than a mistake.

14:17:39  24        MR. HARTMAN:  That's correct.

14:17:48  25        THE COURT:  You may continue.    Go ahead.

14:17:50  1              MR. HARTMAN:  Thank you.   Under 18 U.S.C.

14:17:58  2    3553(a)(2), it's the need for the sentence imposed to

14:18:00  3    reflect the seriousness of the offense, to afford

14:18:05  4    adequate deterrence, protect the public, and provide

14:18:09  5    educational and vocational training, et cetera.

14:18:13  6              Now, reflecting the seriousness of the

14:18:17  7    offense, it's just what you said earlier about this not

14:18:22  8    being a case about terrorism with a capital T.   I

14:18:29  9    couldn't help noticing yesterday on the way into the

14:18:35  10   courthouse the lack of extra security.  There were no

14:18:41  11   vans around, no extra agents, no paramilitary, no bomb

14:18:48  12   sniffing dogs, nothing.   And in a sense this is not at

14:18:57  13   all like the case we started with.   And I think, as I

14:19:01  14   look around the room, I think you and I were the only

14:19:05  15   ones there on day one.   I think I was the only lawyer

14:19:08  16   on the first day from the defense side.   But in many

14:19:12  17   ways, Judge, this is just like any other case.   This is

14:19:17  18   not a big terrorism case.   And it's not to say it's not

14:19:23  19   serious.   But I would --

14:19:28  20              THE COURT:  Don't get tripped up by the

14:19:30  21   label?

14:19:31  22              MR. HARTMAN:  Right.   Exactly.   That's

14:19:33  23   exactly what I'm saying.

14:19:36  24              The need to afford adequate deterrence.   A

14:19:39  25   life sentence is not necessary here.

14:19:41  1          THE COURT:  I agree.  I think we're talking

14:19:46  2  about personal and public deterrence, with a greater

14:19:50  3  emphasis on public deterrence.  And even back up

14:19:53  4  further to Beccaria and Bentham, we're talking about

14:20:10  5  either incapacitation, punishment, deterrence, or

14:20:14  6  rehabilitation.  Those factors may not be on the list,

14:20:24  7  but they underlie everything a criminal court ever does.

14:20:27  8  I think in this instance we are talking about punishment

14:20:30  9  and deterrence.

14:20:32  10          MR. HARTMAN:  And the need to protect the

14:20:34  11  public.

14:20:36  12          THE COURT:  That comes in in the

14:20:40  13  construct -- traditional construct both in terms of

14:20:44  14  incapacitation and deterrence.  In other words, either

14:20:50  15  incapacitate the individual because he directly and

14:20:54  16  immediately is a danger; he's going to go on out the

14:21:01  17  front door and go about the same business.

14:21:03  18  Alternatively, protect the public by making an example

14:21:06  19  of the individual and so that other individuals who

14:21:13  20  might think about this will say, Wait a minute.  Either

14:21:16  21  way, you're protecting the public by very different

14:21:21  22  penological purposes or policies that apply.  Candidly,

14:21:30  23  I think after whatever term he may serve, and I think

14:21:34  24  the government itself by taking the approach that it has

14:21:39  25  in its argument as sort of the puller of the strings

14:21:46  1  rather than on the trigger, to speak metaphorically, is

14:21:51  2  indicating that in its view the involvement of Mr.

14:21:57  3  El-Hindi, without diminishing the government -- it's

14:22:01  4  standpoint of his culpability or the need for

14:22:09  5  punishment, was a different and distinct kind of

14:22:16  6  quality.  He was, I think Mr. Getz acknowledged this,

14:22:21  7  he was sort of doing inside what Griffin was doing and

14:22:26  8  being asked to do on the outside of the group as it

14:22:30  9  were.  In other words, help to move things along and

14:22:32  10  facilitate and so forth.  He wasn't running around the

14:22:40  11  fields playing paint ball or whatever.  He didn't go to

14:22:43  12  the shooting range, did he?

14:22:45  13          MR. HARTMAN:  No, he didn't.

14:22:46  14          THE COURT:  Okay.  So I really think that

14:22:51  15  the government might not go that far, but I think the

14:22:54  16  issue of incapacitation is a significantly less concern

14:22:59  17  than punishment and public deterrence.  And in thinking

14:23:05  18  about all of this, punishment serves an important public

14:23:09  19  function because it says -- it's the way a society

14:23:17  20  speaks to itself and sets its standards and says, This

14:23:21  21  kind of conduct is not followed.  It says so in a case

14:23:31  22  like this even though the harm is a potential harm.

14:23:39  23  And as I tried to say earlier, perhaps not in these

14:23:44  24  terms, I think that's an important consideration.  And

14:23:48  25  I think that's ultimately what motivates the government

14:23:51  1    in making the demand, even in Mr. El-Hindi's case, and

14:23:55  2    perhaps be in Mr. Mazloum's case:  Judge, put these

14:23:58  3    people away for life so that the rest of the country and

14:24:01  4    the rest of the world know that we mean business, and

14:24:06  5    there is no mercy when you start not just talking about

14:24:12  6    but start heading in the direction, even if he didn't

14:24:17  7    get very far because the government was walking beside

14:24:20  8    you ever step of the way from the outset, nonetheless,

14:24:25  9    the consequences are potentially so grave and so

14:24:30  10   substantial, even if any individual defendant there was

14:24:34  11   no way those consequences could occur.  So I think the

14:24:42  12   historical concept of punishment is important as well.

14:24:49  13        Obviously I'll make my decision based upon

14:24:52  14   the factors.  And I'm trying to communicate to you, I

14:24:56  15   agree with you in terms of the incapacitation concept.

14:25:02  16   I really think the likelihood that Mr. El-Hindi, once he

14:25:07  17   is released from prison, once he returns to his family

14:25:10  18   here in the United States, that he's going to do

14:25:12  19   anything of this sort is very seldom.  The government

14:25:16  20   disagrees.  I think that likelihood will be monitored

14:25:20  21   and controlled through a lifetime of supervised release.

14:25:23  22   So incapacitation and personal deterrence --

14:25:31  23        MR. HARTMAN:  I think it's important, Judge,

14:25:33  24   to keep in mind, though, that the conduct never got to

14:25:39  25   the point of action because he didn't make it.   It's

14:25:45  1   not that the government was walking right alongside him.

14:25:49  2   He never did it.    After February and March, he didn't

14:25:57  3   have -- he had very little contact with the

14:26:00  4   co-defendants.    He had no contact with Zubair and

14:26:03  5   Khaleel, and he had very little contact with Griffin.

14:26:07  6   When Griffin called him in January a couple weeks before

14:26:11  7   he was arrested, Griffin says something like, How's

14:26:16  8   Wassim?    And El-Hindi says, Who?    And when he saw him,

14:26:23  9   he said, Boy, you've lost quite a bit of weight.    It

14:26:27  10  had been months they hadn't seen each other.    He wasn't

14:26:30  11  doing anything.    He wasn't trying to make anything

14:26:32  12  happen.

14:26:40  13          THE COURT:  So when would you say the last

14:26:43  14  contact or consequence, the last act of consequence

14:26:48  15  visible in this record occurred, giving the government

14:26:53  16  full credence?  I'm not asking you to go against

14:27:02  17  yourself.  I'm asking you what is the last thing the

14:27:08  18  government can point to as some kind of conduct or

14:27:13  19  consequence between Mr. Amawi, Mr. Mazloum, the Ahmeds,

14:27:19  20  or whatever?

14:27:20  21          MR. HARTMAN:  Well, the government would

14:27:21  22  argue it was when El-Hindi and Griffin went to see Mr.

14:27:27  23  Dahabi about forming a nonprofit group.    That was April

14:27:31  24  4.    I don't think that was it.    I think it was before

14:27:34  25  that.

14:27:36  1         THE COURT:  But that would be ten months

14:27:38  2  before the arrest?

14:27:40  3         MR. HARTMAN:  Correct.  Correct.  I don't

14:27:43  4  recall without looking specifically.

14:27:46  5         THE COURT:  That's fine.  I'm sure Mr. Getz

14:27:48  6  will give me its view as well.  But I really want to

14:27:52  7  know what you think the government can point to with

14:27:55  8  some degree of plausibility, even if you disagree with

14:27:58  9  its interpretation, the significance of Mr. Dahabi.

14:28:05  10        MR. HARTMAN:  I think that was Marwan --

14:28:06  11        THE COURT:  I recall Mr. Dahabi testified.

14:28:13  12 He threw away those papers in light of the FBI because

14:28:15  13 he was frightened about what Griffin was talking about

14:28:18  14 rather than what your client might have been talking

14:28:20  15 about.

14:28:22  16        MR. HARTMAN:  Correct.

14:28:30  17        THE COURT:  But quite candidly, I think

14:28:32  18 public deterrence is among the factors.  You'll go

14:28:39  19 through them again, but that's the one that's foremost

14:28:42  20 in my mind in trying to fashion a sentence sufficient

14:28:44  21 but not greater than necessary to accomplish that

14:28:48  22 objective.

14:28:50  23        MR. HARTMAN:  And what we're deterring --

14:28:52  24        THE COURT:  It's not life imprisonment.

14:28:54  25 And I'm not contemplating 20 years.  Okay.  I'll hear

14:28:59    1    from Mr. Getz.    And I haven't made my mind up.    But I

14:29:04    2    just want you to know, all as I'm saying in 30 seconds,

14:29:11    3    there are some things you don't have to worry about.

14:29:14    4    Incapacitation and private deterrence, I know what

14:29:20    5    you're going to say, and I agree.    I do agree.    Mr.

14:29:27    6    Getz may persuade me otherwise, or seek to.    And if his

14:29:31    7    arguments cause me to think again, I'll let you know.

14:29:35    8    I'll say, Mr. Hartman, what about this or that?

14:29:42    9            MR. HARTMAN:  So I could have slept last

14:29:44   10    night?

14:29:49   11            Then I want to talk about recruitment if

14:29:51   12    it's okay with you.

14:29:54   13            THE COURT:  Under the seriousness of the

14:29:56   14    offense, as I see it listed in the statute, and respect

14:30:00   15    for the law, I think that's an important consideration.

14:30:05   16    And I really do think the issue of public deterrence.

14:30:14   17    Mr. Sofer said, I think sending a message -- I think,

14:30:21   18    quote, "sending a message" ultimately may be the most

14:30:26   19    useful thing a Judge does when he or she sentences

14:30:31   20    somebody because it speaks to the public.    What I'm

14:30:48   21    trying to say, to some extent that's the job that a

14:30:51   22    Judge does, by holding somebody out, saying:  Do this,

14:30:57   23    and that's what happens.

14:30:59   24            MR. HARTMAN:  But send the message --

14:31:03   25            THE COURT:  I'm sorry.

14:31:05   1          But particularly in this area.   I do think,

14:31:08   2     and I'm not affected by the label.   But I'm concerned

14:31:15   3     about the prospect of confronting this country in

14:31:20   4     general and how we as a society reduce the risk to

14:31:28   5     ourselves and even the risk elsewhere.   And I think

14:31:37   6     quite candidly a severe punishment, even though these

14:31:43   7     three people simply didn't get very far along, and

14:31:48   8     simply never were going to get any further --

14:31:52   9          MR. HARTMAN:  By choice with him.

14:31:53  10          THE COURT:  Pardon?

14:31:54  11          MR. HARTMAN:  By choice.

14:31:55  12          THE COURT:  And that's a fair argument to

14:31:57  13     make.   I think you're making it well, Look, Judge, for

14:32:01  14     ten months they got nothing except that phone call

14:32:08  15     chart.   Those phone calls at least between phone

14:32:11  16     numbers, right?

14:32:14  17          MR. HARTMAN:  Yeah, there are some phone

14:32:15  18     calls.

14:32:16  19          THE COURT:  I think the answer to that is,

14:32:18  20     okay, they're there.  We don't know who was speaking; we

14:32:22  21     don't know what was said.   So you're saying, Judge, to

14:32:29  22     the extent there may have been some contact, you can't

14:32:33  23     give it a whole lot of weight.   It isn't fair.   You're

14:32:38  24     considering conduct that simply -- it's at least a great

14:32:43  25     likelihood it's not relevant, as it would be relevant

14:32:47  1  conduct as that term is used in the guidelines.

14:32:49  2          MR. HARTMAN:  Yeah.  It's conduct.  You're

14:32:51  3  also sending the message that you get punished for what

14:32:54  4  you do.  On the spectrum of these types of cases, you

14:33:00  5  have people who get punished for what they did.  You

14:33:07  6  know, it's after the fact.  There was some kind of

14:33:10  7  attack or something.

14:33:11  8          THE COURT:  Putting what they think to be a

14:33:15  9  bomb in the trunk and getting in the car.

14:33:18  10          MR. HARTMAN:  Moussaoui, the 20th hijacker.

14:33:22  11          THE COURT:  The millennium bomber.

14:33:24  12          MR. HARTMAN:  Exactly.  You also have

14:33:26  13  people who get caught in the end.  And the message to

14:33:29  14  those people is unequivocal:  You get locked up for

14:33:34  15  life.  Period.  Then you have people who are preparing

14:33:42  16  for whatever act it is they're doing.

14:33:47  17          THE COURT:  Then you would say, assume the

14:33:50  18  next level down, meaning another level down is people

14:33:53  19  are talking about preparing for the act?

14:33:56  20          MR. HARTMAN:  That's down three or four

14:33:58  21  levels, people talking about the act.  They're not

14:34:00  22  talking about the preparation.  They haven't chosen

14:34:03  23  something to do.  When Griffin said, Marwan, maybe you

14:34:07  24  want to go to Philistine, that's the only indication

14:34:12  25  that there was something to do.  Even in this whole

14:34:15  1    conspiracy, there was never a plan.   There was never an

14:34:20  2    objective.   There was -- well, there was a loose

14:34:24  3    objective.

14:34:25  4              THE COURT:  But never a timetable?

14:34:28  5              MR. HARTMAN:  Never a timetable.

14:34:29  6              THE COURT:  Never a destination?

14:34:30  7              MR. HARTMAN:  Or a target.

14:34:31  8              THE COURT:  There was never a method.

14:34:34  9              MR. HARTMAN:  Right.   It's at the bottom of

14:34:37  10   that spectrum.   And the message should also be that you

14:34:40  11   do get a fair shake here.   And you get punished for

14:34:43  12   your conduct, like the statute says.

14:34:55  13             Khaleel and Zubair Ahmed actually were way

14:35:04  14   up on that spectrum because --

14:35:10  15             THE COURT:  Eight or nine year -- they got

14:35:15  16   an eight or nine year binding sentence.

14:35:18  17             MS. SIZEMORE:  They have not yet been

14:35:20  18   sentenced.

14:35:21  19             THE COURT:  But they're binding plea

14:35:23  20   agreements.

14:35:23  21             MS. SIZEMORE:  Correct.

14:35:24  22             THE COURT:  So I have no discretion.   Eight

14:35:27  23   or nine years.

14:35:28  24             MR. HARTMAN:  I think nine to 11.

14:35:34  25             MR. HERDMAN:  Your Honor, they're tied to a

14:35:35  1   specific guideline range.   It would be a criminal

14:35:38  2   history category VI.   I believe -- criminal history

14:35:54  3   category VI, Khaleel Ahmed would be at an offense level

14:35:58  4   23.   Zubair Ahmed would be at an offense level 24.

14:36:09  5          THE COURT:   So the guideline range?

14:36:16  6          MR. HERDMAN:   It's 92 to 115 months at the

14:36:20  7   offense level 23, and 100 to 125 months at the offense

14:36:27  8   level 24 for Zubair.

14:36:30  9          THE COURT:   So around ten years.

14:36:34  10          MR. HERDMAN:   I think nine to ten.

14:36:35  11          THE COURT:   That's what I thought.

14:36:37  12          MR. HARTMAN:   What El-Hindi did was nowhere

14:36:39  13   close to what those guys did.

14:36:43  14          THE COURT:   What does the record tell me

14:36:45  15   that they did?

14:36:47  16          MR. HARTMAN:   They got on an airplane and

14:36:52  17   they flew halfway across the world to meet somebody who

14:36:58  18   was going to get them into a training camp or Iraq, one

14:37:03  19   or the other.   That's getting really close to the top

14:37:09  20   of that spectrum we were talking about.   And he didn't

14:37:15  21   corrupt them.   He didn't make them terrorists or make

14:37:19  22   them want to be terrorists.   That was before he ever

14:37:23  23   met them.  The lengths they went to before they ever

14:37:28  24   came in contact with Marwan El-Hindi, they had this

14:37:31  25   interest in guns.   They had all this computer material.

14:37:36   1   They had this firearms license.

14:37:38   2           THE COURT:  At least one of them had been in

14:37:40   3   contact with somebody.

14:37:42   4           MR. HARTMAN:  With Haris in Atlanta.   And I

14:37:44   5   think there was some indication of even Irhabi-007, that

14:37:50   6   Zubair was in contact with them.   I mean this was that

14:37:53   7   close to the real thing.   If that contact in Cairo had

14:37:58   8   turned out -- I don't know what happened there, so I

14:38:01   9   can't say, but it was close to the real thing.   And

14:38:08  10   they got the benefit of a plea agreement because of the

14:38:12  11   contact with that other person probably.   You know what

14:38:15  12   it reminds me of, the government asking for a life

14:38:19  13   sentence for El-Hindi?  It reminds me of the old drug

14:38:22  14   cases where the girlfriend who was in the car twice when

14:38:25  15   the guy dropped off the drugs gets convicted of the

14:38:28  16   conspiracy, and she's responsible for all the drugs in

14:38:31  17   the whole conspiracy, but the guy who was the dealer can

14:38:34  18   give up people above him, so he gets a plea deal, and he

14:38:39  19   walks or gets a light sentence, and she goes to prison

14:38:42  20   for 20 years.   She wasn't really a drug dealer.

14:38:47  21   That's what this reminds me of.   It's fundamentally

14:38:52  22   unfair, that situation.   But Marwan didn't corrupt

14:38:56  23   these two young men.

14:39:03  24           THE COURT:  They weren't putty; they were

14:39:07  25   already fully formed.

14:39:08  1            MR. HARTMAN:  They took the opportunity.

14:39:09  2    They tried to go be terrorists.   And the father called

14:39:13  3    Marwan for the purpose of trying to go get them and

14:39:16  4    bring them back.   He called and he said, Help.   That's

14:39:19  5    why this --

14:39:22  6            THE COURT:  But we already -- it may be

14:39:25  7    true.   But in terms of looking at his conduct here,

14:39:29  8    knowing that, and then instead of acting in a way that

14:39:40  9    he had when he went to Cairo and pulled them back from

14:39:45  10   the edge of that, kept them from taking those next

14:39:53  11   steps, he behaved differently.   They wound up coming,

14:39:58  12   but he knew -- whether he knew --

14:40:04  13           MR. HARTMAN:  That a -- sorry.

14:40:07  14           THE COURT:  -- Griffin was going to be there

14:40:09  15   or not.

14:40:09  16           MR. HARTMAN:  He didn't know Griffin was

14:40:11  17   going to be there.   I think that's an important factor

14:40:13  18   because he never met up with Griffin again.

14:40:16  19           THE COURT:  I'm sorry, but this is very

14:40:18  20   troublesome because he was there, and if memory serves

14:40:24  21   on that video camera that Griffin had in his briefcase

14:40:28  22   or whatever, if I recall correctly, one way the Ahmeds

14:40:35  23   are conversing with Griffin and Mr. El-Hindi would

14:40:40  24   appear to be within earshot, or do I misrecollect?

14:40:45  25           MR. HARTMAN:  No, you're correct.   Both

14:40:46  1   Ahmeds are there.   And they are clearly talking about

14:40:50  2   Griffin training them, teaching them to shoot, run with

14:40:54  3   a .50 caliber.

14:40:55  4           THE COURT:  My problem is, Mr. El-Hindi made

14:40:59  5   a choice.   He may have made it implicitly.   And if

14:41:05  6   memory serves, I don't think he, quote, joined in the

14:41:10  7   conversation.

14:41:11  8           MR. HARTMAN:  Not much.   He talked about

14:41:13  9   training for fitness at the end.   They were talking

14:41:16  10  about getting in shape.

14:41:18  11          THE COURT:  But it was a different "he" than

14:41:23  12  the "he" who was in Cairo.  The "he" who went to Cairo

14:41:33  13  pulled them back.   He didn't pull them back.   He sat

14:41:38  14  idly by in Cleveland, and they are talking in pretty

14:41:42  15  unmistakable terms about what they want and how they're

14:41:45  16  going to get it from Griffin.   And that's troublesome.

14:41:52  17          MR. HARTMAN:  There is no question; you're

14:41:54  18  exactly right.   But really, Judge, let's look at what

14:41:57  19  happens after that.

14:41:59  20          THE COURT:  Because once again, I think part

14:42:01  21  of the message that ought to be communicated is:  Watch

14:42:06  22  out.   This is a danger zone.   It's like a minefield.

14:42:11  23  You don't know where the mines are.   There may be one;

14:42:14  24  there may be 100.   The path may be narrow or wide.

14:42:18  25  But in this area, I think part of the function of the

14:42:23  1   Court in a case like this is to say to people like Mr.

14:42:26  2   El-Hindi, particularly after the laudable thing that he

14:42:31  3   did, to sit there and to hear this in his own

14:42:39  4   self-interest or anyone else similarly situated to say:

14:42:42  5   Time out; wait a minute; forget about it; that's not why

14:42:46  6   I brought you here.  We've got this other conference

14:42:48  7   going on.  Stay away from Griffin.  He is nothing but

14:42:51  8   bad news.  What he's talking about, what he's already

14:42:57  9   talked about can get you in trouble.  Again, I keep

14:43:04  10  coming back to this.  I think an appropriate function

14:43:09  11  in a case such as this  is to raise that skull and

14:43:14  12  crossbones, danger, minefield, danger, don't go there,

14:43:18  13  turn around.

14:43:18  14           MR. HARTMAN:  Okay.  There's another way to

14:43:20  15  do the same thing.  There's another way to do that,

14:43:27  16  which is that you tell him, okay, yeah, I'll get you

14:43:31  17  together; we'll do it.  But then you never do.  And

14:43:36  18  the comments after that.  And they don't even allege

14:43:45  19  Griffin and the Ahmeds got together after Cleveland.

14:43:48  20  But the comments after that, you hear El-Hindi saying,

14:43:51  21  Maybe we'll get together, when he's talking to Griffin,

14:43:54  22  or when he's talking to the Ahmeds.  But you also hear

14:43:57  23  him say completely contradictory things to Griffin about

14:44:05  24  those same guys.  You hear him say they're doing well.

14:44:10  25  They're back in school.  You hear him tell Griffin,

14:44:13  1  Tell them you'll train them, but not for jihad.  I

14:44:16  2  mean, he talks out of both sides of his face.

14:44:27  3          That's not relegated to just this specific

14:44:30  4  issue either.  I mean, for the government, the

14:44:33  5  government called him a thief and a con man.  But then

14:44:36  6  they turn around and said that he was a great leader in

14:44:39  7  the community.  Judge, no, that's not the reality of

14:44:46  8  the situation.  I think in large part it's a cultural

14:44:50  9  thing, but I think the way that the government pegs him

14:44:53  10  as a con man and they talk about he's a small

14:44:56  11  nickel-and-dime hustler, well, I mean, it's a question

14:45:02  12  of perspective.  But you think of an entrepreneur, a

14:45:08  13  businessman on the one hand, a nickel-and-dime hustler

14:45:11  14  on the other.  Depends on your definition.  But that's

14:45:14  15  him.  And everybody knows that.  He wasn't the leader.

14:45:19  16  And he didn't have to lead these kids into doing

14:45:21  17  anything either.  We have to remember that.  They were

14:45:24  18  already there.  They were already on the plane.  He

14:45:28  19  didn't have to make them do anything.  So afterwards,

14:45:32  20  not only doesn't he get them together with Griffin, but

14:45:35  21  you can't tell from his words what he wants to do.  The

14:45:39  22  government points out, rightly, when he makes comments

14:45:44  23  that make it sound like he's going to get them together

14:45:47  24  again.  And we pointed out when he makes comments that

14:45:51  25  make it sound like he's not going to get them together

14:45:56  1    again.

14:45:57  2                THE COURT:  What's the most significant

14:46:01  3    aspect of there's no "there" there?  There was no

14:46:06  4    further -- there's no evidence of anything untoward

14:46:10  5    between him and the Ahmeds there, correct?

14:46:14  6                MR. HARTMAN:  Absolutely.

14:46:15  7                THE COURT:  Okay.  And I understand that.

14:46:18  8                MR. HARTMAN:  Absolutely.

14:46:27  9                THE COURT:  The fact they may have been here

14:46:31  10   four times, I simply can't speculate one way or the

14:46:34  11   other.  For all we know, he may have been discouraging

14:46:38  12   them.  Look, guys, for all we know he may be saying,

14:46:42  13   We'll get to it.  Either way, it's speculation, and I

14:46:48  14   can't say.

14:46:51  15               MR. HARTMAN:  That's fair.  But the record

14:46:53  16   does reflect no meeting.  And we can leave it at that.

14:47:05  17               Now, Griffin pushed El-Hindi this whole

14:47:07  18   time, Judge.  This is another important factor in why

14:47:12  19   this thing seemed so big.  And Griffin, the recordings,

14:47:21  20   is pushing El-Hindi constantly to get him together with

14:47:24  21   the Ahmeds.  And that doesn't happen.  So the problem

14:47:30  22   for El-Hindi is that he stays around.  The government

14:47:38  23   said -- Mr. Sofer pointed out over and over again in his

14:47:42  24   closing argument, He didn't run away.  He didn't do

14:47:45  25   anything, but he didn't run away.  Well, eventually I

14:47:51  1    think Griffin probably understood that nothing was going

14:47:54  2    to happen with the Ahmeds, but by this time Amawi's on

14:47:58  3    the scene, and we have that interaction.

14:48:04  4            This is again a perfect example of the fact

14:48:09  5    that Griffin is pushing this thing.  Griffin is coming

14:48:12  6    after this.  It's not El-Hindi.  Griffin told the FBI,

14:48:16  7    you know, on multiple occasions, you know, he was

14:48:20  8    creating the cell.  He didn't get asked to do that by

14:48:23  9    Marwan El-Hindi.  When he met Amawi on February 2, it

14:48:28  10   was because Griffin brought him over to Amawi's house.

14:48:31  11   He didn't know who he was.  And they end up watching

14:48:35  12   the videos.  And the videos are disturbing to us.  But

14:48:40  13   Griffin made that happen.  On the 16th when they come

14:48:46  14   to El-Hindi's house, the planning meeting or however it

14:48:53  15   was described, El-Hindi didn't even know that was going

14:48:56  16   to happen.  He thought Amawi was coming over to fix his

14:49:00  17   computer.  He didn't even know Mazloum was coming.

14:49:10  18            When they get there, the government shows

14:49:14  19   you Sentencing Exhibit 6, which is the picture of the

14:49:22  20   child.

14:49:22  21            THE COURT:  I remember the video.

14:49:24  22            MR. HARTMAN:  You remember the video.

14:49:25  23   Okay.  Well, then you heard what the government said.

14:49:38  24   He was sitting, hearing, listening to everything going

14:49:42  25   on.  That's how Mr. El-Hindi -- that's how they

14:49:45  1   characterized Mr. El-Hindi in this meeting.

14:49:47  2           If you saw that video, you remember that's

14:49:48  3   not true because you remember the empty couch.  He left

14:49:52  4   several times, Judge.   El-Hindi was active, but it's

14:49:55  5   because he was serving food, and at one point playing

14:49:58  6   with his kids.   That video is actually a good corollary

14:50:02  7   for this whole case because El-Hindi's active, but he's

14:50:08  8   not engaged with what's going on.

14:50:11  9           THE COURT:  He's not proactive.

14:50:14  10          MR. HARTMAN:  No, he's not proactive.

14:50:16  11          But again, he doesn't run away.   And his

14:50:19  12  words come out of both sides of his mouth.   And that's

14:50:24  13  clearly enough to get him convicted.

14:50:43  14          THE COURT:  I think we want to encourage

14:50:45  15  people in that situation to run away.

14:50:47  16          MR. HARTMAN:  It's hard to do.

14:50:49  17          THE COURT:  I understand.

14:50:50  18          MR. HARTMAN:  It's even harder for

14:50:52  19  someone --

14:50:54  20          THE COURT:  I'm sorry.  Go ahead.

14:50:55  21          MR. HARTMAN:  I'm sorry.  It's even harder

14:50:57  22  for someone who's Arab.

14:50:59  23          THE COURT:  Who's what?

14:51:01  24          MR. HARTMAN:  An Arab.   I'm reading the New

14:51:04  25  York Times this weekend, and there's a story about the

14:51:07  1    New York Times journalists, I don't know if you saw it,

14:51:10  2    who got kidnapped.   And there's a reference in here to

14:51:15  3    having someone in your house and being a host.   It's a

14:51:19  4    cultural thing we don't understand.   He's not going to

14:51:23  5    throw them out of the house.   He's just not.

14:51:29  6              I understand that the Court wants to send a

14:51:32  7    message to people that you should have thrown him out of

14:51:35  8    the house.   But if you don't do anything, the layman is

14:51:44  9    going to think as long as you don't do anything, you

14:51:48  10   don't get in trouble.   I'm not doing anything.   And

14:51:51  11   most laymen are going to think about that.   But again,

14:51:56  12   you run into conspiracy law, and there you go.   You

14:52:00  13   know, even if I said -- showed an interest, even if I

14:52:05  14   said things that made it sound like I'm interested, as

14:52:09  15   long as I don't do anything, if I don't cross that line,

14:52:11  16   I don't get in trouble.   So I didn't really have to

14:52:14  17   throw them out of the house.   I can just sit here and

14:52:17  18   listen.   The problem for El-Hindi is that afterwards he

14:52:19  19   goes and watches those videos -- in and of itself not a

14:52:23  20   crime.   But again, it makes him look interested.   But

14:52:27  21   if we're going to sentence him on his conduct, El-Hindi

14:52:37  22   doesn't take the book that Griffin offers.   El-Hindi

14:52:42  23   doesn't take the book that Griffin offers when he's at

14:52:45  24   this meeting.   He doesn't respond when Griffin out of

14:52:48  25   the blue for the very first time when he says, Marwan,

14:52:51  1   maybe you want to go to Philistine, he doesn't show any

14:52:53  2   response to that.   He didn't engage in that portion of

14:52:58  3   the conversation where Griffin was talking about his

14:53:02  4   plan.

14:53:03  5           Now, the government will point out,

14:53:05  6   correctly so, that he did engage in a conversation with

14:53:08  7   Amawi and Mazloum where they're talking about  conflict

14:53:13  8   in the Middle East and who needs what and what people

14:53:18  9   are trying to do.   Well, you know what, again, as long

14:53:22  10  as they don't cross that line, I'm not doing anything

14:53:26  11  wrong, and I can't get in trouble.   I'm not saying that

14:53:29  12  saying the Mujahidin needs manpower is akin to saying

14:53:32  13  the Red Sox need pitchers; I'm not going to say that.

14:53:36  14  But on some level --

14:53:40  15          THE COURT:  Actually, it's hitters.   But go

14:53:43  16  ahead.

14:53:43  17          MR. HARTMAN:  It's usually pitchers.

14:53:45  18          THE COURT:  I understand what you're saying.

14:53:49  19          MR. HARTMAN:  And I don't mean to belittle

14:53:51  20  this.   I really don't.

14:53:52  21          THE COURT:  I know.   Neither do I.

14:53:56  22          MR. HARTMAN:  But if you're just talking

14:53:58  23  about it, and again, I think this might be in part a

14:54:01  24  cultural thing --

14:54:04  25          THE COURT:  I understand exactly what you're

14:54:09  1  saying.  I think there is a difference between, for

14:54:13  2  whatever reason, saying, I hope the insurgency prevails;

14:54:17  3  I hope they drive the Americans out of the Middle East

14:54:21  4  forever.  Clearly a difference between that, protected

14:54:29  5  speech in this country, not popular, but so what; and

14:54:34  6  saying, you know, Maybe I'll go over there and help,

14:54:37  7  that's how strongly I feel about it.  That's when you

14:54:40  8  begin to cross the line.

14:54:42  9              MR. HARTMAN:  Right.

14:54:43  10              THE COURT:  And listening to you reminds me

14:54:45  11  of something, when I was -- for three summers in college

14:54:52  12  I carried mail.  I've never forgotten the first day on

14:54:56  13  the job.  And the assistant postmaster got a group of

14:55:03  14  us substitutes, and he started talking about what we

14:55:06  15  shouldn't do with the mail.  You shouldn't be reading

14:55:09  16  the Playboys; you shouldn't be reading post cards; you

14:55:13  17  shouldn't look at catalogs.  Somebody has paid us to

14:55:17  18  carry that.  Even if it's junk to us, it's not to the

14:55:21  19  people that paid for it.  You have to act as if there's

14:55:25  20  a postal inspector behind every mailbox looking at you.

14:55:29  21  And in all candor, I think that's what the government

14:55:31  22  wants to accomplish through prosecutions such as this.

14:55:34  23  It's perfectly all right.  We're not going to punish you

14:55:38  24  for whatever your views are, whether you support what

14:55:43  25  the government does or you do not support.  Whatever

14:55:46  1  you say, for or against.  But when somebody shows up at

14:55:54  2  your doorstep saying, Let's do jihad, let's do something

14:55:58  3  about this, let's get training, let's get about the

14:56:02  4  business of it; just like the young letter carrier that

14:56:08  5  summer that got asked if anybody was talking to you and

14:56:14  6  trying to reduce you to flypaper, and -- I think that's

14:56:24  7  why the government says this prosecution is so

14:56:29  8  important, because given the ultimate consequences, and

14:56:33  9  given the clear difficulty of detecting these kinds of

14:56:37  10  conspiracies, as I understand, I've seen in the paper

14:56:47  11  the nature of the cases that come to public attention,

14:56:51  12  not only drug cases, they catch somebody dealing, they

14:56:58  13  have a hook, they go from there, they know what's going

14:57:04  14  on.  Here they don't because of the secretive nature of

14:57:12  15  this kind of thing.  You don't have that sort of be

14:57:14  16  public activity, that activity that potentially could

14:57:17  17  come into the view of law enforcement agents.

14:57:22  18          MR. HARTMAN:  But by the same token, here

14:57:24  19  they know because it was their guy who went looking for

14:57:28  20  him.

14:57:30  21          THE COURT:  That's exactly my point.  Just

14:57:33  22  like other people who say, oops, wait a minute, back

14:57:38  23  off, wait a minute.  I want nothing to do with Mr.

14:57:43  24  Griffin and his -- I think there was some reference he

14:57:47  25  took lots of other people shooting out there.  For

14:57:50  1   whatever reason, they weren't joined in this indictment.

14:57:55  2   They never reindicted or anything.   A fair inference,

14:58:00  3   assuming that Mr. Griffin took them out to Clelands for

14:58:03  4   the same reason he took these guys out, they made a

14:58:07  5   decision and said, oops, no thanks.

14:58:11  6              MR. HARTMAN:  But a lot of this, what

14:58:16  7   happened with El-Hindi didn't start until Griffin came

14:58:18  8   on the scene.   So --

14:58:23  9              THE COURT:  I don't know.   Assuming I

14:58:27  10  credit or I agree with the connection to be made with

14:58:30  11  the Eckhlaas and the IAI e-mail, the postings on the

14:58:39  12  Ekhlaas website.

14:58:40  13             MR. HARTMAN:  That was after Griffin was on

14:58:42  14  the scene.   Griffin had been working on him for four

14:58:44  15  years.

14:58:44  16             THE COURT:  Yeah, but Griffin didn't say,

14:58:47  17  Hey, here's how you get yourself to get all this cool

14:58:50  18  kind of stuff.

14:58:51  19             MR. HARTMAN:  No, but he did say back in

14:58:56  20  2003, early 2003, I want to get militant.   I want to be

14:59:01  21  over there doing a training program.   He started

14:59:03  22  talking like that.   And he spends that much time

14:59:08  23  talking like that to a person.   He's creating his cell.

14:59:16  24  But is he creating not just the cell, but he is creating

14:59:28  25  something in that defendant.   Is he incubating something

14:59:33  1    that otherwise wouldn't have come out?   I don't know.

14:59:38  2    But the way you're talking about it, that's a fuzzy,

14:59:45  3    fuzzy line.   And let's face it --

14:59:49  4            THE COURT:   I agree with you.   Okay.   But

14:59:52  5    it's like the sign with the message that the government

14:59:56  6    wants communicated is:   Err on the side of caution if

15:00:02  7    someone comes to you under the banner of jihad and

15:00:07  8    starts talking about going overseas and getting ready to

15:00:19  9    do it.   The government wants to tell, as loudly and as

15:00:23  10   extensively at it can, at that point you have a choice

15:00:26  11   to make because unless you back off, which from the

15:00:31  12   government's standpoint is the most effective way of

15:00:35  13   trying to keep people from progressing any further --

15:00:39  14   it's almost an inoculation.

15:00:45  15           MR. HARTMAN:   That's on the edge of being

15:00:47  16   pretty scary.   Let's face it.   This guy wasn't watched

15:00:53  17   very closely.   I mean, he was deciding what to do and

15:00:58  18   when to do it.   He was lying to his own handlers.

15:01:02  19           THE COURT:   I'm well aware of that.   If

15:01:05  20   Griffin wasn't a government employee, he's the hub of

15:01:12  21   what went on.   I understand that fully.   And I'm only

15:01:16  22   talking in terms of the message that I believe and

15:01:20  23   understand the government wants this community to hear.

15:01:25  24   And the reasons that it does so is given the nature of

15:01:27  25   the potential consequences and the difficulties in

15:01:30  1  detecting these kinds of conspiracies.  A drug

15:01:33  2  conspiracy, people are out there on the streets.  It's

15:01:40  3  a much -- the conduct at least to some extent is on the

15:01:48  4  street corner.  It's visible.  That's not the case

15:01:51  5  here.  I think that's what the government is saying.

15:01:59  6  If not, they can tell me.

15:02:01  7          MR. HARTMAN:  I understand that.  And I

15:02:02  8  understand why the government would want to say that.

15:02:05  9  But --

15:02:07  10          THE COURT:  And I don't think in doing so is

15:02:12  11  having any effect.  Mr. El-Hindi's sister said she's

15:02:15  12  scared to say anything.  Well, candidly, she shouldn't.

15:02:20  13  I understand what she means.

15:02:22  14          MR. HARTMAN:  A lot of people are.

15:02:23  15          THE COURT:  I understand that.

15:02:30  16          MR. HARTMAN:  The message that you're

15:02:31  17  sending is important; I'll give you that.  But you

15:02:36  18  can't forget that the purpose of this person and the

15:02:43  19  things that he said about his intent to go make this

15:02:47  20  happen, it definitely -- it tips a certain scale

15:02:56  21  somewhat when you're talking about his conduct because

15:03:01  22  of the way Griffin did it.  And you've got to remember,

15:03:06  23  what he's telling the FBI, you know, when Griffin and --

15:03:11  24  or when El-Hindi and Amawi have a falling out, and

15:03:15  25  Griffin tells the FBI, don't worry, I'll smooth it all

15:03:19   1   over, we'll get them to go to train.

15:03:21   2           THE COURT:  Put Humpty Dumpty back together.

15:03:25   3           MR. HARTMAN:  Yeah.   I'll go get these

15:03:27   4   guys, I'll put them together.   I'll talk them up.

15:03:30   5   I'll get them round up; I'll see if they bite.   Well,

15:03:34   6   where's that line that El-Hindi has to cross in order to

15:03:37   7   bite?   Amawi, I think by what --

15:03:42   8           THE COURT:  The jury found he crossed the

15:03:45   9   line.

15:03:45  10           MR. HARTMAN:  No, the jury found a

15:03:46  11   conspiracy, Judge.   The words.   3553 is talking about

15:03:51  12   the conduct.  We've been talking about the conduct.

15:04:08  13           Marwan's 46.   History and characteristics

15:04:12  14   of the defendant.   Just briefly -- you're going to hear

15:04:16  15   from him shortly.   He's been in the U.S. for 25 years

15:04:22  16   with no record of violence or aggression or radical

15:04:26  17   behavior.

15:04:28  18           THE COURT:  Until his concurrent fraud or

15:04:36  19   the fraud conviction.

15:04:38  20           MR. HARTMAN:  Right.   Right.   You're

15:04:40  21   right.   There wasn't any.   And there wasn't any of

15:04:44  22   those negative tendencies that we talked about until --

15:04:47  23   well, until Griffin comes along.

15:04:54  24           I think Ms. Sizemore would tell you he's

15:04:56  25   been a model prisoner up at Milan.   In fact, he wanted

15:05:02  1  to see if we could bring down some of the guards to

15:05:05  2  testify at his sentencing about the way he's been and

15:05:08  3  they were willing to do it.   But the BOP doesn't allow

15:05:11  4  that kind of thing.

15:05:17  5          The government's approach is sort of

15:05:24  6  one-size-fits-all.  Although they're going to say it's

15:05:27  7  not, it is.   And it doesn't give proper consideration

15:05:38  8  to the act or to the actor.   And Marwan was never like

15:05:45  9  this.   He was a simple guy doing the best he could with

15:05:52  10  what he had.   All these little things that we call

15:05:57  11  scams or hustling, conniving, he's trying to eek by.

15:06:06  12  That's what he's been doing in trying to raise his

15:06:09  13  family.   And he's going to tell you, his family is the

15:06:12  14  most important thing in his life.   That's part of the

15:06:15  15  record when he told Griffin, jihad to this man is

15:06:18  16  raising his children.   That's what he gets fired up

15:06:22  17  about the most.   That's what he told Griffin.   That's

15:06:26  18  jihad.

15:06:37  19          I think we've -- does Your Honor think the

15:06:42  20  cases that the government pointed out are really

15:06:44  21  analogous?

15:06:47  22          THE COURT:  No, I think we've all -- the

15:06:51  23  common understanding is this is sui generis, unique.

15:07:06  24  So far anyway.  Sort of contrary to what I'm supposed to

15:07:16  25  do, look up and find other cases, there being no other

15:07:20  1    cases, I don't have, as it were, those channel markers,

15:07:25  2    those red and green lights.

15:07:31  3              MR. HARTMAN:  I certainly don't think the

15:07:33  4    government can act as those red and green lights.  The

15:07:37  5    Fort Dix case --

15:07:38  6              THE COURT:  And in all candor, trying to

15:07:41  7    work within -- I'm trying to work within the three

15:07:43  8    individuals.

15:07:49  9              MR. HARTMAN:  I think for this one, if you

15:07:50  10   really look within the actor and the act, I think you're

15:07:58  11   going to find that the message that you need to send is

15:08:04  12   the only issue really.  But I would --

15:08:08  13             THE COURT:  I agree with you.  That's what

15:08:10  14   I was trying to say earlier.  I think your position is,

15:08:18  15   Judge, number one, that may not be what the

15:08:23  16   government -- maybe not their point, maybe I

15:08:26  17   misinterpreted the motivation and the vigor with which

15:08:32  18   they have prosecuted this particular case when, quote,

15:08:35  19   nothing has happened, and applied the resources that

15:08:40  20   have been borne into this case, both to pay you and the

15:08:46  21   other lawyers, the government lawyers, investigators,

15:08:50  22   two-plus years, $340,000 without getting a tax return

15:08:59  23   filed is candidly a very troubling circumstance.  But

15:09:02  24   that's neither here nor there.

15:09:04  25             MR. HARTMAN:  I agree.

15:09:10　1　　　　　　　　THE COURT:  But with regard to Mr. El-Hindi,

15:09:13　2　the issue is what sentence is sufficient but not greater

15:09:18　3　than necessary to communicate an appropriate message

15:09:22　4　about the conduct that he engaged in along with the

15:09:26　5　other four, if you add them all up?  Whether the Ahmeds

15:09:34　6　still are part of this indictment or not, nonetheless, I

15:09:38　7　think that's the only question, the only substantial

15:09:43　8　question.  I'll consider all the factors.  I like to

15:09:46　9　preserve the record for myself as well.  But I'll

15:09:50　10　consider those --

15:09:51　11　　　　　　　　MR. HARTMAN:  I understand.  But I think

15:09:53　12　the message you're talking about sending in this

15:09:55　13　instance is when -- run away.

15:10:03　14　　　　　　　　THE COURT:  This is not the person through

15:10:05　15　whom to make that example.

15:10:08　16　　　　　　　　MR. HARTMAN:  Clearly.  Because the example

15:10:13　17　you're making with him is run away.  That's what the

15:10:17　18　government -- that was the mantra in closing.  The

15:10:21　19　message you're sending is, Hey, folks, run away from a

15:10:24　20　guy like this, even though the government put him there.

15:10:28　21　　　　　　　　Can I have a minute to consult?

15:10:30　22　　　　　　　　THE COURT:  Of course.

15:10:32　23　　　　　　　　MR. HARTMAN:  Thanks.

15:11:53　24　　　　　　　　(Discussion had off the record.)

15:12:25　25　　　　　　　　MR. HARTMAN:  I am finished.  We will ask

| | | |
|---|---|---|
| 15:12:27 | 1 | the Court to hear from our client, but I'm wondering if |
| 15:12:32 | 2 | we can take a quick break. |
| 15:12:34 | 3 | THE COURT:  Sure.  When it rains, it pours. |
| 15:12:37 | 4 | Amy tells me I have a TRO I have to tend to. |
| 15:12:41 | 5 | MR. HARTMAN:  Thank you very much. |
| 15:12:42 | 6 | THE COURT:  I would assume not later than |
| 15:12:46 | 7 | 3:30 we'll get underway.  How long do you expect Mr. |
| 15:12:50 | 8 | El-Hindi to talk? |
| 15:12:52 | 9 | MR. HARTMAN:  I don't think he'll go longer |
| 15:12:53 | 10 | than ten minutes. |
| 15:12:54 | 11 | THE COURT:  Mr. El-Hindi, you'll have the |
| 15:12:56 | 12 | opportunity shortly to speak on your own behalf.  This |
| 15:13:04 | 13 | is often, if not always, for me anyway, and for you and |
| 15:13:09 | 14 | the people in your situation, the most important part of |
| 15:13:12 | 15 | this proceeding.  It's your opportunity to speak to me |
| 15:13:14 | 16 | directly and plainly on your own behalf and to say what |
| 15:13:20 | 17 | you want to say.  There are no time limits, and I ask |
| 15:13:25 | 18 | only in terms of my own schedule. |
| 15:13:28 | 19 | MR. HARTMAN:  Judge, I do need to move this |
| 15:13:30 | 20 | tape as Sentencing Exhibit 3. |
| 15:13:40 | 21 | THE COURT:  No objection, I assume? |
| 15:13:42 | 22 | MR. GETZ:  No objection. |
| 15:13:44 | 23 | MR. HARTMAN:  Thank you. |
| 15:13:52 | 24 | THE COURT:  Let's say 3:30. |
| 15:56:26 | 25 | (Recess taken.) |

15:56:26    1            THE COURT:  You may proceed.

15:56:31    2            MR. HARTMAN:  Your Honor, at this time Mr.

15:56:33    3    El-Hindi is going to address the Court.

15:56:35    4            THE COURT:  Okay.

15:56:43    5                          * * *

15:56:43    6            THE DEFENDANT:  By the name of God most

15:56:46    7    merciful, Allah, the Lord of the world, the garden of

15:56:54    8    the heavens, may peace be upon his companions of the

15:56:59    9    prophets.  Prophet Mohammad, please be upon him and

15:57:03   10    whoever follow him.

15:57:07   11            To proceed first I would like to thank the

15:57:13   12    Court for the opportunity that they give us.

15:57:18   13            THE COURT:  Actually, Mr. El-Hindi, you can

15:57:20   14    thank the founders of our republic.  They inshrined

15:57:26   15    this opportunity in our Constitution, and you have the

15:57:28   16    absolute right.  I'm not doing any favor; I'm simply

15:57:31   17    doing my job.  I'll give you a chance, but it's an

15:57:36   18    important part of the job I have to do.

15:57:38   19            THE DEFENDANT:  Thank you.  I really

15:57:40   20    appreciate that.  And I appreciate my attorneys who

15:57:44   21    fought so hard to bring justice, which is, I believe --

15:57:52   22    I don't believe has been served.  However, I would like

15:57:55   23    to talk about myself before the case.  And yes, indeed,

15:58:03   24    I want everybody to be Muslims.  I would invite you,

15:58:07   25    invite the government, invite everybody to be good

15:58:10  1   Muslims and to follow because this is my duty.   And I

15:58:18  2   am Muslim from Arab origin.   Proud of being an

15:58:22  3   American, American citizen who has raised seven

15:58:27  4   children, seven American children.   Their security is

15:58:32  5   everybody's security, every American's security.   I

15:58:37  6   became American by choice.   And I love this country

15:58:40  7   more than any country in the world.   I spend most of my

15:58:44  8   life in this country.   Its pains, my pains; its grief

15:58:51  9   is my griefs; it's enemies, my enemy.   No matter what

15:58:57  10  the government paint me as a monster, a terrorist; I'm

15:59:03  11  not a terrorist.   I'm a good citizen of this country.

15:59:08  12  I spent 25 years in this country.   And I never hurt a

15:59:11  13  person.   And I am proud to be American.   The

15:59:23  14  government said at the beginning of the trial that I

15:59:28  15  should have ran away from Darren Griffin, not walked

15:59:34  16  away.   Yes, I agree with you.   I should have ran away

15:59:38  17  from Darren Griffin.   However, our custom does not

15:59:43  18  permit us to do so.

15:59:44  19          THE COURT:  I didn't hear what you just

15:59:46  20  said.

15:59:47  21          THE DEFENDANT:  Our culture doesn't permit

15:59:49  22  us to do so.   Our religion doesn't permit us to do so,

15:59:52  23  to push people out of our houses.   He came to me, and

15:59:57  24  he wanted to learn Islam.   The recording is very clear

16:00:05  25  when he asked me that he wanted to learn about jihad.

| | | |
|---|---|---|
| 16:00:13 | 1 | So I told him to have a seat, and I will explain to him |
| 16:00:17 | 2 | what jihad means.   Jihad is a struggle.   A struggle of |
| 16:00:26 | 3 | raising my children.   And he seen how much that I have |
| 16:00:30 | 4 | struggled in raising my children.   Being a single |
| 16:00:35 | 5 | parent between home schooling, between fixing their |
| 16:00:40 | 6 | breakfast, fixing their dinner, give them bath, going to |
| 16:00:48 | 7 | bed.   I did not have any time for any of what the |
| 16:00:52 | 8 | government is allegation.   If it wasn't for Darren |
| 16:00:58 | 9 | Griffin, none of this would happen.   I wouldn't be in |
| 16:01:01 | 10 | this Court.   The government made Darren Griffin as a |
| 16:01:11 | 11 | hero.   He was not.   He was not a hero at all.   The |
| 16:01:21 | 12 | money, that's what attracted him to come and lie to you. |
| 16:01:25 | 13 | Whether you fabricated these things or him, I don't |
| 16:01:29 | 14 | know, but it was -- everything was fabricated. |
| 16:01:34 | 15 | Especially when I hear, and I have been hearing that I |
| 16:01:38 | 16 | approached him to condemn Israeli soldier or an official |
| 16:01:44 | 17 | of the United States.   That was his approach.   And I |
| 16:01:48 | 18 | told him, no, you cannot do that.   And where am I going |
| 16:01:52 | 19 | to an Israeli soldier? I never.   I never been in |
| 16:02:01 | 20 | Palestine to go attack American soldier or Israeli |
| 16:02:07 | 21 | soldier.   If I disagree with the government, that does |
| 16:02:11 | 22 | not mean that I would like any harm to be in this |
| 16:02:17 | 23 | country.   If I disagree with the government policy, I |
| 16:02:22 | 24 | honor the country rather than hate the country. |
| 16:02:28 | 25 | I should be the hero, Your Honor, of saving |

16:02:35  1  lives rather than the accusation of killing lives.   I

16:02:39  2  am the one whose saved the Ahmeds.

16:02:43  3         THE COURT:  Saved?

16:02:44  4         THE DEFENDANT:  I'm the one who saved the

16:02:46  5  Ahmeds, Zubair and Khaleel Ahmed, from either killing

16:02:50  6  themselves or killing American soldiers.   I should be

16:02:54  7  the one who get the credit for that.   I would have said

16:03:00  8  anything to bring them back safe to their family from

16:03:03  9  Egypt.   They were in Egypt.   If I had any intent, and I

16:03:10  10  mean intent in my mind, to recruit them for something

16:03:18  11  dangerous for them, there's a lot of opportunity for

16:03:21  12  them in Egypt or the Middle East.

16:03:25  13         THE COURT:  I didn't understand.

16:03:27  14         THE DEFENDANT:  If I had an intent to harm

16:03:29  15  them or harm anybody else, I would have left them in

16:03:37  16  Egypt where they have more opportunity to train and to

16:03:43  17  be with radical Muslims, as everybody says, which I

16:03:48  18  don't know anybody in Egypt radical or would offer

16:03:53  19  training.   However, I saved them and brought them back

16:04:01  20  to their family.

16:04:03  21         Now, in the ICNA conference, the government

16:04:07  22  allege that I introduce them to Griffin.   When Griffin

16:04:10  23  called me, I was on my way from Chicago to the ICNA

16:04:14  24  conference with Zubair and Khaleel Ahmed where we had a

16:04:21  25  partnership for the EMSS, and we had a contract.   I had

16:04:24   1   a contract with Zubair Ahmed's father that he would --

16:04:31   2   would recruit students for us.   And that's -- that was

16:04:38   3   the only reason why I took them to ICNA conference, not

16:04:42   4   to meet Darren Griffin, because I did not know that he

16:04:45   5   was going to be in the ICNA conference.

16:04:50   6                Your Honor, we spent almost three days or

16:04:54   7   four days and three nights in Cleveland; Cleveland,

16:05:00   8   Ohio.  We did not meet with Darren Griffin behind any

16:05:06   9   closed doors.  We did not have any meetings.   We did

16:05:09  10   not have any plans to do anything where we had the

16:05:13  11   opportunity.   I had the opportunity to take him to

16:05:16  12   Griffin where he spent three nights over there.   Rather

16:05:20  13   than doing so, Griffin came down from his booth, which

16:05:27  14   was on the first floor, that he was representing

16:05:33  15   KindHearts, a charity organization, used to be from

16:05:37  16   Toledo.   He came downstairs to our booth, the EMSS

16:05:43  17   booth, sneak in from the back.   And I did not know that

16:05:53  18   he was talking to the Ahmeds about any training.   I

16:05:57  19   was -- if you would watch the video carefully, Your

16:06:01  20   Honor, you will see my brother Yousef and I talking to

16:06:08  21   other people about the business, about the student

16:06:14  22   business.   And when I came, when I realized that he was

16:06:17  23   there talking to them, I approached, and they totally

16:06:22  24   changed the conversation.   Their conversation, the

16:06:27  25   first time I've seen it was in that video that the

16:06:31  1   government presented.   I did not know what was going on

16:06:35  2   back then about the .50 calibers.   I did -- I don't

16:06:39  3   even know the .50 caliber gun; until today I don't know

16:06:52  4   how it looks like.   They start talking about

16:07:00  5   cardiovascular training.

16:07:02  6          THE COURT REPORTER:  I didn't understand.

16:07:05  7          THE COURT: Cardiovascular training.

16:07:05  8          THE DEFENDANT:  Yes, cardiovascular

16:07:09  9   training.   I specifically told him, But not for jihad,

16:07:11  10  because I know their intent.   Train them to protect

16:07:14  11  their family.   Train them to protect mosque.   And you

16:07:18  12  could hear on the video or on -- I'm sorry, in the

16:07:23  13  recording.   Unfortunately, they recorded that it's most

16:07:32  14  important, we cannot find it.   The government always --

16:07:37  15  well, either the government is hiding it or he hide it

16:07:41  16  from the government, I don't know.   The whole

16:07:46  17  allegation is lies.

16:07:50  18          When I speak to my children, I always tell

16:07:55  19  them to tell the truth, even if it's going to harm them.

16:07:58  20  Tell the truth, because I'm in prison because of the

16:08:02  21  lying, because somebody came and lied to the government

16:08:11  22  for anger, I don't know what it is, for the money, their

16:08:14  23  position with the government; I really don't know.

16:08:20  24          I never went to fire training -- firearm

16:08:25  25  training, Cleland or anywhere where he gave me all the

16:08:29  1  opportunity.  He was pushing me to go into the shooting

16:08:35  2  range.  I never went with him.  He always was telling

16:08:42  3  me to send e-mails.  The only e-mail that I have sent

16:08:46  4  him, probably two or three e-mails, one of them an

16:08:50  5  e-mail that the government alleged is for training for

16:08:56  6  IED traps.  That e-mail wasn't for IED to harm anybody.

16:09:04  7  That's to prevent.  That's to teach you how to prevent

16:09:10  8  the IED.  It's not to set off an IED.

16:09:19  9       And the other e-mail that I have sent to

16:09:22  10  Darren Griffin, which is -- that's why I kept him

16:09:29  11  around, my second wife needed support for immigration to

16:09:36  12  stay in the country, and he told me that he will do it

16:09:40  13  for me.  That's why I send him the application via

16:09:44  14  e-mail.  And he promised me that he was going to sign

16:09:50  15  for me.

16:09:55  16       At the time of my arrest, I hardly had any

16:09:58  17  conversation with Mazloum; Amawi, even.  The only

16:10:08  18  conversation that I had with Amawi is when Darren

16:10:11  19  Griffin came to my house and he initiated the call to

16:10:15  20  Jordan.  And he was asking for used laptops.  And I

16:10:22  21  was assisting him in how to find used laptops and to get

16:10:26  22  it the cheapest way.  The first time that I met Mr.

16:10:31  23  Amawi is when Darren Griffin and I were in Office Max

16:10:38  24  doing brochures, which is -- you could see it, the

16:10:46  25  brochures, and some CDs.  Not the vest, as the

16:10:55  1    government claimed, but CDs for my business, which is to

16:11:00  2    recruit medical students, not to recruit terrorists,

16:11:04  3    because I am not terrorist, and I am against anybody

16:11:09  4    that support terrorists.  At that time, of course,

16:11:15  5    there is no recording.  That recording disappears.

16:11:19  6              The other recording you have typed is when

16:11:21  7    he takes it to Amawi's house, and he says, sorry that

16:11:27  8    restraint on you.  And I wrote -- Brother El-Hindi to

16:11:34  9    introduce him to me.  Prior to that, when we're in

16:11:37  10   Office Max, he told me, Didn't you have problems with

16:11:40  11   your computers?  And I have brother that he could fix

16:11:44  12   your computers.  Let me introduce you to him.  He

16:11:47  13   lives close-by.  That's in February 2 when he took me

16:11:53  14   to Amawi.  Then Amawi -- then he asked Amawi, he is the

16:11:58  15   one who asked Amawi if the computer is on, if his

16:12:05  16   internet, if we can go in the room and see some of the

16:12:09  17   things that he had.  We went in there.

16:12:12  18             Being an Arab, we always discuss politics.

16:12:16  19             THE COURT:  I'm sorry?

16:12:17  20             THE DEFENDANT:  Being an Arab, we always

16:12:19  21   discuss politics.  We always are curious how things are.

16:12:27  22   Not for the intent to go and make it and destroy anybody

16:12:33  23   or to harm anybody.  And I invited Amawi on that day to

16:12:42  24   come and fix my computers, not to come and have a

16:12:45  25   meeting.  And in the beginning of the tape on February

16:12:52  1   16 of '05, you could hear Amawi, which is the government

16:12:57  2   have it "unintelligible," saying, Oh, I totally forgot,

16:13:04  3   didn't I come here to fix your computers?  I forgot the

16:13:08  4   Windows for Arabic Windows.  It was very clear that

16:13:12  5   dinner was for Amawi to come and fix my computers.  He

16:13:17  6   didn't tell me that there was another person named

16:13:22  7   Wassim Mazloum was coming with them.  They called me on

16:13:25  8   the way and they told me that there's another brother

16:13:28  9   who would like to come and have dinner.  Being an Arab,

16:13:33  10  I don't care if he brings the whole Toledo with him

16:13:38  11  because this is our tradition, not to push anybody that

16:13:46  12  comes to your house.  And you will hear -- you will

16:13:50  13  hear it on the video very clear when they came to

16:13:54  14  introduce Mr. Wassim Mazloum to me.  And we were playing

16:14:00  15  with the kids.  And all of a sudden, Darren Griffin

16:14:06  16  gets up and gives a speech.  And you could see my

16:14:11  17  reaction in the video where I was shaking my head,

16:14:15  18  surprised at the speech.  You could go back and look at

16:14:20  19  it, Your Honor.  And even when he says:  Maybe El-Hindi

16:14:28  20  would like to go to Palestine; I never told him that I

16:14:31  21  wanted to go to Palestine.  I never had the intent to

16:14:34  22  go to Palestine.  I never had the intent to go back

16:14:37  23  even to Jordan where my family -- where my loved ones

16:14:41  24  live.  I want to stay in the United States and raise my

16:14:44  25  children in the United States.

16:14:47  1          I would tell Your Honor, if I could tell you

16:14:51  2     everything that happen to me for six years, I should

16:14:54  3     say, because today marks three years and eight months

16:15:00  4     that I've been in Milan Detention Center, and in the

16:15:07  5     beginning, for the first two and a half years, they put

16:15:14  6     me in segregation.   They marked me as a dangerous.

16:15:21  7     They treated me so bad that I cannot even -- a human

16:15:28  8     being cannot even imagine.   I wouldn't like to talk

16:15:33  9     about it because it really hurts me whenever I think

16:15:38  10    back of what happened to me over there in segregation.

16:15:41  11    But God, Allah, is watching over all of us.

16:15:46  12          The allegation of recruiting Zubair and

16:15:52  13    Khaleel was all false allegation.   I had saved their

16:15:56  14    life and saved American lives.   Even they call me a

16:16:04  15    hypocrite.   Why?   Because I brought them safe back to

16:16:08  16    their family, and I did not -- they did not accomplish

16:16:17  17    their goal.

16:16:20  18          Your Honor, when his father called me and

16:16:22  19    asked me to help, I sacrificed my family behind, and I

16:16:30  20    went to help.   Before that I told his mom on the phone,

16:16:34  21    call the FBI.   Call the FBI, Your Honor.   If my intent

16:16:42  22    is to recruit terrorists, would I call the FBI?   And in

16:16:48  23    the airport when we went to the airport I told her, Ms.

16:16:52  24    Ahmed, did you call the FBI?   She said, Yes, and I made

16:16:55  25    a police report.   I said, Thank you.   Now we could

16:16:58  1   take the extra step because I didn't know what their

16:17:04  2   intent -- I didn't even know Zubair Ahmed or Khaleel

16:17:07  3   Ahmed.   But in the airport during my time with his

16:17:15  4   father in the airport, going to Amsterdam, he explain to

16:17:19  5   me what kind of a son he is, that he stole the money

16:17:26  6   from the gas station, he took his cousin, and they're

16:17:29  7   going for jihad, and please locate him for me.   I said,

16:17:34  8   Okay.   Fine.   If you would pay my expenses, and my

16:17:39  9   brother's expenses, I would love to go with you.   I

16:17:43  10  would love to help you.

16:17:45  11          We arrive in Egypt, and they were at the

16:17:48  12  place -- it's called Alhussin Mosque area,

16:17:55  13  A-l-h-u-s-s-i-n, which is next to Al Azhar, A-l

16:18:11  14  A-z-h-a-r.

16:18:16  15          I took them from that place to a place

16:18:21  16  called Al Madar, A-l M-a-a-d-r, which is known very well

16:18:32  17  in Egypt that has no radical Muslims over there.   It's

16:18:39  18  a very nice place.   I took them from the most dangerous

16:18:45  19  area that they could meet people in Egypt to the most

16:18:52  20  safe area in Egypt, which is Al Madar.   It's in Cairo.

16:18:58  21  And I kept asking them for the lady that they have met

16:19:03  22  in Egypt, to report it to the authority over there.

16:19:08  23  But they kept denying it.   They kept denying for me to

16:19:15  24  meet her.   And I was stopped in the airport by the

16:19:21  25  Egyptian police or the Secret Service, and I spent

16:19:25   1   almost three hours with them asking me questions.

16:19:33   2   Unfortunately, I did not tell them about Zubair and

16:19:35   3   Khaleel because I didn't have any information about that

16:19:38   4   lady that they alleged to go and meet over there.

16:19:42   5          Your Honor, I do not want to take too much

16:19:44   6   of your time or everybody's time.  But I came from an

16:19:50   7   honorable family; loving, caring family.  And we had a

16:19:58   8   lot of disputes sometimes because of my love for this

16:20:04   9   country.  Your Honor, you said earlier that you wanted

16:20:08   10  to send a message to the people.  And I hope, no

16:20:17   11  disrespect to the Court, that you don't send the message

16:20:19   12  to the people that there is no more freedom of speech in

16:20:25   13  America.  My sister has told you that she is too scared

16:20:31   14  to talk about politics or policies.  As matter of fact,

16:20:38   15  she was scared to come down here to Ohio.  And I don't

16:20:41   16  know what convinced her to come down here.  Maybe my

16:20:44   17  brother, he did so.  My brother told me that he doesn't

16:20:48   18  talk politics because back there, we don't have that

16:20:54   19  freedom.  And if you send the message to the people

16:21:01   20  that we do not have the freedom of speech, I don't know

16:21:04   21  what to believe ever.  I came to America because of the

16:21:07   22  freedom, because of the Constitution.  The government

16:21:12   23  here, they're trying to devalue the Constitution rather

16:21:16   24  than --

16:21:17   25          THE COURT:  They're trying to what?

16:21:22  1          THE DEFENDANT:  Demolish the Constitution
16:21:24  2   rather than telling the people, yes, we have a
16:21:27  3   Constitution.  We have the first amendment rights that
16:21:30  4   you can watch anything you want; you can talk about the
16:21:35  5   government.

16:21:37  6          It remind me of a story that I was told
16:21:41  7   about President Jimmy Carter when he went to Russia.
16:21:46  8   And he told the Russian prisoners:  I'm proud of
16:21:53  9   America, that anybody could come and stand in front of
16:21:56  10  the White House and say, Mr. President, you are wrong.
16:22:00  11  I disagree with you.   I disagree with America.   And
16:22:05  12  the president of Russia said, Oh, we have the same
16:22:09  13  thing, the same freedom.   He said, What is it?  He
16:22:12  14  said, Anybody could come and stand in front of the
16:22:15  15  Kremlin and say, I disagree with America.   I don't like
16:22:21  16  America.   I disagree with you, President.

16:22:26  17         Have we come to this stage, Your Honor, that
16:22:28  18  I cannot say, George Bush, you are wrong; George Bush,
16:22:32  19  you are sending our kids, our daughters, our sons to a
16:22:37  20  war that doesn't -- we don't believe in there?  Is that
16:22:43  21  my crime, Your Honor, that I disagree with the
16:22:46  22  government?  If I disagree with the government, that
16:22:48  23  does not mean that I don't love America.   I love
16:22:52  24  America.   And that's why I am here.

16:22:58  25         Your Honor, you said justification but not

16:23:03    1    greater than necessary.   I have suffered a lot.   Four

16:23:07    2    years.   Four years away from my children.   Four years

16:23:22    3    away from my family, my loved ones.   One of my

16:23:34    4    daughters, she said to me the other day, Dad, I lost

16:23:41    5    security in my life.

16:23:49    6              Thank you, Your Honor.

16:23:56    7              THE COURT:  Mr. Getz, if you have a few

16:23:58    8    words, and then I'll hear from Mr. Hartman again.

16:24:01    9              MR. GETZ:  Mr. Sofer would like to make some

16:24:07   10    remarks.   With the Court's indulgence, I would like to

16:24:10   11    have Mr. Sofer address the Court.   Then I do have some

16:24:13   12    follow-up.   Unfortunately I feel compelled to have to

16:24:17   13    present -- to counter some of the misrepresentations

16:24:20   14    that have been made in the past hour or so.   Thank you.

16:24:56   15              THE COURT:  Mr. Sofer.

16:24:57   16              MR. SOFER:  Your Honor, I appreciate the

16:24:58   17    opportunity to speak to the Court.   I did prevail upon

16:25:02   18    Mr. Getz as I tried to sit on my hands listening to Mr.

16:25:06   19    Hartman and now Mr. El-Hindi.   I feel compelled to

16:25:10   20    stand up and try as best as I can in the very short

16:25:14   21    period of time we have to set this record straight.   As

16:25:18   22    I was sitting back there listening to this, all I could

16:25:21   23    think of, Judge, is, Thank goodness we had a smart,

16:25:26   24    intelligent, hard-working jury in this case, or we would

16:25:30   25    never have even gotten to this point.   Mr. Hartman's

16:25:35  1  statement was the third bite at the same apple, Your

16:25:39  2  Honor.   His opening statement -- it all sounds great.

16:25:42  3  It sounded great during his opening statement.   It got

16:25:45  4  a lot worse after all the evidence came in.   The jury

16:25:48  5  didn't buy it on his closing statement.   And now he's

16:25:51  6  trying with the Court, Judge.   It is an absolute

16:25:57  7  distortion of this record.   And unless Your Honor will

16:25:59  8  say to us now that you are not accepting much of the

16:26:04  9  factual statements that he made, I think we have no

16:26:06  10  other choice to do something which we did not want to do

16:26:11  11  today and tried not to do, which is go back and

16:26:14  12  relitigate all this stuff one more time.   But this

16:26:17  13  notion that Marwan El-Hindi didn't recruit Zubair and

16:26:21  14  Khaleel Ahmed is absolutely belied by the evidence, and

16:26:26  15  we have tape after tape after tape which shows this.

16:26:29  16  Again, a sentencing proceeding, Your Honor, the

16:26:32  17  government submits is not about relitigating the guilt

16:26:34  18  or innocence.   And I would submit to you that 95

16:26:37  19  percent of what we've heard here this afternoon is

16:26:42  20  essential that.   We can only hope that Your Honor's

16:26:45  21  recollection of the record is good enough, unless we

16:26:49  22  augment it now, so that you won't make a decision based

16:26:53  23  on what we consider to be massive distortions.   I will

16:26:56  24  say this:  I'm not from Toledo, Judge, but thank

16:27:00  25  goodness those 12 people who were up there were as hard

16:27:03  1   working as they were and were able to go through all of

16:27:07  2   this evidence and see through this because it is just

16:27:10  3   distortion.   And I don't know what to say to the Court

16:27:14  4   other than I hope you'll give us either an opportunity

16:27:17  5   to spend the next however many minutes or hours

16:27:19  6   rebutting it because, for the third time, I might add,

16:27:25  7   or if you tell us to sit down, I won't hear from you,

16:27:30  8   then that's what we'll do, but I think it would be a

16:27:33  9   travesty of justice under the circumstances, Judge.   I

16:27:35  10  haven't really said these kind of things to you before.

16:27:38  11          THE COURT:   So that whatever I decide you're

16:27:42  12  confident that you have the chance to, as you say, set

16:27:44  13  the record straight, why don't you briefly touch upon at

16:27:49  14  least at that aspect of what you believe the record

16:27:52  15  would show.

16:27:53  16          MR. SOFER:   With Your Honor's indulgence, I'm

16:27:56  17  not going to do that; Mr. Getz will do that.   That's

16:28:00  18  what he and Mr. Herdman are here to do.   I will say a

16:28:04  19  couple quick things, then I will sit down.

16:28:08  20          Your Honor said some things which really --

16:28:11  21  everyone's trying to figure out in part or at least

16:28:15  22  ascribe the motivations for why it is the government did

16:28:17  23  what it did in this case.   I don't think this is a --

16:28:20  24  should be any kind of particularly complex or difficult

16:28:23  25  issue.   Your Honor said it: The stakes in these cases

16:28:30  1  are incredibly high.  The seriousness of these crimes

16:28:34  2  is so significant.  That's why we have the conspiracy

16:28:38  3  laws.  Somehow during the last two days conspiracy has

16:28:43  4  suddenly been turned into some evil word.  But this

16:28:48  5  statute was passed by the Congress a long time ago.

16:28:51  6        THE COURT:  I would have thought I made my

16:28:53  7  understanding of that clear during my conversations with

16:28:57  8  Mr. Hartman.

16:28:58  9        MR. SOFER:  I understand, Your Honor.  I'm

16:29:00  10  not trying to say Your Honor doesn't think it, but

16:29:03  11  that's the way it's being portrayed by the defense.

16:29:07  12        THE COURT:  For better or worse I have the

16:29:09  13  last word ON that.  I tried to formulate an

16:29:12  14  understanding of both the nature of the investigation in

16:29:16  15  this case, which I referred to as casting a net and

16:29:22  16  really not knowing whether you get minnows or sharks or

16:29:26  17  anything at all.  Because as I said, Mr. Sofer,

16:29:35  18  conspiracies to commit terroristic acts are as difficult

16:29:46  19  to detect as anything.

16:29:49  20        MR. SOFER: Perhaps more, Your Honor.

16:29:51  21        THE COURT:  I understand.  But my point is

16:29:52  22  you have a drug conspiracy or Medicare fraud conspiracy,

16:30:00  23  the kinds of conspiracies that courts more routinely and

16:30:04  24  regularly see.  Well, there's some conduct that is

16:30:08  25  occurring, quote, in the open, whether it is a

16:30:14  1  submission of faith, false bills through Medicare which

16:30:23  2  have computer programs that check billing practices and

16:30:26  3  so forth; or whether it is police officers patrolling a

16:30:31  4  beat in, quote, high drug areas.  There's something

16:30:36  5  above the surface.  And that may be so in the case of

16:30:46  6  some conspiracies where people want to cause harm

16:30:51  7  through acts of terrorism.

16:30:54  8           MR. SOFER:  But the government can't be sure

16:30:59  9  that's always the way it is and whether --

16:31:05  10           THE COURT:  If I may.  And whether viewed

16:31:09  11  from one perspective, what the government did in terms

16:31:15  12  of sending Mr. Griffin out into the neighborhood, as it

16:31:19  13  were, to see what he might uncover and then overseeing

16:31:23  14  what he was doing and what he was saying, taping -- I

16:31:32  15  think it was Agent Coats in the car, and he's getting

16:31:36  16  instruction.  It's very clear Agent Coats has been well

16:31:40  17  instructed in terms of what constitutes inducement in a

16:31:43  18  sense as opposed to what constitutes entrapment; what

16:31:47  19  constitutes putting a little bait on the hook, and what

16:31:52  20  constitutes something more.  So all I'm saying, I'm

16:31:58  21  trying to communicate to you, and I also understand that

16:32:04  22  in a hackney phrase, I -- at least I tried to project in

16:32:10  23  my discussion with Mr. Hartman the kind of message that

16:32:13  24  the government wants.  And I disagree with Mr. El-Hindi

16:32:16  25  that the government is prosecuting speech.  It's not

16:32:22  1    prosecuting speech.   The jury might have found that it

16:32:25  2    was, but it didn't.   And we have the convictions.   And

16:32:32  3    that's where we are.   And interpreting what it is the

16:32:35  4    government wants when it asks for the most drastic of

16:32:40  5    all possible penalties and trying to understand what the

16:32:43  6    government is trying to accomplish after the expenditure

16:32:47  7    of the resources that it has expended, I tried to

16:32:52  8    formulate that understanding, and in light of that

16:32:59  9    understanding in terms of altering the public deterrent

16:33:03  10   function, a sentence that accomplishes that objective in

16:33:07  11   light of what the government believes must be

16:33:10  12   accomplished.

16:33:12  13          MR. SOFER:   Judge, I didn't mean by any of

16:33:14  14   my statements to infer anything else from the Court, but

16:33:17  15   I'm trying to respond to what counsel said.   I want

16:33:21  16   this record to be complete.   I hope you'll let us do

16:33:24  17   that for fear on our part that it's the argument that we

16:33:26  18   think of tonight, and you impose a sentence, and we wake

16:33:30  19   up in the middle of the night and say, Oh, my goodness,

16:33:33  20   he didn't realize this, or we failed to explain that.

16:33:36  21   We just can't let that happen.   And I hope you'll

16:33:39  22   indulge us.

16:33:40  23          THE COURT:   Sure.   I'm not sure for how

16:33:42  24   long.

16:33:44  25          MR. SOFER:   I understand, Judge.   We

16:33:47   1   understand the late hour.  We're prepared to stay here

16:33:50   2   as long as we can.   We have to rely on the Court's

16:33:53   3   recollection of much of this record.  We can't

16:33:56   4   relitigate this case.   It's why we came in here the way

16:33:59   5   we did.   I understand we took some hours, but we didn't

16:34:02   6   come in here and give a nine and a half hour summation.

16:34:04   7   We really didn't want to do that again.   But given the

16:34:07   8   things -- Mr. Hartman came in here; I've heard this

16:34:10   9   before.   I heard it before from Mr. Hartman, now I got

16:34:15  10   to hear it from Mr. El-Hindi.

16:34:16  11           THE COURT:  I understand that.   I've

16:34:19  12   already overruled the motion for a new trial challenged

16:34:23  13   on the sufficiency of the evidence.

16:34:25  14           MR. SOFER: You said something very

16:34:27  15   important.   Again, the record should show we disagree

16:34:29  16   with Your Honor about whether this is a terrorism case

16:34:32  17   or not, but I'm not going to argue that with the Court,

16:34:36  18   whether it's a big T or little T.   What matters are the

16:34:39  19   statutes involved here.   Not a cultural issues, not

16:34:42  20   what's going on necessarily in the world.   It's a

16:34:44  21   question of whether or not people have violated U.S.

16:34:48  22   law, U.S. statutes, and what that means.   And again,

16:34:51  23   just for the record, I know Your Honor knows this, but

16:34:53  24   based on the record that's made here today, I want to

16:34:56  25   make sure this is clear.   It's the object crimes of

16:34:59    1    these conspiracies that makes this such a serious case.

16:35:05    2    There is a federal crime of conspiracy.   It's found, I

16:35:09    3    think, 18 U.S.C., 371.   That's not what's charged here.

16:35:14    4    These are particular statutes which have particular

16:35:16    5    object crimes.

16:35:17    6                    THE COURT:   18 U.S. Code 1 or 2, whatever it

16:35:22    7    is.

16:35:25    8                    MR. SOFER:   It's very important to us

16:35:26    9    because Your Honor is right, it is very important to the

16:35:29   10    government of the United States, and I believe very

16:35:31   11    important to the people of the United States more

16:35:33   12    importantly than the government of the United States

16:35:35   13    that a message be sent here, the correct message.   The

16:35:39   14    object crimes here were conspiring to -- this is what

16:35:43   15    the jury found.   This is not me saying this per se.

16:35:46   16    The jury already found this after a lengthy review of a

16:35:50   17    lot of evidence, and a full and fair opportunity for

16:35:53   18    every one of these defense attorneys to get up here and

16:35:55   19    say all the things that they did with all the resources

16:35:58   20    that they had.   The first crime was conspiracy to kill

16:36:03   21    or maim people overseas.   This jury actually

16:36:05   22    specifically found that these men conspired to kill

16:36:08   23    people including Marwan El-Hindi, that he conspired to

16:36:11   24    kill people.   He gets up here and says, just like Amawi

16:36:14   25    did, that he was framed, basically.   That's not

16:36:17  1   mitigation, Judge.   A lot of courts would look at that

16:36:20  2   and be outraged.

16:36:23  3              THE COURT:  I rethought this in the course

16:36:25  4   of overruling the motion for a new trial -- motions,

16:36:30  5   plural.

16:36:31  6              MR. SOFER:  That's the first crime.

16:36:32  7              The second was providing material support in

16:36:35  8   order to kill U.S. citizens overseas.   I am

16:36:41  9   paraphrasing that statute; I have not done it perfectly.

16:36:45  10             The last one is providing materials that

16:36:49  11  relate to explosives -- I'm paraphrasing the statute in

16:36:53  12  ordinary words -- in order to further a federal crime of

16:36:56  13  violence.   That was to kill Americans overseas.

16:37:02  14             Now, I recognize that this Court is not

16:37:04  15  going to give a life sentence to this man.  We all do, I

16:37:08  16  think.   That's not a question.  We disagree with that.

16:37:10  17  That's okay.   That's part of the way the system works.

16:37:13  18  But Your Honor has already moved on that chart quite a

16:37:20  19  long ways.

16:37:20  20             THE COURT:  I understand.   Clearly.

16:37:25  21             MR. SOFER: And the relative position of

16:37:27  22  these defendants, which we do not maintain they're the

16:37:30  23  same.   We're not saying, Judge, he's a terrorist, he's a

16:37:34  24  terrorist, he's a terrorist; throw theme all in jail for

16:37:36  25  the rest of their lives.  We tried to say the particular

16:37:39  1  things they've done in the case.  We haven't exaggerated

16:37:42  2  and said they've done things they haven't done.  We

16:37:44  3  haven't exaggerated and said they've done things the

16:37:47  4  jury didn't find they were guilty of.  What we're

16:37:51  5  asking the Court to do is send the appropriate message,

16:37:54  6  not just to them, but to anybody else in this position.

16:37:59  7        THE COURT:  I agree with that.  The matter

16:38:01  8  of principal concern is public deterrence.  Other

16:38:09  9  matters are of concern, and I'll address them.  But at

16:38:13  10  the core of this -- at least that's my understanding.

16:38:16  11  If I'm wrong in that, correct me.  I don't mean to

16:38:18  12  disregard the other factors.  I'm looking beyond those,

16:38:24  13  quite candidly, to what the criminal law is all about

16:38:30  14  and what those who have thought about this a lot more

16:38:35  15  than any of us and whose thoughts I think generally

16:38:39  16  underlie our criminal statutes I think we are about.

16:38:48  17  So I hope the Court of Appeals -- in fact, I mentioned

16:38:53  18  those things.  I understand I think I'm going beyond but

16:38:58  19  not around the guidelines in thinking about those as

16:39:02  20  well, those sort of more overarching issues.

16:39:06  21        MR. SOFER:  My final appeal to the Court,

16:39:08  22  then I'll sit down, and we'll address these factual

16:39:12  23  issues.  To the extent Your Honor has them, if you can

16:39:14  24  tell us what it is you're accepting --

16:39:17  25        THE COURT:  I think it's in a fairly brief

16:39:20   1   way, you have an opportunity for rebuttal.

16:39:25   2           MR. SOFER: The last thing I'd say is, Judge,

16:39:27   3   there's been a huge amount of argument about the fact

16:39:30   4   that nothing was going to happen.  And again, all I

16:39:35   5   would say is somehow during the course of all of this

16:39:40   6   discussion, it seems to me that we have turned the

16:39:46   7   system upside down.

16:39:49   8           THE COURT:  I think I understand what you're

16:39:50   9   saying.  And I think it's correct from this standpoint

16:39:56  10   to say what you said and are perhaps about to say, and

16:40:00  11   that is that one simply cannot say at all that but for

16:40:08  12   the aborting of this conspiracy when that occurred,

16:40:17  13   nobody can say nothing was going to happen.  And I

16:40:21  14   don't think that's what the defendants are contending.

16:40:26  15           MR. GETZ:  And I would submit to Your Honor

16:40:28  16   if this jury really believed that nothing was going to

16:40:31  17   happen, they would not have convicted these defendants.

16:40:33  18   And in some way it's subverting the jury's verdict to

16:40:38  19   say otherwise.  Again, we recognize not a life

16:40:40  20   sentence.  We recognize there are conspiracies, and

16:40:42  21   there are conspiracies.  And we're not saying that, as

16:40:45  22   we said before, that we can point to a case where

16:40:47  23   exactly these facts happened and this is what you should

16:40:50  24   give.  And we do believe life is appropriate.  We

16:40:54  25   recognize and we accept the fact the Court has

16:40:56  1   deviated -- or that's the wrong word.

16:40:59  2                    THE COURT:  Varied.

16:41:01  3                    MR. SOFER:  -- has varied, which is well

16:41:02  4   within your power.   And whether that ultimately becomes

16:41:05  5   an issue or not --

16:41:07  6                    THE COURT:  You may contend it's a deviant

16:41:09  7   variation.

16:41:10  8                    MR. SOFER: It was not a Freudian slip, Your

16:41:12  9   Honor.

16:41:12 10                    THE COURT:  I understand.

16:41:16 11                    MR. SOFER: All I'm saying, again, is you've

16:41:18 12   already moved down that sliding scale quite a bit in a

16:41:21 13   very significant way, and I just implore the Court to

16:41:25 14   think about that as you go through these next two

16:41:27 15   sentences.

16:41:28 16                    THE COURT:  I am.  I know full well, I knew

16:41:33 17   sentencing Mr. Amawi in all likelihood, I couldn't be

16:41:36 18   certain, I'm not certain until it comes time for me to

16:41:41 19   pronounce sentence, but it's fair to look at that as a

16:41:44 20   ceiling in terms of time.   And you're right, Mr. Amawi

16:41:49 21   was what, 29 years old, 28, life expectancy of 50 years.

16:41:58 22   Go from roughly 50 years to 20 is a very substantial

16:42:04 23   variance.   I understand that.

16:42:07 24                    MR. SOFER: Again, on a personal note I thank

16:42:10 25   you for giving us this time.   I know you've been very

16:42:12  1   accommodating to both sides, and we much appreciate it.

16:42:16  2            THE COURT:  Mr. Herdman or Mr. Getz?

16:42:19  3            MR. GETZ:  Thank you, Your Honor.  I do

16:42:23  4   want to start with --

16:42:25  5            THE COURT:  Let me simply say, if you can

16:42:28  6   kind of keep it to ten minutes or less, because I'm

16:42:32  7   going to give Mr. Hartman the last word for about five

16:42:34  8   minutes.  It's not a time clock or stopwatch.  And I'm

16:42:39  9   not going to turn off the microphone if you go beyond.

16:42:45  10  But if you can hit the high points or low points,

16:42:50  11  whichever your viewpoint would be.

16:42:54  12           MR. GETZ:  All right, Your Honor.  I'll do

16:42:55  13  my best to try to trim it down.  We will have to rely

16:42:58  14  all the more on the Court's recollection of some of

16:43:02  15  these instances.

16:43:07  16           THE COURT:  Tell me what there is in the

16:43:08  17  record that would move me back to the, quote,

16:43:12  18  recruitment rather than simple responsibility.  Also,

16:43:25  19  I'm pretty well convinced there's ample proof of the

16:43:29  20  Eckhlaas situation.  Feel free to button that up a

16:43:34  21  little as well.

16:43:35  22           MR. GETZ:  I'll start there then, Your

16:43:37  23  Honor, because that can be done very quickly.  I'll

16:43:39  24  just bring to the Court's attention Joseph Corrigan's

16:43:43  25  testimony at trial.  He was the FBI computer evidence

16:43:46   1   technician who specifically testified that in order to

16:43:49   2   get that cookie, you have to sign into the site.   And

16:43:53   3   in order to do that, you have to use your password and

16:43:55   4   your user ID.   And that was his testimony, very

16:43:58   5   clearly.

16:43:59   6          I would also remind the Court that that was

16:44:01   7   an Arabic website.   So this idea somehow that Darren

16:44:04   8   Griffin would have been using the defendant's computer

16:44:07   9   and tapping into that website is just not to be

16:44:10  10   believed.

16:44:11  11          THE COURT:  I listened to that testimony,

16:44:13  12   and candidly I didn't have -- and I listened to what

16:44:18  13   counsel said about it both before and today.   I think

16:44:23  14   at least at this stage, and I will make a finding by a

16:44:28  15   preponderance of the evidence that that connection has

16:44:31  16   been established, and my sentence will reflect that

16:44:36  17   finding.

16:44:40  18          MR. GETZ:  Thank you.   Many of these things

16:44:41  19   are going to focus obviously on the Ahmeds because they

16:44:45  20   have become somewhat of a central focus, and a lot of

16:44:47  21   time was spent in addressing their connection to the

16:44:51  22   defendant and to his case.   Mr. Hartman started by

16:44:55  23   basically suggesting that I had misrepresented

16:44:58  24   something.   I think you brought it up twice.

16:45:01  25          THE COURT:  I said to my law clerks, I never

16:45:03  1   like lawyers, especially lawyers as competent as those

16:45:07  2   in this case, to use the word "misstatement," and even

16:45:10  3   go further from there.   I think it's more accurate for

16:45:12  4   any lawyer to say that his view or her view of what the

16:45:17  5   record shows differs.   That's how I interpret what Mr.

16:45:23  6   Hartman was saying to me.   He's not attributing to you

16:45:26  7   any kind of inappropriate misconduct.

16:45:30  8            MR. GETZ:  I understand, Your Honor.

16:45:31  9            THE COURT:  It's still, you have a right to

16:45:34  10  correct it and say, Wait a minute, Judge, our view is

16:45:37  11  different.

16:45:38  12           MR. GETZ:  Your Honor, I don't think the

16:45:39  13  record needs corrected.   I think the record, if

16:45:42  14  checked, you'll find what I said is exactly what the

16:45:44  15  evidence showed, which is that in that conversation the

16:45:48  16  defendant suggested calling Zubair and saying to him,

16:45:51  17  Zubair, Zubair, what's up?  You with us or not?

16:45:57  18  Something to that effect.   That is also referenced in

16:46:03  19  our memo with a specific link.   So to the extent it was

16:46:07  20  misrepresented --

16:46:08  21           THE COURT:  The first two words were Zubair,

16:46:12  22  not Bilal.

16:46:13  23           MR. GETZ:  What is important is Mr. Hartman

16:46:15  24  never said that the statement wasn't made.   What he

16:46:17  25  said was that he never said it to Zubair.   And that I'm

16:46:20  1   saying, I never said he said it to Zubair, but it's a

16:46:23  2   distinction without a difference.   What difference does

16:46:26  3   it make if he makes that statement to Darren Griffin

16:46:27  4   suggesting they call Zubair and say this, or if he

16:46:31  5   actually makes this call and says it to Zubair.   I know

16:46:34  6   it may make a difference if no calls were ever made

16:46:37  7   between the defendant and the Ahmeds, but the evidence

16:46:40  8   showed that calls were made between them.   And, in

16:46:44  9   fact, we have a clip.   I could play it.   It's from

16:46:47  10  October 8, 2004 where the defendant calls Khaleel Ahmed

16:46:50  11  and is urging them to come to Toledo for training.

16:46:59  12            THE COURT:  Go ahead and play it.

16:47:01  13            MR. GETZ:  I'm sorry?

16:47:01  14            THE COURT:  Go ahead and play it.

16:47:12  15            (Audio played and transcript displayed.)

16:52:23  16            MR. GETZ:  Now, Your Honor, we only heard,

16:52:25  17  of course, one side of that conversation.

16:52:28  18            MR. HARTMAN:  Your Honor, I'm going to have

16:52:29  19  the same issue that I did at trial if we start playing

16:52:34  20  clips.   Out of fairness --

16:52:40  21            MR. GETZ:  Again, Your Honor, you heard

16:52:42  22  Darren Griffin's voice.  He was present there.   That's

16:52:44  23  how the recording was made.   The argument, I suspect,

16:52:50  24  would be, Well, he's calling them to get them to come

16:52:54  25  for some kind of security guard training, that that's

16:52:57  1    what he believes that it is.  Well, we just heard Mr.

16:53:00  2    Hartman telling this Court about how these two

16:53:03  3    individuals were fully formed terrorists.  They're

16:53:06  4    capital T terrorists.  That this defendant saved and

16:53:13  5    he's indicating he's some kind of hero for going and

16:53:17  6    saving them.  Is it logical the defendant is then

16:53:19  7    calling them to get them involved in some kind of

16:53:22  8    legitimate training exercise? We know the evidence has

16:53:24  9    indicated very clearly that that was not the case and

16:53:27  10   that there's no way the defendant ever could have

16:53:29  11   believed that that was the case.  The Court has already

16:53:32  12   made reference and we spoke earlier of the conversation

16:53:36  13   where at the February 16 meeting, Darren Griffin lays

16:53:42  14   all of this out about what the training is about and the

16:53:47  15   defendant saying, I understand.  There's no

16:53:49  16   misunderstanding about what this training is.  And he's

16:53:51  17   calling them trying to get them to come to Toledo.

16:53:53  18              THE COURT:  When was this call?

16:53:54  19              MR. GETZ:  It was October 8, 2004.  This

16:54:00  20   would have been several months after the ICNA conference

16:54:04  21   when he first introduced them --

16:54:06  22              THE COURT:  About three months.

16:54:07  23              MR. GETZ:  -- to Darren Griffin.  For the

16:54:09  24   record, we should identify that clip, just

16:54:16  25   SM90-69185747-10A-1.

16:54:25  1          I think it would be helpful to the Court to

16:54:27  2   very quickly remind the Court of what the timeline is of

16:54:30  3   the Ahmeds' involvement in this case.   The Court will

16:54:32  4   recall that in May of 2004 the Ahmeds left to go to

16:54:39  5   Egypt to attempt to hook up with somebody and ultimately

16:54:43  6   engage in jihad in Afghanistan.   The defendant is hired

16:54:49  7   by Zubair's father to go over and try to locate them.

16:54:53  8   They return in early June of 2004.   The defendant stays

16:54:57  9   in Egypt a little while longer but also returns in June.

16:55:01  10  We have evidence, a call, June 23 of 2004, where the

16:55:07  11  defendant calls Darren and says he has two brothers that

16:55:12  12  want to train.   They have a lot of energy.   I think

16:55:14  13  the Court will recall that conversation.

16:55:18  14          June 29 of 2004, the defendant calls Darren

16:55:23  15  Griffin and says he's bringing two brothers to the

16:55:26  16  convention.   We just heard Mr. Hartman say the

16:55:28  17  defendant didn't know that Darren Griffin was going to

16:55:31  18  be at that conference.   Well, that's clearly not true.

16:55:33  19  This conversation indicates not only does he know that

16:55:38  20  Darren's going to be there, but he's telling him, I'm

16:55:41  21  bringing you two brothers who want to meet you, and I'm

16:55:44  22  bringing them to the convention.   He then, in fact,

16:55:47  23  does that on July 3 of 2004.   And, in fact, contrary to

16:55:51  24  what the defendant told the Court, Darren Griffin didn't

16:55:56  25  come down to their booth to see them.   The evidence is

16:55:59  1   clear that he took them up to the booth where Darren

16:56:02  2   Griffin was working and introduced them.

16:56:06  3            The convention continued the next day on

16:56:08  4   July 4, 2004.

16:56:10  5            THE COURT:  I remember that.  That's when

16:56:12  6   the conversation occurred was on July 4.

16:56:16  7            MR. GETZ:  That's correct.  That's when he

16:56:17  8   tells Darren Griffin --

16:56:18  9            THE COURT:  I remember that's what the

16:56:19  10  testimony was about on the first day.

16:56:22  11           MR. GETZ:  That's correct, Your Honor.  And

16:56:23  12  he tells Darren Griffin that the Ahmeds want to be

16:56:25  13  professional snipers during that meeting on July 4 of

16:56:30  14  '04.  There was this discussion again about how they're

16:56:36  15  already fully formed terrorists as opposed to this

16:56:41  16  defendant.

16:56:41  17           And I think I even heard the words here

16:56:44  18  about how they couldn't be molded or they weren't clay.

16:56:47  19  Well, that's a direct contradiction to the defendant's

16:56:50  20  own words on July 15 of 2004 when he specifically tells

16:56:54  21  Darren Griffin, again in a recorded conversation, that

16:56:58  22  Zubair Ahmed and Khaleel Ahmed are, in fact, clay to be

16:57:03  23  molded.  And that is how he looks at them.

16:57:07  24           October 8 of '04 is the telephone call that

16:57:11  25  we just saw.

16:57:15  1        Mr. Hartman indicated that during the course

16:57:18  2   of this time period the Ahmeds traveled to Toledo four

16:57:23  3   times.  And we challenge that statement, and I

16:57:27  4   challenge it again saying, I don't know; I firmly

16:57:31  5   believe that is not in the record.  And in stopping and

16:57:35  6   thinking about it, it's hard to identify a witness that

16:57:38  7   could have testified or put in any evidence of those

16:57:42  8   trips.

16:57:42  9        THE COURT:  Well, I'm not sure.  At the very

16:57:45  10  least that's neutral.  I don't think it advances his

16:57:54  11  argument very far because it would seem to me that the

16:58:00  12  government would want to place them in Toledo as often

16:58:04  13  as possible.  And in any event, they came here four

16:58:09  14  times; we don't know why one way or the other.  I don't

16:58:14  15  think it matters because I cannot deduce anything on

16:58:19  16  which I can rely from that mere fact.  So I think, as

16:58:26  17  I've done at least once, I'm going to disregard that

16:58:31  18  because to do otherwise would be speculative.

16:58:37  19        MR. GETZ:  I'm going to skip over a number

16:58:38  20  of these clips, Your Honor.  I would like to --

16:58:43  21        THE COURT:  I think you canvassed, not

16:58:47  22  covered the waterfront, with regard to, quote,

16:58:50  23  recruitment, solicitation or responsibility.  I'll hear

16:58:56  24  from Mr. Hartman, of course.  But go ahead.  Other

16:59:00  25  topics?

16:59:04  1        MR. GETZ:  Your Honor, I would just suggest
16:59:06  2   there was a challenge to the term that I used in my
16:59:10  3   statement that the defendant in some way was a
16:59:13  4   facilitator as well as being a recruiter and a mentor.
16:59:16  5   And the question was asked by Mr. Hartman, what
16:59:19  6   facilitation?   There was no facilitation here.   And I
16:59:23  7   would just suggest to the court, taking the Ahmeds, who
16:59:27  8   we knew to be want-to-be terrorists and attempted
16:59:31  9   terrorists who were looking for training, looking for a
16:59:36  10  hookup, and actually taking them to meet with Darren
16:59:39  11  Griffin who he believed could be that hookup and provide
16:59:41  12  that training, that's facilitation, Your Honor.
16:59:45  13  Inviting them to training, calling them and trying to
16:59:47  14  get them to come to Toledo for it, that's facilitation.
16:59:51  15  Suggesting copying materials onto CDs taken to them
17:00:00  16  because they were unable to come to Toledo, I would
17:00:02  17  suggest that's all facilitation.
17:00:07  18         This notion that somehow the Ahmeds are
17:00:09  19  capital T terrorists but the defendants in this case are
17:00:13  20  not, only because the Ahmeds went to Egypt to attempt to
17:00:19  21  get hooked up, is just a ludicrous argument, Your Honor.
17:00:22  22  I think Mr. Hartman said they got on an airplane to meet
17:00:25  23  someone to put them on the battlefield.  Defendants
17:00:29  24  Amawi, Mazloum, and El-Hindi, they had Darren Griffin
17:00:32  25  here to hook up with to provide them with that same kind

17:00:37   1   of a hookup, presumably for the same purposes, to get

17:00:40   2   the training, to get prepared for jihad.  They didn't

17:00:42   3   have to travel to Egypt to do that.  And the fact that

17:00:47   4   somehow the Ahmeds are worse because they travelled a

17:00:51   5   little bit further for the same thing, again, is just

17:00:55   6   not a logical notion.  And of course this defendant is

17:00:58   7   the one who then hooked up the Ahmeds with Darren

17:01:02   8   Griffin, the same person who they had hooked themselves

17:01:06   9   up with.  The government submits they're all capital T

17:01:10  10   terrorists, Your Honor.

17:01:15  11          The defendant stated to this Court in

17:01:18  12   regards to the conversation with Khaleel Ahmed, or

17:01:25  13   Khaleel and Zubair Ahmed at the convention that what was

17:01:28  14   supposedly stated to his remarks about that were false

17:01:33  15   and were made up by Darren Griffin.  He said he didn't

17:01:37  16   even know what a .50 caliber machine gun is.  Well,

17:01:40  17   that's belied by a specific recording where, in fact,

17:01:44  18   he's talking to Darren Griffin about Zubair's comments

17:01:49  19   about running with a .50 caliber machine gun.  He talks

17:01:52  20   about like Rambo.  He very clearly in the

17:01:58  21   conversation -- again, we can play the clip, but very

17:02:00  22   clearly from the conversation he knows what a .50

17:02:03  23   caliber machine gun is, and they're discussing it.

17:02:08  24          I want to conclude, Your Honor, also by

17:02:13  25   saying that or suggesting and raising the question of

17:02:18  1   this notion somehow that the defendant should get some

17:02:24  2   benefit because all that he is is a con man and running

17:02:27  3   illegal schemes and defrauding people, and somehow

17:02:31  4   that's a mitigating factor in this case.

17:02:33  5              THE COURT:  No, I understand.   There is a

17:02:36  6   separate sentence that has to be considered.   I

17:02:39  7   understand that.

17:02:40  8              MR. GETZ:  And to that point, Your Honor, I

17:02:42  9   know that there is a presumption that the sentences

17:02:44  10  should be concurrent when sentencing occurs on the same

17:02:48  11  day, but we would argue, Your Honor, it's only a

17:02:51  12  presumption, and again, we feel that this defendant

17:02:54  13  should not get the benefit of getting a concurrent

17:02:59  14  sentence for that case merely because that case was put

17:03:02  15  off.

17:03:02  16             THE COURT:  I understand I have discretion

17:03:04  17  in that regard provided I explain myself adequately.

17:03:14  18             MR. GETZ:  Again, going to just very quickly

17:03:16  19  the idea of some kind of comparison between the

17:03:20  20  sentences that the Ahmeds have agreed to receive and are

17:03:27  21  expected to receive as a result of their plea agreement,

17:03:30  22  and somehow that equates to or should be compared

17:03:34  23  somehow to the sentence in this case.  I remind the

17:03:37  24  Court those Defendants pled guilty.  Zubair Ahmed has

17:03:41  25  testified in two terrorism cases in Atlanta.

17:03:46  1           THE COURT:  What were the names of the

17:03:51  2  defendants in those cases.

17:03:53  3           MR. GETZ:  The Atlanta cases, Sadequee was

17:03:56  4  one of the defendants, and Syed Haris Ahmed was the

17:04:01  5  other.

17:04:04  6           Khaleel Ahmed has already surrendered

17:04:07  7  himself and begun serving jail time.  They both fully

17:04:11  8  accept what they have done and accepted responsibility.

17:04:14  9  Frankly from our position to argue this defendant should

17:04:17 10  receive some kind of a sentence that comes anywhere

17:04:22 11  close to what those defendants are receiving after he's

17:04:26 12  placed the government in the position of having to prove

17:04:28 13  his guilt, even to this day standing up and telling the

17:04:31 14  Court in essence that he's not guilty and not accepting

17:04:35 15  responsibility, again, we don't believe that that would

17:04:38 16  be appropriate.

17:04:42 17           I would refer the Court again to its opinion

17:04:45 18  and order when it denied the motion, post-trial motion

17:04:49 19  for judgment of acquittal when it -- you listed out the

17:04:53 20  number of steps and actions that this defendant took

17:04:57 21  after that February 16, 2005 meeting.  So this idea

17:05:02 22  again that somehow this surprise dinner meeting at the

17:05:09 23  defendant's home, that he was surprised by Darren

17:05:14 24  Griffin's speech, and then somehow didn't undertake any

17:05:23 25  activities after that and didn't do anything, well, the

17:05:27  1    Court found differently, and obviously so did the jury

17:05:31  2    from the evidence in this case.

17:05:44  3            THE COURT:  What was the date of that?   I

17:05:46  4    want to take a quick look at that.

17:05:48  5            MR. GETZ:  The order or --

17:05:52  6            THE COURT:  Or do you have a document

17:05:54  7    number, either way?

17:05:56  8            MR. GETZ:  Document 951 filed May 15, 2009.

17:06:01  9    Specifically they're referring to pages 6 and 7.

17:06:08  10           THE COURT:  951?

17:06:12  11           MR. GETZ:  951, Your Honor.

17:06:59  12           THE COURT:  Do you have a copy.

17:07:00  13           MR. GETZ:  As stated at the commencement of

17:07:02  14    this hearing --

17:07:03  15           THE COURT:  Do have you a copy of that?

17:07:05  16           MR. GETZ:  I do Your Honor.   If you don't

17:07:07  17    mind, I have highlighted these sections.

17:07:09  18           THE COURT:  No problem.

17:07:17  19             Mr. Hartman, he's referring to page 6 of

17:07:22  20    my order.

17:07:23  21           MR. HARTMAN:  Yeah.

17:07:48  22           THE COURT:  Okay.

17:07:48  23           MR. GETZ:  Your Honor, there was a statement

17:07:50  24    earlier, and maybe the Court made it, about this not

17:07:53  25    being like a bank robbery case, a bank robber is a bank

17:07:57  1    robber.    But I believe the Court would most likely

17:08:01  2    agree with me even those cases are not always that

17:08:03  3    simple.

17:08:04  4             THE COURT:  I agree.    But in terms of

17:08:06  5    trying to understand the nature of the offense.    Sure,

17:08:10  6    there are differences, all kinds of differences.    And

17:08:15  7    there are thousands of cases, statistics, so on and so

17:08:23  8    forth.    There are benchmarks; there are channel markers,

17:08:27  9    whatever metaphor you want to use.    That's all.

17:08:30  10            MR. GETZ:  I understand that, Your Honor.

17:08:31  11   It just occurred to me when we heard that as an

17:08:34  12   illustration, I was thinking three bank robbers that

17:08:37  13   agree together to rob a bank, well, it doesn't make

17:08:40  14   sense for them to pull this off successfully to all

17:08:43  15   three go in the bank and ask for the teller to give them

17:08:46  16   the money.    It makes sense for somebody to wait in the

17:08:49  17   car; it makes sense for somebody to stand by the door

17:08:51  18   and be the lookout; it makes sense for somebody to go in

17:08:54  19   and demand the money.    It doesn't make sense to treat

17:08:58  20   them differently.    That's what conspiracy law is also

17:09:01  21   about.    I think the terminology has been used in

17:09:04  22   conspiracy, when you're in for a penny, you're in for a

17:09:06  23   pound.    That's the case here.    This defendant clearly

17:09:09  24   entered into this agreement; he knew what it was about.

17:09:12  25   He took actions to further these activities and to

17:09:17   1    further the goals.    And as I attempted to point out at

17:09:23   2    the commencement of this hearing, his role may have been

17:09:25   3    somewhat different because he was -- he's not in the

17:09:29   4    same position as the other defendants.    He's older; he

17:09:32   5    had children; he had a family; he had other things that

17:09:34   6    he was doing.    But what he attempted to do and what the

17:09:37   7    evidence showed he attempted to do was use his

17:09:39   8    background, his experience, his skills that he brought

17:09:42   9    to this conspiracy to make it work.    And to somehow say

17:09:47   10   that his role, his culpability is somewhat less because

17:09:51   11   those skills were different and because that background

17:09:54   12   is different, I submit to you is maybe not the best way

17:09:58   13   to look at his involvement.

17:10:01   14          THE COURT:    What is the last date between

17:10:05   15   the date of arrest that you have that you believe the

17:10:09   16   record shows what I refer to as a contact or conduct of

17:10:15   17   consequence?

17:10:18   18          MR. GETZ:    Well, Your Honor, we have the

17:10:19   19   phone calls a couple weeks prior, but we don't know, to

17:10:23   20   be honest and fair, we don't know the what the substance

17:10:25   21   of those were.    So we can't say whether they're of

17:10:29   22   consequence.    We know they existed.    We know they're

17:10:32   23   still in touch with one another.

17:10:36   24          Just a moment, Your Honor.

17:10:37   25          THE COURT:    Mr. Herdman, would you like to

17:10:42  1  ask a question?

17:10:43  2          MR. HERDMAN:  I want to clear it with my

17:10:46  3  supervisor first.

17:10:48  4          MR. HARTMAN:  Can you clarify what you think

17:10:49  5  is substantive?

17:10:50  6          THE COURT:  I'll let them tell me.

17:10:52  7          MR. HARTMAN:  Okay.

17:11:00  8          MR. GETZ:  I can't pull that out immediately

17:11:04  9  other than to say in your order I believe you refer to

17:11:07  10  May 25 of 2005.  And that may be.  I would assume if we

17:11:13  11  had had something additional to supplement that with

17:11:18  12  we -- the Court would have had it.

17:11:19  13          THE COURT:  In any event, for a fairly

17:11:21  14  lengthy period of time the government doesn't know what

17:11:24  15  Mr. El-Hindi was up to, good or bad or nothing at all?

17:11:30  16  That's all.

17:11:30  17          MR. GETZ:  Again, some of that time Mr.

17:11:32  18  Griffin was overseas, and obviously other things were

17:11:36  19  going on.  That is correct, Your Honor.

17:11:40  20          THE COURT:  At least it seems to me sitting

17:11:42  21  here now I have to -- I cannot presume that anything --

17:11:51  22  I can't draw any adverse inferences.  I need not also

17:11:54  23  and perhaps should not draw positive inferences.  But

17:11:58  24  that's what the government's got; that's all it can

17:12:02  25  point to.  That's what I'm asking.  Anything further?

17:12:06  1        MR. HERDMAN:  Your Honor, there is one.  I

17:12:08  2   apologize.  There was additional evidence that set out

17:12:10  3   that the defendant watched a video on his computer that

17:12:15  4   depicted the manufacture of black powder; you remember

17:12:18  5   that video.  And that was in November of 2005.  So

17:12:21  6   that was a little further along in that year.  But that

17:12:23  7   was the same video that Mr. Amawi had on his Sony laptop

17:12:27  8   over in Jordan.

17:12:28  9        THE COURT:  Okay.  Mr. Hartman, a few

17:12:31  10  closing remarks.

17:12:32  11       MR. HARTMAN:  Judge I have a couple very

17:12:34  12  quick points.

17:12:35  13       THE COURT:  That's fine.

17:12:36  14       MR. HARTMAN:  I don't want to -- literally

17:12:38  15  it will take about two minutes.

17:12:39  16       First, the phone call they played, did you

17:12:42  17  hear Darren Griffin in the background?

17:12:44  18       THE COURT:  Uh-huh.

17:12:44  19       MR. HARTMAN:  Ask him just if he can come

17:12:46  20  for day, just for a day.

17:12:51  21       July 4, we disagree about the evidence.

17:12:59  22       THE COURT:  I do recall that going, quote,

17:13:03  23  upstairs to wherever Griffin was.  If that's a mistake,

17:13:07  24  it's a mistake.  That's my recollection.

17:13:13  25       MR. HARTMAN:  Completely -- Mr. Sofer proved

17:13:18  1   my point.   It's a cookie cutter approach.   He got

17:13:22  2   convicted of this statute.

17:13:25  3            THE COURT:  I understand.   But my sentence

17:13:28  4   will reflect individualized consideration.

17:13:33  5            MR. HARTMAN:  18 U.S.C. 3553.   You know it

17:13:36  6   better than I do.

17:13:38  7            And finally, Judge, there is one other group

17:13:49  8   of people that's listed to the message that you're going

17:13:53  9   to send, and that's the Muslim community here.   Not

17:13:58  10  just here in Toledo, but here in this country and

17:14:01  11  everywhere else, and the message that you're going to

17:14:05  12  send is going to be an extension of the message that the

17:14:10  13  government sent, an extension of the message that the

17:14:15  14  Bush administration sent when they decided it's okay for

17:14:20  15  us to take a person and send them into your Mosque with

17:14:24  16  no suspicion whatsoever, and that's what they decided.

17:14:30  17  And we're going to look at you; we're going to keep tabs

17:14:33  18  on you, and we're going to go in and talk to you to see

17:14:36  19  if you bite.   The Muslim community is watching this

17:14:39  20  case for that reason.   The message that you send is

17:14:44  21  going to be heard very, very loudly by that community.

17:14:50  22  And I would just ask that you keep that in mind.   Thank

17:14:50  23  you.

17:14:55  24                          * * *

17:14:55  25            THE COURT:  Eric, do have you a minute?  I'm

17:14:57  1    going to take a very brief recess.    Very brief.

17:23:50  2                    (Recess taken.)

17:23:58  3                    THE COURT:  As a preliminary matter, I think

17:24:17  4    the government is correct in finding he wasn't merely

17:24:20  5    responsible for the Ahmed's involvement; he was, in

17:24:24  6    fact, recruiting them, as I would understand that term.

17:24:29  7    There will be that finding of fact in the case.

17:24:33  8                    If you want to challenge that, I don't know

17:24:35  9    if that constitutes an objection, but again, I think

17:24:38  10   it's appropriate to tell you that's my finding.    The

17:24:40  11   same with regard to the issue of solicitation.

17:24:46  12                   I'm going to impose two sentences.    My

17:24:51  13   understanding that the guideline range on the fraud

17:24:56  14   conviction, which was tried to me, there were seven

17:25:01  15   counts of conviction on that.    I believe the guideline

17:25:03  16   range is a Criminal History Category I.    And I cannot

17:25:08  17   recall the base offense level, but the guideline

17:25:10  18   range -- you better tell me what it was.

17:25:12  19                   MS. SIZEMORE:  It was a 15, Your Honor.

17:25:14  20                   THE COURT:  Is there any objection to those

17:25:17  21   findings relative to the applicable guideline?  Do you

17:25:21  22   want to take a look at it?

17:25:23  23                   MR. HARTMAN:  Nothing additional.

17:25:25  24                   MS. SIZEMORE:  Your Honor, the guideline is

17:25:28  25   18 to 24 months.

17:25:48  1           THE COURT:  I apologize.  I should have

17:25:51  2  called it to your attention.  I sort of focused on the

17:25:57  3  other conviction.

17:26:37  4           MR. GETZ:  Your Honor, the government agrees

17:26:40  5  that offense level 15 is correct for the fraud offense,

17:26:42  6  and a Criminal History Category of I.

17:26:45  7           THE COURT:  And then the guideline range is

17:26:48  8  18 to 24 months.

17:26:55  9           I'm going to impose a consecutive sentence

17:26:59  10  on the four counts of conviction, really that we've been

17:27:03  11  talking about, would be terms of 144 months as to each

17:27:09  12  to run concurrently.

17:27:11  13           As to the fraud convictions which were tried

17:27:14  14  to me, there will be a sentence of 18 months, and they

17:27:18  15  will run consecutively.

17:27:20  16           Is that the proper way to pronounce the

17:27:21  17  term?

17:27:27  18           MS. SIZEMORE:  You were saying all the fraud

17:27:31  19  counts, you would like those to be run consecutively?

17:27:34  20           THE COURT:  Right.  As to that set of

17:27:36  21  convictions, the sentences -- the sentence will be 18

17:27:39  22  months.  That sentence is to run consecutive to the

17:27:43  23  other sentences being imposed.  And I'll go through and

17:27:47  24  explain my reasons after I pronounce sentence.

17:27:51  25           Pursuant to the Sentencing Reform Act of

17:27:54  1   1984 and U.S. Code Section 3553(a), it's the judgment of

17:27:59  2   this Court that the Defendant, Marwan Othman El-Hindi,

17:28:03  3   be an hereby is committed to the custody of the Bureau

17:28:06  4   of Prisons in case 3:06-CR-719-02 to be imprisoned for a

17:28:17  5   term of 144 months as to Count 1, 144 months as to each

17:28:26  6   of Counts 2, 5, and 6.   Those sentences to run

17:28:30  7   concurrently.  They represent variances.  I will explain

17:28:36  8   my reasons.

17:28:37  9           Regarding case 3:07-CR-74-001, Defendant

17:28:44  10  Marwan Othman El-Hindi is hereby committed to the

17:28:47  11  custody of the Bureau of Prisons for a term of 18 months

17:28:55  12  each as to Counts 1, 2, 3, 4, 5, 6 and 7.   Those terms

17:29:03  13  to run concurrently as to each other and consecutively

17:29:06  14  with regard to the 144-month term.

17:29:10  15      If my arithmetic is correct, that results in a

17:29:14  16  total of 162 months.

17:29:16  17      Upon release from imprisonment the defendant

17:29:18  18  shall be placed on supervised release for a life term as

17:29:21  19  to Counts 1 and 2; a term of three years to each of

17:29:24  20  Counts 5 and 6 in case number 3:06-CR-719-02.  As to

17:29:34  21  case 3:07-CR-00074-001, the defendant shall be placed on

17:29:40  22  supervised release for a term of three years as to

17:29:42  23  Counts 1 through 7.   Those terms, of course, will run

17:29:47  24  concurrently.

17:29:48  25      Within 72 hours of release from the custody of

17:29:50  1    the Bureau of Prisons, the defendant shall report in

17:29:52  2    person either to the U.S. Pretrial Service and Probation

17:29:55  3    Office in this district or the Probation Office in the

17:29:58  4    district into which he is released.

17:30:01  5                    There is no fine; no fine will be imposed.

17:30:05  6                    As to case 3:07CR00074-001, the defendant

17:30:09  7    shall pay restitution in the amount of $20,000 to the

17:30:14  8    United States Department of Health and Human Services,

17:30:16  9    through the Clerk of the United States District Court.

17:30:18  10   Restitution is due and payable immediately.

17:30:21  11                   The defendant shall pay 25 percent of his

17:30:23  12   gross income per month through the Federal Bureau of

17:30:26  13   Prisons Inmate Financial Responsibility Program.  If a

17:30:28  14   restitution balance remains upon release from

17:30:31  15   imprisonment, payment is to commence no later than 60

17:30:34  16   days following release from imprisonment to his term of

17:30:38  17   supervised release.

17:30:38  18                   The defendant shall pay a minimum of ten

17:30:41  19   percent of his gross monthly income during the term of

17:30:44  20   supervised release and thereafter as prescribed by law.

17:30:50  21   Notwithstanding establishment of the payment schedule,

17:30:53  22   nothing shall prohibit the United States from executing

17:30:55  23   or levying upon property of the defendant discovered

17:30:59  24   before or after the date of this judgment.

17:31:01  25                   The defendant shall pay a special assessment

17:31:03 1 of $1,100 which is due immediately and shall likewise be

17:31:08 2 taken from his prison earnings until satisfied.

17:31:11 3 While on supervision the defendant shall not

17:31:14 4 commit another federal, state, or local crime, shall not

17:31:17 5 illegally possess a controlled substance, shall comply

17:31:19 6 with the standard conditions adopted by this Court,

17:31:23 7 which he will be made aware when he begins to serve

17:31:26 8 supervision, and shall comply with the following special

17:31:28 9 conditions -- I see no reason to impose mandatory drug

17:31:33 10 testing. The defendant shall not possess a firearm,

17:31:36 11 destructive device, or dangerous weapon. He shall

17:31:38 12 submit his person, residence, place of business,

17:31:38 13 computer, or vehicle to warrantless search conducted and

17:31:41 14 controlled by the U.S. Probation Office at a reasonable

17:31:44 15 time and in a reasonable manner based upon reasonable

17:31:47 16 suspicion that he is in possession of contraband or

17:31:52 17 evidence of a violation of a condition of release.

17:31:54 18 Failure to commit to such a search may be grounds for

17:31:56 19 revocation. The defendant shall inform any other

17:31:58 20 residents that the premises is subject to search

17:32:01 21 pursuant to this condition.

17:32:02 22 The defendant shall while on supervised

17:32:05 23 release provide the probation officer with any and all

17:32:08 24 requested financial information promptly upon the upon

17:32:11 25 making such request.

17:32:12  1          While on supervised release the defendant

17:32:14  2   shall diligently seek to obtain and if he obtains

17:32:17  3   diligently seek to maintain lawful, gainful employment.

17:32:21  4   He shall cooperate in the collection of DNA as directed

17:32:25  5   by the Probation Office.   He shall not associate with

17:32:29  6   any member of a threat group as defined for him in the

17:32:33  7   record by the probation officer.

17:32:38  8          I believe that my reasons are probably

17:32:44  9   discernable to any attentive reader of the transcript or

17:32:48  10  anybody that's been here this afternoon, or actually

17:32:51  11  throughout the entire course of these proceedings, but

17:32:54  12  to be made clear, I consider this to be a very serious

17:32:57  13  offense, and I believe that in light of the history and

17:33:04  14  characteristics of the offense, this is a sentence that

17:33:07  15  is necessary but not more than necessary under Section

17:33:16  16  3553(a).   I believe and I hope that if the sentence,

17:33:22  17  when it becomes known to someone who understands all the

17:33:26  18  pertinent facts and circumstances, will promote respect

17:33:29  19  for the law.   I believe that it is a just sentence.

17:33:33  20  As I've already indicated, I think the factor of

17:33:38  21  individual -- excuse me, the factor of public deterrence

17:33:41  22  is of primary concern and has been given that concern

17:33:47  23  and attention by me in trying to determine what is a

17:33:51  24  just but not unnecessary sentence to accomplish that

17:33:54  25  purpose.

17:33:59  1            I've tried to express off and on throughout

17:34:02  2    the afternoon my view of what the nature of the message

17:34:14  3    that is to be sent when a Court imposes a sentence under

17:34:19  4    circumstances and conditions such as these.   To try to

17:34:26  5    reformulate or restate that one more time, the threat of

17:34:35  6    terroristic acts is real.   I don't think anybody in

17:34:39  7    this country can doubt that.   I don't think anybody in

17:34:42  8    the world can doubt that.   Terrorism by its nature is a

17:34:48  9    crime that is conceived, plotted, planned, and executed

17:34:55  10   in the utmost secrecy.   If it were not, it could not

17:34:59  11   succeed.   That makes it particularly difficult to

17:35:04  12   detect and deter and defend against.   It is in that

17:35:10  13   regard an act, when accomplished, that distinguishes it

17:35:16  14   from practically any other crime as defined would be

17:35:21  15   found within the federal criminal code.   It is a crime

17:35:24  16   that threatens countless numbers of people and countless

17:35:33  17   numbers of locations with a substantial risk of injury

17:35:40  18   or death or destruction.   And it is imperative that our

17:35:47  19   government and any government take all lawful and

17:35:51  20   reasonable steps available to it to try to detect, deter

17:35:58  21   and defend against the risk of terrorism.   I think

17:36:01  22   that's what was done in this case.

17:36:05  23            I disagree with the contention that the

17:36:08  24   message that I am trying to send and the government

17:36:16  25   desires me to send and to be communicated and heard

17:36:23  1    chills the right to vigorous and robust exercise of all

17:36:28  2    of our First Amendment rights, be they the rights of

17:36:32  3    free speech, of association, or of religion.   I think

17:36:36  4    that, though fuzzy as many lines are that the law seeks

17:36:41  5    to draw, nonetheless, there is a distinction between the

17:36:46  6    exercise of those rights in a lawful and productive

17:36:51  7    manner and way that is essential to the willing of a

17:36:56  8    robust and vital democratic society.  I think there's a

17:37:00  9    line between that and the necessary function that that

17:37:03  10   kind of -- the exercise of those rights forms for the

17:37:11  11   wellbeing of us all and the conduct that led to the

17:37:15  12   conviction of these defendants.  I do think the line was

17:37:20  13   crossed, and the jury properly found on the basis of

17:37:22  14   sufficient evidence that it was crossed.  And that,

17:37:26  15   although I do not think that a sentence of this length

17:37:30  16   is necessary either to incapacitate or to deter Mr.

17:37:37  17   El-Hindi from further criminal conduct as to either of

17:37:40  18   these sets of crimes of which he stands convicted;

17:37:44  19   nonetheless, I think that it is appropriate for the

17:37:46  20   government to ask me and for me to respond to that

17:37:48  21   request to try to communicate through this sentence, and

17:37:53  22   I think this sentence does so, to those who might be

17:37:58  23   tempted to take their opposition to our government and

17:38:04  24   its policies, whatever those policies may be, whether

17:38:07  25   they're domestic policies or foreign policies, but for

17:38:13 1 those who might be tempted to take the first steps in
17:38:17 2 the path towards generating a risk of harm to our fellow
17:38:23 3 citizens or to anyone else, should understand that. To
17:38:28 4 use the metaphor that I referenced earlier, that this
17:38:33 5 sentence, I hope, serves as a signpost: Danger, warning
17:38:38 6 ahead. It's a minefield. You can't tell whether
17:38:45 7 there's one mine in a football field or whatever the
17:38:48 8 space may be or 1,000, but proceed from here with
17:38:54 9 caution.

17:38:55 10       And also I referenced and I know that it is
17:38:59 11 a cause of concern, just as it is an understandable
17:39:04 12 cause to be concerned that the government's efforts and
17:39:06 13 perhaps my own in pronouncing this sentence may have an
17:39:10 14 adverse effect upon the free exercise of First Amendment
17:39:15 15 Rights, I do not think it does, but I think that I can
17:39:19 16 understand how someone like Mr. El-Hindi's sister might
17:39:23 17 sense that concern. I don't think she should, but
17:39:27 18 clearly she does. But there is, I think, public
17:39:32 19 concern about the kinds of investigatory methods that
17:39:36 20 were employed in the case, the casting of a net not
17:39:39 21 knowing whether there are any fish in the sea or, if so,
17:39:42 22 again, to repeat the metaphor, whether they are minnows
17:39:47 23 or sharks. Nonetheless, given the nature of the risk
17:39:50 24 and of the threat and of the extent of that threat and
17:39:55 25 the consequences of a successful terroristic attack

17:40:00   1   wherever that might occur and against whomever it might

17:40:04   2   be directed, justifies our government in employing the

17:40:09   3   kinds of activities that it employed in this case, and

17:40:18   4   that it is necessary and proper for it to do so, at

17:40:21   5   least in my view.   It is not a view that by any means

17:40:24   6   would be universally shared.   It is necessary and

17:40:27   7   proper for it to do so because, as the government

17:40:31   8   mentioned in its sentencing memo, it must act promptly;

17:40:35   9   it must act swiftly.   It must do so not just to detect

17:40:39   10  and defeat and to prevent the risk of an accomplished

17:40:45   11  terroristic act, but also to deter those who might be

17:40:50   12  inclined, as I say, to take those first steps and step

17:40:54   13  into the minefield.

17:40:57   14          I do think that this sentence, I hope,

17:40:59   15  serves as a publicly displayed and effective notice to

17:41:04   16  those who might be inclined to do as these defendants

17:41:08   17  did and to cross that line, that they will say -- that

17:41:13   18  they will be deterred, that they will exercise the

17:41:16   19  caution I think these defendants should have exercised

17:41:20   20  when Mr. Griffin first started talking about things that

17:41:23   21  he did and first held himself out to them as a resource

17:41:27   22  in the way that he did.   I do not think that by posting

17:41:31   23  that sign or by encouraging people to give heed to it

17:41:35   24  that either I or the government of this country --

17:41:41   25  either that I am or the government of this country is

17:41:45  1    posting a sign or sending a message that will deter a

17:41:50  2    full and robust exercise of our First Amendment rights.

17:41:53  3    I do think it is a very important message to send.   And

17:41:57  4    I think it's appropriate that the government has

17:41:59  5    undertaken to, through this prosecution, and through

17:42:02  6    others that apparently are on the way, to communicate

17:42:06  7    that message.   To the extent that that causes

17:42:10  8    individuals who begin these conversations and start

17:42:13  9    thinking about these kind of acts to become worried when

17:42:16  10   somebody pops up, like Mr. Griffin did in the mosque

17:42:22  11   attended by these three defendants, and starts talking

17:42:24  12   the kind of talk that he did, that would also be my hope

17:42:30  13   that folks say, Wait a minute; who is this guy?   Where

17:42:34  14   does he come from?   What's he saying?  And boy, I'd

17:42:38  15   better be careful because I may not be talking to a

17:42:41  16   compatriot.   I may be talking to a turncoat.   Again, I

17:42:46  17   think it's entirely appropriate that that concern under

17:42:51  18   the circumstances such as these where somebody starts

17:42:53  19   talking about violent and deadly acts, that for somebody

17:43:00  20   to act -- for a person to whom those statements are

17:43:04  21   being made, I think it makes sense to encourage people

17:43:08  22   who are hearing those statements to say to themselves,

17:43:11  23   Wait a minute; who are you?   Maybe you are from the

17:43:17  24   Federal Bureau of Investigation, you are here from the

17:43:21  25   government, and you are not here to help.   So as I say,

17:43:26  1   the principal foundation and basis upon which I impose

17:43:29  2   this sentence, which is both severe, particularly given

17:43:35  3   Mr. El-Hindi's age, but is also substantially more

17:43:39  4   lenient than the government has asked for, is the

17:43:45  5   interest of public deterrence and the effort to respond

17:43:49  6   to very serious and grave threats, the threat and the

17:43:53  7   welfare and wellbeing of all of us, including, as Mr.

17:43:56  8   El-Hindi said, his own children.  I hope that that

17:44:03  9   purpose has been accomplished.  I think if it has, then

17:44:06  10  this sentence has served a very fundamentally important

17:44:10  11  purpose of protecting the public.

17:44:12  12          With regard to personal rehabilitation,

17:44:14  13  education, and vocational requirements and needs, I

17:44:19  14  don't think that plays much of a role.  Mr. El-Hindi

17:44:22  15  is, obviously, like Mr. Amawi, an intelligent,

17:44:26  16  well-educated, well-read, and thoughtful individual.  I

17:44:31  17  don't think this sentence will in any practical way

17:44:36  18  serve that purpose.

17:44:37  19          Let me ask the government first whether I

17:44:42  20  have failed to consider the pertinent factors or

17:44:46  21  otherwise missed something or need to say something

17:44:52  22  further in that regard?

17:44:53  23          MR. GETZ:  Your Honor, I don't believe so.

17:44:56  24  I don't know if the Court addressed the 3553 factor that

17:45:03  25  deals with education or vocational needs.

17:45:07  1        THE COURT:  That's what I just said at the

17:45:09  2   end.   I don't know if he's well-educated or not.   I

17:45:12  3   can't recall.   But I certainly think he is, whether

17:45:14  4   formally educated or not, many members of his family

17:45:18  5   are.  He's obviously a well-read and well-educated

17:45:22  6   individual.

17:45:25  7        MR. GETZ:  We believe it's been covered,

17:45:26  8   Your Honor.

17:45:29  9        MR. SOFER: Your Honor, one additional point.

17:45:30  10  Like the last sentencing, we'd like to preserve our

17:45:34  11  right to appeal the sentence based on the lack of

17:45:38  12  rationale under the 3553 factors to vary in the manner

17:45:42  13  and, more importantly, the extent to which the Court has

17:45:47  14  varied.

17:45:47  15       THE COURT:  But have I failed to consider

17:45:50  16  any of the pertinent factors?

17:45:53  17       MR. SOFER: Again, I don't think Court has

17:45:55  18  failed to consider the factors.   And I am not

17:45:58  19  announcing --

17:46:00  20       THE COURT:  Let me say, my question is:

17:46:03  21  Regardless of how well you think I've connected the

17:46:08  22  dots, I have at least connected the dots?  I don't want

17:46:12  23  to be in a situation where the Court comes back and

17:46:15  24  said, Judge, you didn't think about this.   As I

17:46:17  25  understand it, I considered the nature and circumstance

17:46:20  1   of the offense; I believe I have.  It encompasses the

17:46:24  2   history and characteristics; I believe I have.  The need

17:46:26  3   for the sentence being imposed, in light of the

17:46:28  4   seriousness of the offense, to provide respect for the

17:46:33  5   law, provide a just sentence, provided a deterrence,

17:46:36  6   both individual and public, protect the public, and

17:46:39  7   provide the defendant with educational and or vocational

17:46:44  8   training or medical care.

17:46:47  9          MR. SOFER: Certainly that --

17:46:50  10          THE COURT:  Let me put it this way.  Have I

17:46:52  11  properly recited the facts?

17:46:54  12          MR. SOFER:  Yes, Your Honor.

17:46:56  13          THE COURT:  I understand.  No one is happy

17:46:57  14  with the application, I'm sure.

17:46:59  15          Mr. Hartman, have I properly taken into --

17:47:03  16  have I taken into consideration the factors that I need

17:47:06  17  to take into consideration?

17:47:08  18          MR. HARTMAN:  I believe you have, Judge.

17:47:10  19          THE COURT:  Does any party have any

17:47:12  20  objection to any part of the proceedings that hasn't

17:47:15  21  previously been made?

17:47:18  22          MR. BOSS:  May we have a moment, Judge?

17:47:20  23          THE COURT:  Of course.

17:47:38  24          (Discussion had off the record.)

17:47:38  25          THE COURT:  I do know I have that motion and

17:47:41  1  recommendation.  I will turn to that in a moment.

17:47:46  2          So any objection to any part of the

17:47:47  3  proceedings?  Take your time.

17:47:50  4          MR. HARTMAN:  Thank you.

17:48:29  5          (Discussion had off the record.)

17:48:29  6          MR. HARTMAN:  Your Honor, for purposes of

17:48:31  7  the record, we would renew our previous objections to

17:48:33  8  the extent we haven't done that, just to make sure.

17:48:37  9          THE COURT:  I deem your objections to have

17:48:39  10  been made, heard, taken into consideration, and

17:48:42  11  overruled.  To the extent that I didn't do so

17:48:45  12  expressly, I deem all the previously made objections

17:48:48  13  renewed and overruled.

17:48:51  14          Let me ask this:  There's a pending motion

17:48:54  15  that Mr. El-Hindi serve the balance of his term -- I

17:49:00  16  obviously expect and recommend, certainly, that he be

17:49:03  17  given full credit for the time, three years and eight

17:49:06  18  months, he spent in custody, if I count correctly,

17:49:12  19  particularly if his behavior continues to be exemplary.

17:49:15  20  About nine years left to go?  Whatever.  About.

17:49:20  21          MR. HARTMAN:  I think maybe a little less

17:49:23  22  than that with good time.  8.1 with the halfway house.

17:49:29  23          THE COURT:  If you want to make the same

17:49:31  24  motion that Mr. Amawi's counsel did, halfway house

17:49:33  25  placement under the Safety Valve --

17:49:36  1          MR. BOSS:  We do.

17:49:37  2          THE COURT:  For the same reasons stated in

17:49:39  3  response to that motion, that will be overruled.   I'm

17:49:42  4  going to leave that to the Bureau of Prisons.

17:49:45  5          MR. HARTMAN:  I understand.

17:49:51  6          THE COURT:  In what locale does Mr. El-Hindi

17:49:55  7  presently desire to serve the balance of the term?   If

17:50:16  8  you want to consult with him for a bit.

17:50:18  9          MR. HARTMAN:  Your Honor, we have two

17:50:20  10  issues; one is staying close to this general area for

17:50:24  11  the purposes of appeal so he's available, and the

17:50:29  12  balance of the term we would request a facility as close

17:50:32  13  to Syracuse, New York as possible.

17:50:35  14          THE COURT:  I'm not sure I can make a split

17:50:38  15  recommendation.   And certainly, in this kind of case,

17:50:44  16  whatever recommendation I make might carry less weight.

17:50:48  17  But let me say this: in light of the references that

17:50:51  18  have been made to Mr. El-Hindi's conduct while in

17:50:56  19  detention, both during the period of isolation, solitary

17:51:01  20  confinement, de minimus control, whatever you want to

17:51:06  21  call it, and also the period of incarceration in the

17:51:11  22  federal detention center, I would hope that the Bureau

17:51:14  23  of Prisons would look past sort of automatically -- not

17:51:17  24  automatically, but the applied criminal history category

17:51:19  25  and the guideline sentence and say, wait a minute; let's

17:51:23  1    look at this man and see if it's safe for the rest of

17:51:26  2    the inmate population for him to be in something other

17:51:29  3    than a maximum security facility or whatever.

17:51:33  4    Particularly with regard to the period which he'll be

17:51:37  5    working on appeal, I would hope that the Bureau of

17:51:41  6    Prisons will accommodate you and ultimately the interest

17:51:43  7    of all of us to see to it that what we have to pay you

17:51:47  8    to accomplish that are diminished.   But also simply to

17:51:51  9    enable you to more effectively and efficiently represent

17:51:54  10   your client.   I have absolutely no control over that.

17:51:57  11   But I make that recommendation willingly.

17:52:00  12            I also acknowledge the Bureau, so far as I'm

17:52:03  13   aware, has undertaken to accommodate Mr. El-Hindi as far

17:52:08  14   as I'm aware.   It's in an entirely different situation

17:52:10  15   than Mr. Amawi.   He never protested coming to court

17:52:13  16   that I can recall.

17:52:14  17            MR. HARTMAN:   I would ask that the Court

17:52:16  18   recommend that he stay at Milan, just that simply, at

17:52:20  19   the Federal Correction Center in Milan.

17:52:23  20            THE COURT:   I have no idea the extent to

17:52:26  21   which when somebody's in custody whether they take that

17:52:29  22   into consideration and they make their transfers and all

17:52:32  23   of that.

17:52:34  24            MR. SOFER: My understanding from talking to

17:52:36  25   the marshals is once they're in BOP custody, as you have

17:52:40  1   said many times, they run their facilities; they run

17:52:43  2   them according to their rules and regulations.  They

17:52:46  3   certainly, I'm sure, would pay attention to a District

17:52:49  4   Court's recommendation.  My understanding from talking

17:52:51  5   to the marshals is nobody has ever been afforded this

17:52:54  6   kind of particular accommodation here in Toledo.

17:52:59  7              MR. HARTMAN:  But there isn't a rule or

17:53:01  8   statute.

17:53:02  9              THE COURT:  I will say I have a hunch that

17:53:04  10  they haven't had the time that they've had to become

17:53:07  11  acquainted with Mr. El-Hindi that they have.  But it's

17:53:11  12  up to them.  Okay.  I believe I've granted your motion

17:53:16  13  to express my views in that regard.

17:53:19  14              Mr. El-Hindi, you have the absolute right to

17:53:21  15  appeal both your conviction and your sentence.  I

17:53:24  16  recommend that you undertake to do so.  Talk it over

17:53:27  17  with Mr. Hartman and Mr. Boss.  If grounds to appeal

17:53:31  18  appear to exist, have him file a notice of appeal on

17:53:34  19  your behalf within ten days.  If you fail to file a

17:53:37  20  timely notice of appeal, you will lose forever whatever

17:53:41  21  right you would otherwise have to challenge either your

17:53:43  22  conviction or sentence by way of direct appeal,

17:53:46  23  postconviction relief, habeas corpus, or otherwise.  Do

17:53:49  24  you understand?

17:53:51  25              THE DEFENDANT:  Yes, I do.

17:53:51   1          THE COURT:  As I say, you have the absolute

17:53:53   2   right to be represented by counsel on appeal.  In

17:53:57   3   consultation with your attorneys it's up to you whether

17:54:00   4   your current attorneys, whether you want them to

17:54:02   5   continue to represent you, or you would like to have

17:54:05   6   somebody take their place.  That's a judgment for you

17:54:07   7   to make.  You alone can determine whom you want to have

17:54:11   8   represent you.  I think, quite candidly, you've been

17:54:16   9   extraordinarily well represented by both Mr. Hartman and

17:54:19  10   Mr. Boss throughout the entire course of these

17:54:21  11   proceedings.  That's not to deter you from making any

17:54:24  12   judgment. And Mr. El-Kamhawy, of course.  But I want

17:54:28  13   to make clear if you want somebody else to represent

17:54:32  14   you, let them know, and they will see to it that that

17:54:35  15   happens.

17:54:35  16          Anything further from the government?

17:54:38  17          MR. HERDMAN:  No, Your Honor.

17:54:39  18          MR. HARTMAN:  No, Your Honor.

17:54:41  19          THE COURT:  That will conclude this

17:54:42  20   proceeding.

          21                        -  -  -

          22

          23

          24

          25

1             **C E R T I F I C A T E**

2

3     I certify that the foregoing is a correct transcript

4  from the record of proceedings in the above-entitled

5  matter.

6

7  /s Tracy L. Spore_____       _____

8  Tracy L. Spore, RMR, CRR          Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 I N D E X

2    MANAL EL-HINDI, DIRECT EXAMINATION         47

3    BY MR. BOSS:

4    MOHAMMED OTHMAN EL-HINDI, DIRECT EXAMINATION    61

5    BY MR. BOSS:

6    MOHAMMED OTHMAN EL-HINDI, CROSS-EXAMINATION    69

7    BY MR. GETZ:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25